UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| EDUARDO GARZA MORA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 05-1651-RCL |
| | ) |
| THE GILLETTE COMPANY, | ) |
| | ) |
| | ) |
| Defendant. | ) |

_____)

**STATEMENT OF THE MATERIAL FACTS
OF RECORD AS TO WHICH THERE IS
NO GENUINE ISSUE TO BE TRIED**

Pursuant to Local Rule 56.1, and in support of its Motion for Summary Judgment, The

Gillette Company ("Gillette" or the "Defendant") submits this statement of material facts of

record as to which there is no genuine issue to be tried.[1]

**Background**

1.      Gillette is a for-profit corporation with its principal place of business in Boston,

Massachusetts.  See Complaint at ¶ 4; Answer at ¶ 4.  Gillette is engaged in the business of

developing, manufacturing, and distributing a variety of consumer products.

---

[1] Record citations referenced herein correspond to the pleadings on file with the Court, the transcripts of the depositions of Plaintiff Eduardo Garza Mora (Plaintiff Dep. I and Plaintiff Dep. II); Asad Husain (Husain Dep.); and Claudio Ruben (Ruben Dep.); and the Affidavits of Charles Cramb (Cramb Aff.), Claudio Ruben (Ruben Aff.), Kevin Baker (Baker Aff.) and Asad Husain (Husain Aff.).  For the Court's convenience, the transcripts, affidavits, along with the exhibits to each, are collected in Defendant's Appendix to Summary Judgment Materials, filed concurrently herewith.  The facts set forth in the following Local Rule 56.1 Statement are conceded for purposes of summary judgment only, Gillette reserves all rights to contest the factual allegations made by the Plaintiff during any trial that may eventuate in this case.

2.      Plaintiff Eduardo Garza Mora ("Mr. Garza" or "Plaintiff") was employed by Gillette from 1987 until October 31, 2005.  See Complaint at ¶ 7; Answer at ¶ 7; Ex. 1, Plaintiff Dep. I at 9.  During this time, Plaintiff held various positions within Gillette's finance organization at the Company's corporate headquarters in Boston, and at several other locations outside of the United States, including Mexico, Colombia, and Turkey.  See Ex. 1, Plaintiff Dep. I at 29-61; Ex. 9, Plaintiff Dep. I, Exh. 1.  Plaintiff's country of origin is Mexico.  See Complaint at ¶ 1.

3.      Charles Cramb ("Mr. Cramb") was employed by Gillette from 1970 until October 31, 2005.  From 1997 to 2005, Mr. Cramb served as Chief Financial Officer and Senior Vice President of the Company.  See Ex. 5, Cramb Aff. at ¶¶ 1, 3.  Mr. Cramb's country of origin is the United States.  See Ex. 5, Cramb Aff. at ¶ 1.

4.      Claudio Ruben ("Mr. Ruben") was employed by Gillette from 1971 until May 1, 2004.  See Ex. 4, Ruben Dep. at 11-12; 131.  From 2000 to May 1, 2004, Mr. Ruben served as Vice President and Controller of Gillette.  See Ex. 6, Ruben Aff. at ¶ 6.  Mr. Ruben's country of origin is Argentina.  See  Ex. 6, Ruben Aff. at ¶ 1.

5.      Asad Husain ("Mr. Husain") has been employed by Gillette since October of 1989.  See Ex. 3, Husain Dep. at 9.  From June of 2002 to July 12, 2004, Mr. Husain served as the Director of Human Resources for Corporate Human Resources.  See id. at 29-30; Ex. 8, Husain Aff. at ¶ 3.  From July 12, 2004 to January 1, 2006, Mr. Husain served as the Vice President of Human Resources for Corporate Human Resources.  See Ex. 8, Husain Aff. at ¶ 4.  From January 1, 2006 to the present, Mr. Husain has served as the Director of Human Resources, Gillette, Global Business Unit.  See Ex. 8, Husain Aff. at ¶ 6.  In these roles, Mr. Husain

provided human resources support for Gillette's finance organization. <u>See</u> <u>Ex. 8, Husain Aff.</u> at ¶ 5.  Mr. Husain's country of origin is Pakistan.  <u>See</u> <u>Ex. 8, Husain Aff.</u> at ¶ 7.

6.    Kevin Baker has been employed by Gillette since 1982.  He plans to leave the Company on August 31, 2006.  <u>See</u> <u>Ex. 7, Baker Aff.</u> at ¶ 1.  From February 2000 to February 2003, Mr. Baker served as the Finance Director for European Commercial Operations.  <u>Id</u>. ¶ 3.  From February 2003 to the present, he has served as the Vice President of Gillette Financial Shared Services.  <u>Id</u>. at ¶ 4.  Mr. Baker's country of origin is the United States.  <u>Id</u>. ¶ 1.

<b><u>Plaintiff's Employment History</u></b>

7.    During his seventeen years of employment at Gillette, Plaintiff received "exceptional" and "positive" performance evaluations, was repeatedly promoted, and rapidly advanced to an executive level within Gillette's finance organization.  <u>See</u> <u>Ex. 1, Plaintiff Dep. I</u> at 29-61; <u>Ex. 1, Plaintiff Dep. I, Exh. 1</u>; <u>Complaint</u> at ¶¶ 19-24, 28, 45, 47.

8.    From November 1987 until December 1990, Plaintiff was employed as a Business Planning Manager for Gillette Mexico.  This position was located in Mexico.  <u>See</u> <u>Ex. 1, Plaintiff Dep. I</u> at 29; <u>Ex. 9, Plaintiff Dep. I, Exh. 1</u>.  Claudio Ruben interviewed Plaintiff and made the decision to hire him for this position.  <u>See</u> <u>Ex. 4, Ruben Dep.</u> at 37-38.

9.    From 1991 to 1993, Plaintiff was employed as Senior Financial Analyst for Gillette International.  This position was located in Boston, Massachusetts.  <u>See</u> <u>Ex. 1, Plaintiff Dep. I</u> at 31-32; <u>Ex. 9, Plaintiff Dep. I, Exh. 1</u>.

10.    In February of 1993, Plaintiff was promoted to the position of Financial Planning Manager for Gillette International.  This position was located in Boston, Massachusetts.  <u>See</u> <u>Ex. 1, Plaintiff Dep. I</u> at 38; <u>Ex. 9, Plaintiff Dep. I, Exh. 1</u>.

11.     In November of 1993, Claudio Ruben offered Plaintiff the opportunity to become the Finance Controller of Gillette Colombia, a significant promotion for him.  See Ex. 1, Plaintiff Dep. I at 42-48; Ex. 9, Plaintiff Dep. I, Exh. 1; Ex. 4, Ruben Aff. at ¶ 5.  Plaintiff held this position from 1993 to 1998.  Id.  During this time, Plaintiff was located in Colombia.  See Ex. 1, Plaintiff Dep. I at 43.

12.     In March of 1998, Charles Cramb appointed Plaintiff to become the Director of Finance for Gillette Turkey & the Mediterranean.  See Ex. 1, Plaintiff Dep. I at 48-49.

13.     In February of 1999, Plaintiff was promoted to the position of Finance Director of Gillette Mexico and Central America, which was a Grade 21 position.  See Ex. 1, Plaintiff Dep. I at 51; Ex. 9, Plaintiff Dep. I, Exh. 1.  Plaintiff held this position until March of 2002.  See Ex. 9, Plaintiff Dep. I, Exh. 1.  During this time, Plaintiff was located in Mexico.  See Ex. 8, Husain Aff. at ¶ 11.

### Plaintiff Is Selected to Be Director of Project Renaissance by Mr. Cramb and Mr. Ruben.

14.     In early 2002, Charles Cramb and Claudio Ruben spearheaded a project, named Project Renaissance, designed to overhaul the financial reporting and planning functions throughout Gillette's global finance organization.  See Ex. 5, Cramb Aff. at ¶ 4; Ex. 6, Ruben Aff. at ¶ 7.

15.     The purpose of Project Renaissance was to standardize financial planning and reporting systems across Gillette's global operations and to transform different systems in different operations to one global system.  See Ex. 5, Cramb Aff. at ¶ 4; Ex. 4, Ruben Dep. at ¶ 48-49; Ex. 6, Ruben Aff. at ¶ 7; Ex. 1, Plaintiff Dep. I at 63-64; 74-75.

16.     Project Renaissance was a highly significant and visible financial project and was considered by Charles Cramb to be one of the most important financial projects for Gillette in the

last decade.  See Ex. 5, Cramb Aff. at ¶ 5; Ex. 6, Ruben Aff. at ¶ 7; Ex. 1, Plaintiff Dep. I at 63-64.

17.     In early 2002, Mr. Cramb appointed Claudio Ruben to lead Project Renaissance as part of his duties as Controller.  See Ex. 5, Cramb Aff. at ¶ 6; Ex. 6, Ruben Aff. at ¶ 8.  In his role as Controller, Mr. Ruben reported directly to Mr. Cramb.  Mr. Ruben did not receive an increase in position grade or salary in connection with his appointment to Project Renaissance; he also did not receive stock options, bonuses or any other form of compensation or benefits in connection with this appointment.  See Ex. 4, Ruben Dep. at 65-66; Ex. 6, Ruben Aff. at ¶ 9.

18.     Gillette planned to redesign and overhaul the IT infrastructure of financial reporting and planning in connection with Project Renaissance.  The application development work related to Project Renaissance was a major element of the project and was the responsibility of the IT organization.  As a result, the Chief Information Officer of the Company, Kathy Lane, also had a significant leadership role in Project Renaissance.  Ms. Lane reported directly to James Kilts, CEO of Gillette, and was Mr. Cramb's peer.  See Ex. 5, Cramb Aff. at ¶ 9.

19.     Ms. Lane appointed Lem Lanier to lead the IT portion of Project Renaissance.  Mr. Lanier reported directly to Ms. Lane.  Mr. Cramb was not involved in the decision to appoint Mr. Lanier to Project Renaissance; nor was he involved in evaluating Mr. Lanier's performance on Project Renaissance.  Likewise, Mr. Cramb did not have the authority to remove Mr. Lanier from Project Renaissance.  See Ex. 5, Cramb Aff. at ¶ 9.

20.     In approximately February/March of 2002, Mr. Cramb and Mr. Ruben sought to appoint a Director for Project Renaissance who would report to Claudio Ruben and assist him in

leading this major new project.  See Ex. 5, Cramb Aff. at ¶ 7; Ex. 4, Ruben Dep. at 54-58; Ex. 6, Ruben Aff. at 11.

21.     In April 2002, Mr. Cramb and Mr. Ruben selected Plaintiff for the position of Director of Project Renaissance because of his experience and track record of success and positive results in prior assignments.  See Ex. 5, Cramb Aff. at ¶ 8; Ex. 4, Ruben Dep. at ¶ 56-58; Ex. 1, Plaintiff Dep. I at 62-64; Ex. 6, Ruben Aff. at ¶ 12.  Mr. Cramb believed that the Renaissance role would provide Plaintiff with an excellent opportunity to increase his visibility within the finance organization.  See Ex. 5, Cramb Aff. at ¶ 8.

22.      In connection with his appointment to the Project Renaissance position, Plaintiff and his family were relocated from Mexico to Boston in the summer of 2002.  See Ex. 1, Plaintiff Dep. I at 64; Ex. 8, Husain Aff. at ¶ 13.

23.     Gillette provided Plaintiff with a localization package of over $200,000 in funds, over and above his salary and benefits, to facilitate a home purchase in the Boston area.  See Ex. 8, Husain Aff. at ¶ 14; Ex. 8, Husain Aff., Exh. 1.  Gillette also agreed to pay the legal fees and other expenses associated with Plaintiff and his family obtaining green cards and resident status in the United States.  See Ex. 8, Husain Aff. at ¶ 15.

24.     In addition, in connection with his localization, Mr. Garza's salary was converted from Mexican pesos to U.S. dollars utilizing a range to range methodology.  His base salary in Mexican pesos was not increased prior to converting his salary to U.S. dollars.  See Ex. 8, Husain Aff. at ¶ 15; Ex. 8, Husain Aff., Exh. 1.

25.     At his deposition, Plaintiff admitted that he did not negotiate or ask for a pay increase in connection with his appointment to Project Renaissance.  See Ex. 1, Plaintiff Dep. I at 91.

26.     Plaintiff was offered the Director of Project Renaissance position at a grade 21. See Ex. 1, Plaintiff Dep. I at 61, 65.

## Project Renaissance

27.     The original budget for Project Renaissance was approximately $50.1 Million. See Ex. 2, Plaintiff Dep. II at 243; Ex. 10, Plaintiff Dep. II, Exh. 15; Ex. 5, Cramb Aff. at ¶ 39; Ex. 4, Ruben Dep. at 82; Ex. 6, Ruben Aff. at ¶ 39.

28.     The ultimate customer or consumer of Project Renaissance's deliverables was the Financial Leadership Team ("FLT"), which was comprised of approximately 18 senior members of the finance organization across Gillette's global operations.  See Ex. 6, Ruben Aff. at ¶ 13. The FLT was involved in defining the parameters for Project Renaissance and contributed resources to the project.  While the changes implemented by Project Renaissance would impact many areas of Gillette's operations, the results would most directly affect the FLT and the global finance organization.  See Ex. 5, Cramb Aff. at ¶ 10.

29.     At the time of the project's infancy and throughout its development, Joe Schena, Vice President & Controller; Rick Lees, Vice President of Finance; and Kevin Baker, Vice President for Gillette Financial Shared Services; and Ian Lee-Leviten, Vice President of Productivity, among others, were members of the FLT.  See Ex. 5, Cramb Aff. at ¶ 11; Ex. 6, Ruben Aff. at ¶ 14; Ex. 8, Husain Aff. at ¶ 18.

30.     The Renaissance team provided updates to the FLT regarding the status of the project at quarterly leadership meetings and also through regular email communications.  Also, beginning in 2003 and continuing throughout the duration of the project, Mr. Ruben, Plaintiff, and other members of the Renaissance team periodically delivered presentations regarding the design and status of Project Renaissance to the FLT and to Gillette's various operating

committees throughout the world.  See Ex. 5, Cramb Aff. at ¶ 12; Ex. 6, Ruben Aff. at ¶ 15; Ex. 7, Baker Aff. at ¶ 8; Ex. 8, Husain Aff. at ¶ 19.

31.     In early 2003, Mr. Cramb and Mr. Ruben became concerned that Mr. Garza was not demonstrating an effective leadership style and was alienating members of his team, members of the FLT and members of the IT organization with whom he had to work.  See Ex. 5, Cramb Aff. at ¶ 13; Ex. 6, Ruben Aff. at ¶ 16.

32.     In approximately early 2003, after observing Plaintiff make presentations to a number of audiences, Mr. Cramb and Mr. Ruben determined that Plaintiff needed to improve his executive presence, presentation skills, and public persona.  See Ex. 5, Cramb Aff. at ¶ 14; Ex. 6, Ruben Aff. at ¶ 17; Ex. 4, Ruben Dep. at 85-86; 97-101.

33.     In early 2003, at Mr. Cramb and Mr. Ruben's suggestion, Gillette hired an executive coach, Alexander Caillet, to work with Plaintiff in developing his executive presence, public persona, oral and written communication skills, and management style.  See Ex. 8, Husain Aff. at ¶ 22; Ex. 4, Ruben Dep. at 85-86; Ex. 1, Plaintiff Dep. I at 119-120; Ex. 6, Ruben Aff. at ¶ 18; Ex. 5, Cramb Aff. at ¶ 15.

## May 1, 2003 Incident Involving Gary Piscatelli

34.     During a Project Renaissance team meeting on or about May 1, 2003, Gary Piscatelli, Plaintiff's subordinate, became angry when he was asked a question by Claudio Ruben regarding the project.  Mr. Piscatelli made an inappropriate comment (which had nothing whatsoever to do with Mr. Ruben's or anyone else's national origin), slammed his fist on the table, and left the room.  See Ex. 1, Plaintiff Dep. I at 141-143; Ex. 4, Ruben Dep. at 133-134; Ex. 6, Ruben Aff. at ¶¶ 19-21.

35.    Directly after the May 1, 2003 meeting, Mr. Ruben and Plaintiff went to speak with Mr. Cramb about how they should respond to Mr. Piscatelli's inappropriate behavior.  See Ex. 1, Plaintiff Dep. I at 151; Ex. 4, Ruben Dep. at 136-140; Ex. 6, Ruben Aff. at ¶ 22.  Mr. Husain also attended the meeting.  See Ex. 4, Ruben Dep. at 136-139; Ex. 8, Husain Aff. at ¶ 23.

36.    During this meeting, Plaintiff never reported to Mr. Ruben, Mr. Cramb or Mr. Husain that he believed that Mr. Piscatelli's inappropriate behavior at the May 2003 meeting was motivated by discriminatory animus or dislike of Mexicans or Latinos.  See Ex. 6, Ruben Aff. at ¶ 23; Ex. 5, Cramb Aff. at ¶ 18; Ex. 8, Husain Aff. at ¶ 25.

37.    At this meeting, Mr. Ruben, Mr. Garza and Mr. Cramb discussed that Mr. Piscatelli's behavior could be grounds for termination.  See Ex. 6, Ruben Aff. at ¶ 24; Ex. 5, Cramb Aff. at ¶ 19; Ex. 8, Husain Aff. at ¶ 26.  The decision as to what discipline should be imposed upon Mr. Piscatelli was left to Mr. Ruben's discretion.  At this meeting, Mr. Ruben, and Plaintiff decided to fire Mr. Piscatelli.  See Ex. 4, Ruben Dep. at ¶ 139; Ex. 1, Plaintiff Dep. I at 151.

38.    On or about May 2, 2003, Mr. Schena informed Mr. Ruben that he had received a call from Mr. Piscatelli, who had expressed to him that he was very embarrassed by his outburst and remorseful that he had treated Mr. Ruben with disrespect.  See Ex. 6, Ruben Aff. at ¶ 25.

39.    On or about May 3, 2003, Mr. Piscatelli apologized to Mr. Ruben for his inappropriate behavior.  See Ex. 6, Ruben Aff. at ¶ 26.

40.    After discussing the matter further with Mr. Cramb and Mr. Schena, Mr. Ruben decided that Mr. Piscatelli should not be fired because he was very apologetic and under a lot of pressure on the project.  See Ex. 4, Ruben Dep. at 140-143; Ex. 6, Ruben Aff. at ¶ 27.

41.     Mr. Schena and Mr. Cramb expressed to Mr. Ruben that the decision as to how to respond to Mr. Piscatelli's inappropriate behavior was entirely Mr. Ruben's.  See Ex. 6, Ruben Aff. at ¶ 27; Ex. 5, Cramb Aff. at ¶ 21.

42.     Mr. Ruben does not believe that Mr. Piscatelli's inappropriate behavior at the meeting had anything to do with his or anyone else's national origin or the fact that he is Latino. See Ex. 6, Ruben Aff. at ¶ 21.

### Plaintiff is Not Selected as a Next Generation Leader.

43.     In approximately August of 2003, the FLT held its annual talent review process which consisted of a two and a half day meeting during which the team assessed the performance, potential and development needs of all finance employees who held positions at a Grade 18 or higher.  See Ex. 6, Ruben Aff. at ¶ 28; Ex. 4, Ruben Dep. at 150-156; Ex. 8, Husain Aff. at ¶ 28; Ex. 5, Cramb Aff. at ¶ 22.

44.     Beginning in 2003, Gillette implemented a new program, the "Next Generation Leader" program, as part of its talent review process.  See Ex. 6, Ruben Aff. at ¶ 29; Ex. 8, Husain Aff. at ¶ 29; Ex. 1, Plaintiff Dep. I at 113-114; Ex. 5, Cramb Aff. at ¶ 23.

45.     During the annual talent review process and as part of this new program, the FLT identified individuals who, based on their performance and demonstrated potential, were expected to take on senior leadership roles within Gillette's finance organization in the future. These individuals were designated as Next Generation Leaders ("NGLs").  See Ex. 6, Ruben Aff. at ¶ 30; Ex. 4, Ruben Dep. at 151-153; Ex. 8, Husain Aff. at ¶ 30; Ex. 5, Cramb Aff. at ¶ 24.

46.     Individuals who were designated as NGLs did not receive raises, bonuses or stock options as a result of this designation.  See Ex. 6, Ruben Aff. at ¶ 31; Ex. 4, Ruben Dep. at 153-154; Ex. 1, Plaintiff Dep. I at 114.

47.    During the 2003 talent review process, Claudio Ruben did not propose that Plaintiff be designated as an NGL.  Mr. Ruben had determined that Plaintiff's performance on Project Renaissance did not warrant designation as an NGL because from early 2003 until the talent review meeting, Plaintiff had continued to struggle with his leadership skills, communication style, and executive presence.  Specifically, Mr. Garza was unable to express his ideas in a clear, concise and understandable manner at the various meeting and presentations that the Renaissance team conducted related to the project.  He also assumed a passive role at meetings with his team and with the FLT, causing some members of the FLT to question his leadership abilities and skills.  See Ex. 4, Ruben Dep. at 155-156; Ex. 6, Ruben Aff. at ¶ 32.

48.    During the 2003 talent review meeting, Mr. Cramb expressed concerns about Plaintiff's competency and leadership on Project Renaissance.  See Ex. 5, Cramb Aff. at ¶ 26; Ex. 3, Husain Dep. at 125-127.

49.    During the 2003 talent review meeting, no member of the FLT expressed the opinion that Plaintiff should be designated as an NGL during the discussions of his performance. See Ex. 6, Ruben Aff. at ¶ 33; Ex. 5, Cramb Aff. at ¶ 27; Ex. 8, Husain Aff. at ¶ 33.  To the contrary, several members of the FLT expressed concern about Plaintiff's performance on Project Renaissance, including his leadership abilities.  Ex. 5, Cramb Aff. at ¶ 27.

50.    Unlike Plaintiff, employees who were designated as NGLs were recommended to be designated as such by their immediate supervisors and regional and/or divisional managers and were finally approved by the FLT.

51.    The FLT designated Jose Uribe as an NGL in 2003.  Mr. Uribe's country of origin is Mexico.  See Ex. 8, Husain Aff. at ¶ 34.

52.     In addition, in 2003, out of the 93 employees designated by the FLT to be NGLs, 13 were Latino.

53.     In August of 2003, Plaintiff was informed by his supervisor, Claudio Ruben, that he had not been identified as a Next Generation Leader.  See Complaint at ¶ 2003; Ex. 1, Plaintiff Dep. I at 112-113.

### Gillette Hires Glenn Brack to be Vice President, Oral Care in 2004.

54.     During the annual talent review meeting, the members of the FLT also discussed whether there were any internal candidates who could fill a vice president position in the near future.  At the time, this was a hypothetical discussion as there was no open vice president position.  See Ex. 8, Husain Aff. at ¶ 37; Ex. 5, Cramb Aff. at ¶ 28.

55.     Because Plaintiff was in the midst of leading one of the most important and visible financial projects at Gillette at the time, he was not considered a viable candidate for a vice president position in the near term.  See Ex. 8, Husain Aff. at ¶ 38; Ex. 5, Cramb Aff. at ¶ 29.  In addition, in Mr. Cramb's opinion, Plaintiff's performance on Project Renaissance did not warrant consideration for a vice president role.  Ex. 5, Cramb Aff. at ¶ 29.

56.     At the annual talent review meeting, the FLT concluded that there were no internal candidates who could move to a vice president position in the near term.  Some candidates were not considered qualified for the position because of their lack of experience or competency; others were not considered viable candidates because of timing, i.e., their existing projects required their continuing participation for a substantial amount of time.  See Ex. 8, Husain Aff. at ¶ 39; Ex. 5, Cramb Aff. at ¶ 30.

57.     In the late fall of 2003, the then-Vice President, Finance for the Oral Care Global Business Unit left the Company and the position became vacant.  Because the FLT had

concluded just months before that there was no viable internal candidate for a vice president position in the near future, Mr. Husain began to work with headhunters to recruit an external candidate.  See Ex. 8, Husain Aff. at ¶ 40.

58.    Beginning in the fall of 2003, candidates for this position were interviewed by Charles Cramb, Joe Schena, Claudio Ruben, Ian Lee Leviten, Bruce Cleverly, and Asad Husain. See Ex. 8, Husain Aff. at ¶ 41; Ex. 5, Cramb Aff. at ¶ 32.

59.    In approximately mid-February of 2004, Charles Cramb, Joe Schena, and Bruce Cleverly selected Glenn Brack for the Vice President position.  See Ex. 8, Husain Aff. at ¶ 42; Ex. 5, Cramb Aff. at ¶ 33.

60.    For the next several weeks, Mr. Husain worked with Mr. Cramb, Mr. Schena, Mr. Cleverly, and Glenn Brack to put together a package that would be agreeable to both Gillette and Mr. Brack.  In approximately the first week of March, an agreement was reached on the terms of Mr. Brack's employment.  See Ex. 8, Husain Aff. at ¶ 43; Ex. 5, Cramb Aff. at ¶ 34.

61.    On March 11, 2004, Gillette sent a letter to Mr. Brack, extending him an offer to join Gillette as its Vice President, Finance, Oral Care and detailing the terms and conditions of his employment.  See Ex. 8, Husain Aff. at ¶ 44; Ex. 8, Husain Aff., Exh. 2; Ex. 5, Cramb Aff. at ¶ 35.

62.    Mr. Baker and Mr. Lees were not involved in the decision to hire Glenn Brack for the Vice President position.  See Ex. 8, Husain Aff. at ¶ 46; Ex. 5, Cramb Aff. at ¶ 36; Ex. 7, Baker Aff. at ¶ 9.

**Project Renaissance Experiences Significant Delays
And Is Projected to Run 12 Million Dollars Over Budget**

63.    In approximately the late Fall of 2003, Project Renaissance began to encounter difficulties and experience delays.  See Ex. 6, Ruben Aff. at ¶ 35.

64.     In January of 2004, it became clear that Project Renaissance was not going to meet critical deadlines.  See Ex. 2, Plaintiff Dep. II at 222-223; Ex. 6, Ruben Aff. at ¶ 36; Ex. 5, Cramb Aff. at ¶ 37.

65.     In January 2004, Plaintiff and Mr. Ruben informed Mr. Cramb that Project Renaissance's budget would likely be exceeded by approximately $10 to 12 Million, due in large part to the anticipated delays.  See Ex. 2, Plaintiff Dep. II at 242-243; Ex. 5, Cramb Aff. at ¶ 38; Ex. 6, Ruben Aff. at ¶ 37.

66.     The Renaissance team prepared a chart, providing the details of the projected cost overrun and provided this chart to Mr. Cramb.  See Ex. 2, Plaintiff Dep. II at 242; Ex. 10, Plaintiff Dep. II, Exh. 15; Ex. 5, Cramb Aff. at 40; Ex. 6, Ruben Aff. at ¶ 38.  This chart estimated the budget overrun to be approximately $12.9 Million Dollars.  See Ex. 2, Plaintiff Dep. II at 245; Ex. 10, Plaintiff Dep. II, Exh. 15.

67.     Because the estimated budget overrun for Project Renaissance was likely to exceed $10 Million and was over 20% of the original budget of approximately $50 Million, Mr. Cramb was required to obtain approval for this additional expenditure on the project from the CEO of the Company, James Kilts, the Board of Directors, and the ITAC Committee.  See Ex. 5, Cramb Aff. at ¶ 41; Ex. 4, Ruben Aff. at ¶ 39; Ex. 8, Husain Aff. at ¶ 49.

68.     A few weeks later, in early February of 2004, the Renaissance team determined that the project's "go-live" date would be significantly delayed.  See Ex. 2, Plaintiff Dep. II at 227-228; 231; Ex. 11, Plaintiff Dep. II, Exh. 10; Ex. 12, Plaintiff Dep. II, Exh. 11; Ex. 6, Ruben Aff. at ¶ 40; Ex. 5, Cramb Aff. at ¶¶ 42-43.

69.     The delay in Project Renaissance's "go-live" date was caused in part by delays in the development of another project, referred to as "GPCat." See Ex. 1, Plaintiff Dep. I at 79-81; Ex. 6, Ruben Aff. at ¶ 41.

70.     The goal of the GPCat project was to create a single Global Products Catalogue, which would serve as a repository for all data related to all of Gillette's products worldwide. See Ex. 1, Plaintiff Dep. I at 79-80; Ex. 6, Ruben Aff. at ¶ 41. Project Renaissance's reporting system relied on the completion of the Global Products Catalogue. See Ex. 1, Plaintiff Dep. I at 81; Ex. 4, Ruben Dep at 103-110; Ex. 6, Ruben Aff. at ¶ 41.

71.     In February 2004, Project Renaissance's string testing and integration testing for financial and management reporting were also behind schedule. See Ex. 2, Plaintiff Dep. II at 225-226; Ex. 13, Plaintiff Dep. II, Exh. 9; Ex. 4, Ruben Dep. at 112-114; Ex. 6, Ruben Aff. at ¶ 42. These delays were unrelated to delays with the GPCat project. See Ex. 4, Ruben Dep. at 112-114; Ex. 6, Ruben Aff. at ¶ 42.

72.     In early February of 2004, Plaintiff and other members of the Renaissance Team informed members of the FLT of these delays. See Ex. 2, Plaintiff Dep. II at 230-231; Ex. 11, Plaintiff Dep. II, Exh. 10; Ex. 12, Plaintiff Dep. II, Exh. 11; Ex. 6, Ruben Aff. at ¶ 43.

73.     In early February 2004, after it was clear that Project Renaissance was running significantly over-budget and behind schedule, Plaintiff, Gary Piscatelli, and Joe Robinson recommended to Claudio Ruben and Lem Lanier that a quality and risk management review be conducted on Project Renaissance with the objective of helping the team deliver on its goals in the future. See Ex. 2, Plaintiff Dep. II at 241-242; Ex. 14, Plaintiff Dep. I, Exh. 12; Ex. 4, Ruben Dep. at 118-119; Ex. 6, Ruben Aff. at ¶ 44; Ex. 5, Cramb Aff. at ¶ 43.

74.     Chuck Cramb approved this review and Deloitte Consulting was commissioned to conduct the assessment.  See Ex. 5, Cramb Aff. at ¶ 44; Ex. 1, Plaintiff Dep. I at 236, 241; Ex. 6, Ruben Aff. at ¶ 45.

75.     After conducting its assessment, Deloitte prepared a report, dated March 15, 2004 (the "Deloitte Report"), which provided conclusions and recommendations designed to increase the effectiveness with which the Renaissance team operated in the future.  The goal of this report was to ensure that the appropriate organizational structure, management processes, and expertise were in place prior to the execution of comprehensive testing and issues resolution.  See Ex. 1, Plaintiff Dep. I, Exh. 16; Ex. 5, Cramb Aff. at ¶ 45; Ex. 6, Ruben Aff. at ¶ 46.

76.     In this report, Deloitte concluded that the Project Renaissance team "has not, and does not currently, operate in an environment that facilitates efficient and effective execution and has also not uniformly produced high quality deliverables."  See Ex. 15, Plaintiff Dep. II, Exh. 16 at 6.  Among other shortcomings, Deloitte found that Plaintiff and other team members' roles seemed "highly redundant" and "top heavy."  See Ex. 15, Plaintiff Dep. II, Exh. 16 at 6.

77.     To remedy these problems, Deloitte recommended, among other things, that Gillette "identify and empower a single project leader for the entire project" who would have "complete authority over the entire project and all work threads – e.g., IT, Business, Change, Business Case."  See Ex. 15, Plaintiff Dep. II, Exh. 16 at 9; Ex. 8, Husain Aff. at ¶ 54.

78.     Deloitte also recommended that Gillette "plan on executive intervention for the entire project team" and "employ on-going change management to rectify interaction among all business and IT team members and Project Leaders and Sponsors."  See Ex. 15, Plaintiff Dep. II, Exh. 16 at 9.

79.    Deloitte communicated to Gillette that all recommendations made in its report were mission-critical.  See Ex. 15, Plaintiff Dep. II, Exh. 16 at 13.

### Plaintiff and Mr. Ruben Are Removed from Project Renaissance.

80.    As a result of the delays and budget overruns, and after reviewing the findings and recommendations in the Deloitte Report, Charles Cramb determined that in order for Project Renaissance to succeed, its leadership had to be changed.  Accordingly, in March 2004, Mr. Cramb decided to remove the two leaders of the project, Claudio Ruben and Plaintiff from their positions.  See Ex. 5, Cramb Aff. at ¶ 47; Ex. 8, Husain Aff. at ¶ 55.

81.    In late March, Charles Cramb informed Claudio Ruben that he was removing him from Project Renaissance because it was time for a "change in leadership" on the project.  See Ex. 4, Ruben Dep. at 126-127; Ex. 6, Ruben Aff. at ¶ 47; Ex. 5, Cramb Aff. at ¶ 48.

82.    After being notified of this decision, Mr. Ruben decided to retire from Gillette, effective May 1, 2004.  See Ex. 4, Ruben Dep. at 131; Ex. 6, Ruben Aff. at ¶ 47.  From the end of March 2004 to May 1, 2004, Mr. Ruben continued to perform his other duties as Controller, but no longer worked on Project Renaissance.  See Ex. 4, Ruben Dep. at 131; Ex. 6, Ruben Aff. at ¶ 47.

83.    After the removal of Mr. Ruben, Mr. Cramb appointed a single leader, Joe Schena, to spearhead Project Renaissance.  See Ex. 8, Husain Aff. at ¶ 55; Ex. 5, Cramb Aff. at ¶ 49.

84.    In late March, Plaintiff was informed by Charles Cramb and Asad Husain that he was being removed from Project Renaissance.  See Ex. 1, Plaintiff Dep. I at 158-161; Ex. 8, Husain Aff. at ¶ 58; Ex. 5, Cramb Aff. at ¶ 50.  Mr. Cramb did not replace Plaintiff.  See Ex. 8, Husain Aff. at ¶ 57; Ex. 5, Cramb Aff. at ¶¶ 48-50.

85.     Joe Schena, Rick Lees, and Kevin Baker were not involved in the decision to remove Plaintiff or Mr. Ruben from Project Renaissance.  See Ex. 7, Baker Aff. at ¶ 11; Ex. 5, Cramb Aff. at ¶ 51.  Mr. Ruben was not involved in the decision to remove Plaintiff from Project Renaissance.  See Ex. 6, Ruben Aff. at ¶ 49; Ex. 5, Cramb Aff. at ¶ 51.

86.     At his deposition, Mr. Ruben testified that he believed that he and Plaintiff should have foreseen the delays in GPCat and problems with string testing and that they were accountable for the delays and budget overruns of the project.  See Ex. 4, Ruben Dep. at 126-131.

87.     According to Mr. Ruben, the decision to remove both Plaintiff and himself from Project Renaissance was not motivated by discriminatory animus based on race or national origin.  At his deposition, Mr. Ruben testified that he and Mr. Garza were removed from the project because they, as project leaders, failed to deliver.  See Ex. 4, Ruben Dep. at 127-128.

**Plaintiff is Transferred to a<br>Temporary Position in Gillette Financial Shared Services**

88.     Rather than terminating Plaintiff after his removal from Project Renaissance, Charles Cramb requested that Asad Husain find a temporary assignment for him within the Finance organization.  Mr. Cramb instructed Mr. Husain that Plaintiff's salary and grade should not be reduced in connection with his transfer to this temporary assignment and that he wanted the assignment to continue until Plaintiff and his family were able to obtain their green cards.  Mr. Cramb told Mr. Husain that he expected that Plaintiff would be seeking opportunities outside of Gillette after obtaining his green card.  Mr. Cramb emphasized to Mr. Husain that he wanted to do the "right thing" with respect to Plaintiff because he had been a loyal employee of Gillette for a number of years.  See Ex. 5, Cramb Aff. at ¶ 52; Ex. 8, Husain Aff. at ¶ 58.

89.     Mr. Cramb offered Plaintiff's services to others in the Finance organization for "free," meaning that the expense of employing Plaintiff came out of Mr. Cramb's budget and not out of the budget of the project to which Plaintiff would be assigned.  See Ex. 5, Cramb Aff. at ¶ 53; Ex. 8, Husain Aff. at ¶ 59; Ex. 7, Baker Aff. at ¶ 13.

90.     In approximately late March/early April of 2004, Kevin Baker, Vice President of Financial Shared Services, informed Asad Husain that he could create a temporary role for Plaintiff in the Gillette's Financial Shared Services Center ("FSSC").  See Ex. 8, Husain Aff. at ¶ 60; Ex. 7, Baker Aff. at ¶ 14.

91.     On April 15, 2004, Plaintiff was transferred to the temporary position of Project Director within FSSC, reporting to Kevin Baker.  See Complaint at ¶ 73; Ex. 8, Husain Aff. at ¶ 61; Ex. 7, Baker Aff. at ¶¶ 14-15.

92.     Although the Project Director position created for Plaintiff in FSSC did not involve any supervisory responsibilities and required only grade 16/17 level work and experience, Gillette did not reduce Plaintiff's grade, which was a 21, or Plaintiff's salary (which was $171,00 per annum) in connection with his transfer to this position.  See Ex. 8, Husain Aff. at ¶ 61; Ex. 7, Baker Aff. at ¶ 15.

93.     A few weeks after Plaintiff had joined the FSSC team, in May of 2004, Kevin Baker was required to submit his recommendations to Charles Cramb and Asad Husain as to which members of his team should receive stock options in 2004.  See Ex. 7, Baker Aff. at ¶ 15; Ex. 8, Husain Aff. at ¶ 63.

94.     Under Gillette's policies, stock options are granted to employees to provide them with an incentive to remain with the Company for the long term and to reward good performance.  See Ex. 7, Baker Aff. at ¶ 17.

95.     Because of the likelihood that Plaintiff would be exiting the Company in the near future and the fact that his assignment to FSSC was temporary, Mr. Baker did not recommend Plaintiff for a stock option award in 2004.  See Ex. 7, Baker Aff. at ¶ 18; Ex. 8, Husain Aff. at ¶ 64.

96.     Asad Husain, Charles Cramb, Joe Schena, and Ian Lee-Leviten agreed with Mr. Baker's recommendation that Plaintiff should not receive stock options in 2004 because of his likely exit from Gillette in the near future and his poor performance on Project Renaissance.  See Ex. 7, Baker Aff. at ¶ 19; Ex. 8, Husain Aff. at ¶ 65; Ex. 5, Cramb Aff. at ¶ 57.

97.     On other occasions, Mr. Baker has not recommended a stock option award for employees who planned or were expected to leave the Company.  For example, Mr. Baker did not recommend Charles Harvey for stock options when he had reason to believe that he would be leaving the Company in the near future.  Simon Lee, another finance employee, also did not receive stock options one year as he was expected to be leaving the company.  Charles Harvey is a Caucasian male whose country of national origin is the United States.  Simon Lee is a Caucasian male whose country of national origin is the United Kingdom.  See Ex. 7, Baker Aff. at ¶ 20.

**Plaintiff's 2004 Performance Evaluation**

98.     In February 2005, Joe Schena and Kevin Baker jointly drafted Plaintiff's performance evaluation for 2004.  See Ex. 7, Baker Aff. at ¶ 23; Ex. 8, Husain Aff. at ¶ 66.

99.     Mr. Schena, with input from, and the approval of, Charles Cramb, evaluated Plaintiff's performance on Project Renaissance during the first quarter of 2004.  See Ex. 2, Plaintiff Dep. II at 249; Ex. 5, Cramb Aff. at ¶ 59; Ex. 8, Husain Aff. at ¶ 67.  Kevin Baker

evaluated Plaintiff's performance as Project Director in FSSC during the remainder of 2004.  Ex. 8, Husain Aff. at ¶ 67; Ex. 7, Baker Aff. at ¶ 24.

100.    Mr. Cramb and Mr. Husain determined that because Mr. Schena had replaced Mr. Ruben as leader of the project and had observed Plaintiff's performance in 2004 as a member of the FLT, he was the most appropriate person to review Plaintiff's performance for this time period with input and approval from Mr. Cramb.  See Ex. 5, Cramb Aff. at ¶ 60; Ex. 8, Husain Aff. at ¶ 67.

101.    Joe Schena gave Plaintiff an "Unacceptable" rating for his performance on Project Renaissance during 2004.  See Ex. 5, Cramb Aff. at ¶ 61; Ex. 8, Husain Aff. at ¶ 68.  Mr. Cramb reviewed and endorsed Mr. Schena's grading of, and comments regarding, Plaintiff's performance.  See Ex. 5, Cramb Aff. at ¶ 62.

102.    Kevin Baker determined that Plaintiff's performance in his Project Director role in FSSC warranted a solid "Meets Expectations" rating.  Mr. Baker noted, however, that Plaintiff's FSSC role involved no supervisory responsibility and required work at a grade level lower than that of the grade 21 position held by Plaintiff.  See Ex. 7, Baker Aff. at ¶ 25.

**Plaintiff's Discussion with Kevin Baker Regarding Promotion to Vice President**

103.    On or about July 13, 2004, Plaintiff had a discussion with his supervisor, Kevin Baker, about his assignments and career aspirations.  During that discussion, Plaintiff conveyed to Mr. Baker that he expected that he would be promoted to a vice president position in the near future.  See Complaint at ¶ 67-68; Ex. 1, Plaintiff Dep. I at 99-100; Ex. 7, Baker Aff. at ¶ 21.

104.    During this conversation, Mr. Baker informed Plaintiff that he believed that it was extremely unlikely that he would receive a promotion to a vice president position in the near

term based on his lack of success in leading Project Renaissance.  <u>See</u> <u>Complaint</u> at ¶ 70; <u>Answer</u> at ¶ 70; <u>Ex. 7, Baker Aff.</u> at ¶ 22.

105.    Plaintiff admits that at the time he had this conversation with his supervisor, the position of Vice President, Finance of Gillette Latin America was not vacant and that he was discussing his expectation that he would be a future potential candidate for that position.  <u>See</u> <u>Ex. 1, Plaintiff Dep. I</u> at 99-100.

106.    In the past five years, no employee at Gillette has been promoted to a vice president position shortly after having been removed from a Director-level position for poor performance.  <u>See</u> <u>Ex. 8, Husain Aff.</u> at ¶ 70.

**Plaintiff Makes an Internal**
**<u>Complaint of Discrimination Based on National Origin</u>**

107.    In late July/early August, Plaintiff filed a formal complaint of national origin discrimination with Dawn Frazier-Bohnert, Vice President of Workforce Development at Gillette.  <u>See</u> <u>Complaint</u> at ¶ 75; <u>Answer</u> at ¶ 75.

108.    On or about August 6, 2004, Ms. Frazier-Bohnert informed Plaintiff that Michael Estrada, Human Resources Director of Global Financial Shared Services, would conduct an investigation into Plaintiff's discrimination complaint.  <u>See</u> <u>Complaint</u> at ¶ 76; <u>Answer</u> at ¶ 76.

109.    After conducting a number of interviews, reviewing Plaintiff's work history and other documents provided to him by Plaintiff, Mr. Estrada concluded that there was no evidence that anyone at Gillette had discriminated against Plaintiff on the basis of his national origin.  <u>See</u> <u>Ex. 8, Husain Aff.</u> at ¶ 73.

**Plaintiff Refuses to Release His Personnel Information to**
**Procter & Gamble for Consideration for a Position in the Newly Merged Company.**

110.    On January 28, 2005, Gillette announced that it was going to merge with the Procter & Gamble Company.  See Ex. 7, Baker Aff. at ¶ 26; Ex. 8, Husain Aff. at ¶ 74.

111.    In order to be considered for a position in the newly integrated company, Gillette employees were required to authorize Gillette to release certain information from their personnel files to Procter & Gamble.  See Husain Dep. at 163-164; Husain Aff. at ¶ 75; Baker Aff. at ¶ 27.

112.    As he admitted at his deposition, Plaintiff did not authorize Gillette to release his personnel information to Procter & Gamble.  See Ex. 3, Husain Dep. at 163-164; Ex. 8, Husain Aff. at ¶ 76; Ex. 7, Baker Aff. at ¶ 28; Ex. 1, Plaintiff Dep. I at 136-137.

113.    At his deposition, Plaintiff testified that the reason that he did not authorize the release of information in his personnel file is because it contained a poor performance review from Joe Schena.  At his deposition, Plaintiff admitted, however, that he did not discuss the fact that he did not release his information with anyone at Gillette and that he did not ask if that evaluation could be removed from his personnel file.  See Ex. 1, Plaintiff Dep. I at 136-137.

114.    As a result of his failure to authorize the release of this information, Plaintiff was not considered for a position with the integrated company and his employment was terminated effective October 31, 2005 in connection with a post-merger reduction in force.  See Ex. 8, Husain Aff. at ¶ 77; Ex. 7, Baker Aff. at 29.

115.    In connection with his termination, Gillette provided Plaintiff with severance payments equal to $244,661.54 and other severance benefits.  See Ex. 8, Husain Aff. at ¶ 78.

**Plaintiff Files a Charge of Discrimination Based on
National Origin at the Massachusetts Commission Against Discrimination**

116.     On or about December 9, 2004, Plaintiff filed a charge at the Massachusetts

Commission Against Discrimination (the "Charge"), alleging that Gillette discriminated against

him based on his national origin by denying him promotional opportunities.  See Ex. 16, Charge.

117.     In his Charge, Plaintiff does not allege that he was discriminated against on the

basis of his race.

**Plaintiff's Court Action**

118.     On or about July 7, 2005, Plaintiff filed his complaint and jury demand in the

Superior Court of Suffolk County of the Commonwealth of Massachusetts.  See Complaint.

119.     On or about August 9, 2005, Defendant removed this action to this Court.

On or about August 26, 2005, Defendant filed its answer to Plaintiff's Complaint.  See Answer.

120.     In his Complaint, Plaintiff does not set forth any claims related to his termination

from Gillette.  See generally Complaint.

121.     At the Scheduling Conference on November 2, 2005, Plaintiff's counsel notified

the Honorable Nathaniel M. Gorton that the Plaintiff had been terminated from Gillette since

filing his Complaint on July 7, 2005 and expressed his intention to amend the Complaint to add

claims arising out of Plaintiff's termination.

122.     In the Electronic Scheduling Order, dated November 7, 2005 and at the

Scheduling Conference, the Honorable Nathaniel M. Gorton instructed the parties to amend or

supplement their pleadings on or before November 30, 2005.  See Electronic Order, dated

November 7, 2005.

123.     Plaintiff has not amended his Complaint since it was initially filed on July 7,

2005.

THE GILLETTE COMPANY

By its attorneys,


_/s/  Anthony D. Rizzotti_____
Anthony D. Rizzotti  (BBO# 561967)
Christine A. Phipps (BBO# 658942)
ROPES & GRAY LLP
One International Place
Boston, Massachusetts 02110
(617) 951-7000

September 15, 2006

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified in the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non-registered participants (if any) on
September 15, 2006.


Date:  September 15, 2006                    _/s/  David C. Potter_____
                                            David C. Potter