UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| EDUARDO GARZA MORA,<br><br>        Plaintiff,<br><br>v.<br><br>THE GILLETTE COMPANY,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 05-11651RCL<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT'S MOTION FOR LEAVE TO FILE OVERLENGTH MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant The Gillette Company hereby moves for leave to file an overlength memorandum of law in support of its motion for summary judgment. In support of its motion, Defendants state that this overlength memorandum of law is necessary to address the allegations in Plaintiff's Complaint. The Complaint, which has five counts, contains numerous allegations regarding conduct that allegedly took place during the almost twenty years in which the Plaintiff was employed by the Defendant. Defendants require the additional pages to address these allegations and to support its motion for summary judgment in respect to all counts in the Complaint. A copy of the proposed memorandum of law is attached to this filing.

Respectfully submitted,


THE GILLETTE COMPANY

By its attorneys,

/s/ Anthony D. Rizzotti
Anthony D. Rizzotti (BBO# 561967)
Christine A. Phipps (BBO# 658942)
David C. Potter (BBO#644610)
Ropes & Gray LLP
One International Place
Boston, MA  02110-2624
(617) 951-7000

Date:   September 15, 2006

### DEFENDANT'S CERTIFICATION PURSUANT TO LOCAL RULE 7.1(A)(2)

I, David C. Potter, counsel for the Defendants certify that, in accordance with Local Rule 7.1(A)(2), I have attempted to confer with Neil Osborne in good faith to resolve or narrow the issues raised in the Defendant's Motion.  I have left four messages for Attorney Osborne between September 13, 2006 and September 15, 2006.  Attorney Osborne has not returned my messages.

Date:  September 15, 2006                    /s/ David C. Potter
                                             David C. Potter


### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants (if any) on September 15, 2006.


Date:  September 15, 2006                     /s/  David C. Potter
                                              David C. Potter

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
EDUARDO GARZA MORA,                 )
                                    )
            Plaintiff,              )
                                    )
      v.                            )        Civil Action No. 05-11651-RCL
                                    )
THE GILLETTE COMPANY,               )
                                    )
            Defendant.              )
_____)


## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant The Gillette Company ("Gillette" or the "Company") respectfully submits this Memorandum of Law in Support of Its Motion for Summary Judgment. This action is brought by Eduardo Garza Mora ("Plaintiff" or "Mr. Garza"), alleging national origin discrimination in violation of Title VII, Section 1981, and Mass. General Laws ch. 151B. Plaintiff also alleges claims of tortious interference and intentional infliction of emotional distress.

As discussed within, Plaintiff's claims lack any factual or legal merit and should be summarily dismissed. Plaintiff enjoyed what must be considered by any measure a long and successful career at Gillette. When a high-profile project which he led faltered, Gillette removed him from his role on the project. Gillette's reasons were lawful and had nothing whatever to do with Mr. Garza's natural origin.

## STATEMENT OF THE FACTS

The undisputed facts are set forth in the Defendant's Statement of the Material Facts.[1]

The facts may be summarized as follows:

### Plaintiff's Employment History with Gillette
### and his Selection as Director of Project Renaissance

Plaintiff Eduardo Garza Mora ("Mr. Garza" or "Plaintiff") was employed by Gillette from 1987 until October 31, 2005.  (¶ 2).  During this time, Plaintiff was repeatedly promoted to increasingly senior positions within Gillette's finance organization at the Company's headquarters in Boston, and at several other locations outside of the United States, including Mexico, Colombia and Turkey.  (¶ 7).  In April 2002, Charles Cramb and Claudio Ruben selected Plaintiff to serve as the Director for Project Renaissance, a significant and highly visible financial project, which was designed to overhaul the financial reporting and planning functions throughout Gillette's global finance organization.[2]  (¶¶ 14, 16, 20-21).  Plaintiff reported to Mr. Ruben and was responsible for assisting Mr. Ruben in leading this major new project, which Mr. Cramb considered to be one of the most important financial projects for Gillette in the last decade.  (¶¶ 16, 20).  The ultimate customer or consumer of Project Renaissance's deliverables was the Financial Leadership Team ("FLT"), which was comprised of approximately 18 senior members of the finance organization across Gillette's global operations.  (¶ 28).

In early 2003, Mr. Cramb and Mr. Ruben became concerned that Mr. Garza was not demonstrating an effective leadership style and was alienating members of his team, the FLT and

---

[1]  All citations to Defendants' Statement of the Material Facts are hereinafter designated as "(¶ __)".  All citations to the Appendix of Summary Judgment Materials are hereinafter designated as "Ex. __".

[2]  Mr. Cramb and Mr. Ruben were long-time Gillette employees.  (¶¶ 3-4).  Mr. Cramb was the Chief Financial Officer and Senior Vice President.  Mr. Ruben was the Vice President and Controller.  (Id.).

the Information Technology ("IT") organization.  (¶ 31).  After observing Plaintiff make presentations to a number of audiences, Mr. Cramb and Mr. Ruben determined that Plaintiff needed to improve his executive presence, presentation skills, and public persona.  (¶ 32).  At Mr. Cramb and Mr. Ruben's suggestion, Gillette hired an executive coach, Alexander Caillet, to work with Plaintiff in developing his executive presence, public persona, oral and written communication skills, and management style.  (¶ 33).

**Plaintiff is Not Selected as a Next Generation Leader.**

In August, 2003, the FLT held its annual talent review process.  (¶ 43).  During this process and as part of Gillette's new "Next Generation Leader" program, the FLT identified individuals who, based on their performance and demonstrated potential, were expected to take on senior leadership roles within Gillette's finance organization in the future and designated these individuals as Next Generation Leaders ("NGLs").  NGLs did not receive raises, bonuses or stock options as a result of this designation.  (¶ 46).  During the 2003 talent review process, Mr. Ruben did not propose that Plaintiff be designated as an NGL because he believed that Plaintiff's recent performance did not warrant such designation.  (¶ 47).  In 2003, the FLT designated Jose Uribe as an NGL.  Mr. Uribe's country of origin is Mexico.  (¶ 51).  In addition, in 2003, out of the 93 employees designated by the FLT to be NGLs, 13 were Latino.  (¶ 52).

**Project Renaissance Experiences Significant Delays
And Is Projected to Run 12 Million Dollars Over Budget**

In the late Fall of 2003, Project Renaissance began to encounter profound difficulties and experience delays.  (¶ 63).  In January of 2004, it became clear that Project Renaissance was not going to meet critical deadlines and Plaintiff and Mr. Ruben informed Mr. Cramb that Project Renaissance's budget (originally, $50.1 million) would likely be exceeded by approximately $10 to $12 Million.  (¶¶ 27, 64-65).  In early February, 2004, the Renaissance team determined that

the project's "go-live" date would be significantly delayed.  (¶ 68).  During this same time period, certain testing for financial and management reporting were also behind schedule.  (¶ 71).  Plaintiff and other members of the Renaissance Team informed members of the FLT of these delays.[3]  (¶ 72).

Plaintiff, among others, recommended to Mr. Ruben that a quality and risk management review be conducted on Project Renaissance to help the team deliver on its goals in the future.  (¶ 73).  Mr. Cramb approved this review and Deloitte Consulting ("Deloitte") was commissioned to conduct it.  (¶ 74).  Deloitte concluded that the Project Renaissance team "has not, and does not currently, operate in an environment that facilitates efficient and effective execution and has also not uniformly produced high quality deliverables."  (¶ 76).  Among other shortcomings, Deloitte found that Plaintiff and other team members' roles seemed "highly redundant" and "top heavy."  (Id.).  Deloitte recommended, among other things, that Gillette "identify and empower a single project leader for the entire project" who would have "complete authority over the entire project and all work threads – e.g., IT, Business, Change, Business Case."  (¶ 77).

### Plaintiff and Mr. Ruben Are Removed from Project Renaissance.

As a result of the delays and budget overruns, and after reviewing the Deloitte Report, Mr. Cramb removed the two leaders of the project, Claudio Ruben and Plaintiff, from their positions.  (¶ 80).  Mr. Cramb first informed Mr. Ruben of his decision.  (¶ 81).  After the removal of Mr. Ruben, Mr. Cramb appointed a single leader, Joe Schena, to spearhead Project Renaissance.  (¶ 83).  Mr. Cramb and Asad Husain, Gillette's then Corporate Director of Human Resources, then informed Plaintiff that he was being removed from Project Renaissance.  (¶ 84).

---

[3] Plaintiff attempts to wash his hands of any problems with the project, unlike his supervisor, Claudio Ruben.  Mr. Ruben, who was removed from Project Renaissance at the same time that Mr. Garza was removed acknowledges that as the leaders of the project, the buck stopped with him and Mr. Garza.  (¶ 87).

Mr. Cramb did not replace Plaintiff.  (<u>Id</u>.).  Unlike Mr. Garza, Mr. Ruben believes that he and

Plaintiff should have foreseen the various delays and problems with the project and that they

were accountable for the delays and budget overruns of the project.  (¶ 86).  Mr. Ruben does not

believe that the decision to remove both Plaintiff and himself from Project Renaissance was

motivated by discriminatory animus based on race or national origin.  (¶ 87).  Instead, Mr. Ruben

believes that he and Mr. Garza were removed from the project because they, as project leaders,

failed to deliver.  (<u>Id</u>.).  In other words, the buck stopped with the persons leading the project.

<b>Plaintiff is Transferred to a<br><u>Temporary Position in Gillette Financial Shared Services</u></b>

After his removal from Project Renaissance, Mr. Cramb requested that Mr. Husain find a

temporary assignment for Plaintiff within the Finance organization.  (¶ 88).  Mr. Cramb

instructed Mr. Husain that Plaintiff's salary and grade should not be reduced and that he wanted

the assignment to continue until Plaintiff and his family were able to obtain their green cards.

(<u>Id</u>.).  Mr. Cramb told Mr. Husain that he expected that Plaintiff would be seeking opportunities

outside of Gillette.  (<u>Id</u>.).  Mr. Cramb offered Plaintiff's services to others in the Finance

organization for "free," meaning that the expense of employing Plaintiff would come out of Mr.

Cramb's budget.  (¶ 89).  In late March/early April of 2004, Kevin Baker, Vice President of

Financial Shared Services, informed Mr. Husain that he could create a temporary role for

Plaintiff in the Gillette's Financial Shared Services Center ("FSSC").  (¶ 90).  On April 15, 2004,

Plaintiff was transferred to the temporary position of Project Director within FSSC, reporting to

Mr. Baker.  (¶ 91).  Although the position created for Plaintiff did not involve any supervisory

responsibilities and required a lower grade level of work and experience, Gillette did not reduce

Plaintiff's grade or salary in connection with his transfer.  (¶ 92).

A few weeks after the transfer, in May of 2004, Mr. Baker was required to submit his recommendations for which of his team members should receive stock options in 2004. (¶ 93). Under Gillette's policies, stock options are granted to employees as an incentive to remain with the Company and to reward good performance. (¶ 94). Because Plaintiff would be leaving the Company in the near future and his assignment to FSSC was temporary, Mr. Baker did not recommend Plaintiff for a stock option award. (¶ 95). Mr. Baker has made similar decisions in the past. (¶ 97). For example, Mr. Baker did not recommend Charles Harvey or Simon Lee for stock options when he had reason to believe that each would be leaving the Company in the near future. (Id.). Messrs. Harvey and Lee are both Caucasian males from the United States and the United Kingdom, respectively. (Id.).

## Plaintiff's 2004 Performance Evaluation

In February 2005, Mr. Schena and Mr. Baker drafted Plaintiff's performance evaluation for 2004. (¶ 98). Mr. Schena, with input from, and the approval of, Mr. Cramb, evaluated Plaintiff's performance on Project Renaissance; Mr. Baker evaluated Plaintiff's performance as Project Director in FSSC. (¶ 99). Mr. Schena gave Plaintiff an "Unacceptable" rating for his performance on Project Renaissance during 2004. (¶ 101). Mr. Baker determined that Plaintiff's performance in his Project Director role in FSSC warranted a solid "Meets Expectations" rating, although Mr. Baker noted that Plaintiff's FSSC role involved no supervisory responsibility and required work at a grade level lower than that of the position held by Plaintiff. (¶ 102).

**Plaintiff's Discussion with Kevin Baker Regarding Promotion to Vice President**

On July 13, 2004, Plaintiff told Mr. Baker that he expected to be promoted to a vice president position in the near future.  (¶ 103).  Mr. Baker informed Plaintiff that, in his opinion, it was unlikely that this would occur based on his lack of success in leading Project Renaissance. (¶ 104).  In the past five years, no Gillette employee has been promoted to a vice president position shortly after having been removed from a Director-level position for poor performance. (¶ 106).

**Plaintiff Makes an Internal
Complaint of Discrimination Based on National Origin**

In late July/early August, 2004, Plaintiff filed a complaint of national origin discrimination with Dawn Frazier-Bohnert, Vice President of Workforce Development at Gillette.  (¶ 107).  On August 6, 2004, Ms. Frazier-Bohnert informed Plaintiff that Michael Estrada, Human Resources Director of Global Financial Shared Services, would conduct an investigation into Plaintiff's complaint.  (¶ 108).  After conducting a number of interviews, reviewing Plaintiff's work history and other documents provided to him by Plaintiff, Mr. Estrada concluded that there was no evidence of national origin discrimination.  (¶ 109).

**Plaintiff Refuses to Release His Personnel Information to
Procter & Gamble for Consideration for a Position in the Newly Merged Company.**

On January 28, 2005, Gillette announced that it was going to merge with the Procter & Gamble Company ("P&G").  (¶ 110).  To be considered for a position in the new company, Gillette employees were required to authorize the release of information from their personnel files to P&G. (¶ 111).  Plaintiff did not do this.  (¶ 112).  As a result, Plaintiff was not considered for a position and his employment was terminated effective October 31, 2005 in

connection with a post-merger reduction in force.  (¶ 114).  Gillette provided Plaintiff with

severance payments equal to approximately $244,661 and other severance benefits.  (¶ 115).

**Plaintiff Charge of Discrimination at the**
**Massachusetts Commission Against Discrimination and Subsequent Court Action**

On December 9, 2004, Plaintiff filed a charge at the Massachusetts Commission Against

Discrimination alleging national origin discrimination.  (¶ 116).  Plaintiff did not allege race

discrimination.  (¶ 117).  On July 7, 2005, Plaintiff filed the Complaint in Massachusetts

Superior Court.  (¶ 118).  Defendant timely removed and filed its Answer.  (¶ 119).  In the

Complaint, Plaintiff does not state any claims related to his termination.  (¶ 120).  At a

scheduling conference on November 2, 2005, Plaintiff's counsel indicated that he was

considering whether to amend the Complaint to add claims arising out of Plaintiff's termination.

(¶ 121).  In the Electronic Scheduling Order, dated November 7, 2005 and at the Scheduling

Conference, the Court ordered the parties to amend their pleadings by November 30, 2005.  (¶

122).  Plaintiff did not do so.

**STANDARD OF REVIEW**

Summary judgment must be granted "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of

law."  Fed.R.Civ.P. 56(c); Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).  In

assessing motions for summary judgment, the First Circuit has made clear that "[n]ot every

discrepancy in the proof is enough to forestall a properly supported motion for summary

judgment; the disagreement must relate to some genuine issue of material fact."  Mesnick v.

General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991).  The First Circuit has further recognized

that "[g]enuine issues of material fact are not the stuff of an opposing party's dreams.  On issues

where the nonmovant bears the ultimate burden of proof [s]he must present <u>definite, competent</u>

<u>evidence to rebut the motion</u>."  <u>Id.</u> (emphasis added); <u>see</u> <u>also</u> <u>Straughn</u> v. <u>Delta Air Lines, Inc.</u>,

250 F.3d 23, 33 (1st Cir. 2001).

## <u>ARGUMENT</u>

I.    **THE COURT SHOULD ENTER SUMMARY JUDGMENT IN FAVOR OF
DEFENDANT ON PLAINTIFF'S NATIONAL ORIGIN DISCRIMINATION
CLAIMS UNDER TITLE VII AND CHAPTER 151B.**

A.    **All Claims of Discrimination Which Are Based On Events That Occurred
Prior to February 21, 2004 Are Time-Barred Under Title VII and Chapter
151B and Should Be Dismissed.**

The statute of limitations governing employment discrimination actions under Chapter

151B imposes two requirements:  plaintiff must first bring a complaint to the Massachusetts

Commission Against Discrimination ("MCAD") within three hundred days of the allegedly

discriminatory act, and must then file suit within three years of that alleged act.  <u>See</u> Mass. Gen.

Laws c. 151B § 5 (as amended by St. 2002, c. 223 § 1); Mass. Gen. Laws c. 151B, § 9; <u>see</u> <u>also</u>

804 C.M.R. 1.10(2).  Similarly, to preserve a claim under Title VII, a plaintiff must file his

Charge with the Equal Employment Opportunity Commission within 300 days of the alleged act

of discrimination.  42 U.S.C. § 2000e-5(e)(1).  Plaintiff filed his Charge with the MCAD and

simultaneously with the EEOC on December 9, 2004.  (¶ 116).  Thus, under Chapter 151B and

Title VII, Plaintiff's filing is timely only as to those alleged acts which occurred between

February 21, 2004 and December 9, 2004, the date Plaintiff filed his Charge of Discrimination.

Those are the only alleged events which may be properly considered for purposes of Plaintiff's

Title VII and Chapter 151B claims.  <u>See</u>, <u>e.g.</u>, <u>Riebold</u> v. <u>E. Cas. Ins. Co.</u>, 9 Mass. L. Rptr. 599,

1999 WL 140419, at *6 (Mass. Super. Ct. 1999); <u>Keeler</u> v. <u>Putnam Fiduciary Trust Co.</u>, 238 F.3d

5, 10-12 (1st Cir. 2001).  Thus, Plaintiff's national origin discrimination claims under Title VII

and Chapter 151B based on events occurring prior to February 21, 2004, as set forth in

paragraphs 8-15, 25-27, 29-38, 48-55 of his Complaint are barred.

> **B.     Plaintiff's Allegations Are Insufficient to Support a Claim for National Origin Discrimination under Title VII and Chapter 151B.**

In his Complaint and at his deposition, Plaintiff claims that the following alleged acts of

discrimination have occurred since February 21, 2004:

- Plaintiff did not receive the position of Vice President of Finance for the Oral Care GBU in March of 2004.  See Ex., Plaintiff Dep. I at 97-99.

- Plaintiff was removed as Director of Project Renaissance in March 2004 and transferred to a temporary position within FSSC, reporting to Kevin Baker in April 2004.  (¶¶ 84-91.)

- Plaintiff did not receive a stock option award in May of 2004.  (¶ 95.)

- On or about July 13, 2004, Kevin Baker informed Plaintiff that he believed that it was extremely unlikely that he would be promoted to a vice president position in the near future because of his lack of success in leading Project Renaissance.  (¶¶ 103-104.)

- Plaintiff was assigned to a smaller office than those assigned to employees of similar grade.  See Ex.1, Plaintiff Dep. I at 131-133.

- Kevin Baker excluded him from team meetings.  See id. at 133.

- In February 2005, Plaintiff received a poor performance evaluation from Joe Schena. See id. at 155.

These claims fail either because Plaintiff cannot establish a *prima facie* case of discrimination or

because he cannot establish that the legitimate reasons articulated by Gillette were mere pretexts

for national origin discrimination.[4]

---

[4]  Plaintiff cannot rely upon the alleged events in 2002 and 2003 to buttress his claim.  During this time, he alleges that he was subject to discrimination or harassment by Gary Piscatelli, Claudio Ruben, Alexander Caillet, and Rick Lees.  To the extent that he attempts to argue that said events were part of a continuing violation and therefore timely, this doctrine is only applicable where the timely events are substantially related to earlier acts.  See Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 533 (2001); Ruffino v. State Street Bank & Trust Co., 908 F. Supp. 1019, 1040 (D. Mass. 1995).  Messrs. Piscatelli, Ruben, Caillett and Lees, the

Plaintiff has not proffered <u>any</u> direct evidence of discrimination with respect to the alleged acts listed above.  Accordingly, his employment discrimination claim is governed by the familiar three-step burden-shifting framework.  <u>See</u> <u>Abramian</u> v. <u>Presidents & Fellows of Harvard Coll.</u>, 432 Mass. 107, 116 (2000); <u>Matthews</u> v. <u>Ocean Spray Cranberries, Inc.</u>, 426 Mass. 122, 127-28 (1997).

1.     **Plaintiff's Allegations Regarding the Promotion to the Vice President, Finance, Oral Care Position Do Not Establish a *Prima Facie* Case of Discrimination.**

Plaintiff's allegation that he was not offered the Vice President of Finance, Oral Care position because of discrimination based on his national origin is belied by the undisputed facts. To establish a *prima facie* case of discrimination in a failure to promote case, the plaintiff must show that: (1) he is a member of a protected class; (2) that he applied for an open position; (3) that he was not selected; and (4) that the defendant sought to fill the position with a similarly qualified employee.  <u>Chief Justice for Admin. & Mgmt. Trial Court v. Massachusetts Comm's Against Discrimination</u>, 439 Mass. 729, 732 (2003).  Plaintiff cannot meet his burden with respect to the second or fourth elements of his *prima facie* case.

With respect to the second element, Plaintiff did not apply for, or express an interest in, an <u>open</u> position.  By the time Plaintiff allegedly expressed an interest in the Vice President, Finance, Oral Care position on or about March 5, 2004, the decision had already been made to offer the position to Glenn Brack approximately two weeks earlier.  (¶¶ 59-61.)

---

individuals who allegedly discriminated against Plaintiff in 2002 and 2003, were not involved in the acts of discrimination allegedly suffered by Plaintiff from February 2004 to the present. Allegedly discriminatory acts committed by different actors are not substantially related.  <u>See</u> <u>Goguen</u> v. <u>Quality Plan Adm'rs</u>, 11 Mass. L. Rptr. 288, 2000 WL 282485, at *3-4 (Mass. Super. 2000) (plaintiff could not anchor untimely sexual harassment allegations on timely allegation of retaliation where the retaliatory acts were committed by a different individual.)

Plaintiff also cannot establish the fourth element of his *prima facie* case – that Gillette filled the position with a similarly qualified employee.  Simply put, Plaintiff was not qualified to be promoted to a vice president position and was not similarly qualified to Mr. Brack.  When Chuck Cramb, Joe Schena, and Bruce Cleverly decided to hire Mr. Brack, in mid-February of 2004, Mr. Ruben and Plaintiff had recently announced that Project Renaissance would not meet critical deadlines and would exceed its budget by $12.9 Million.  (¶ 65.)  Indeed, approximately three weeks after allegedly expressing interest in the position, Plaintiff was removed from his Director-level position on Project Renaissance for poor performance.  (¶ 84.)  Leaving Mr. Brack's impressive resume, accomplishments and stellar referrals aside (which alone establish that he was better qualified than Plaintiff), the simple fact is that, in February of 2004, Mr. Brack was not about to be removed from a Director-level position for poor performance and had not lost the confidence of Chuck Cramb and the FLT as had Plaintiff.  Moreover, Plaintiff has not proffered any evidence that he was similarly qualified to Mr. Brack.  At his deposition, Plaintiff admitted that he did not know Glenn Brack and that he did not know anything about his background or qualifications for the job.  See Ex. 1, Plaintiff Dep. I at 102.

For these reasons alone, any claim premised upon the award of the Oral B position fails.

### 2. Plaintiff's Allegations Regarding Kevin Baker Do Not Establish a *Prima Facie* Case of Discrimination.

Plaintiff alleges that Kevin Baker discriminated against him by: (1) commenting that he believed that it was extremely unlikely that Plaintiff would be promoted to a vice president position in the near term; (2) assigning him a smaller office than that assigned to employees of similar or lower grade; (3) excluding him from staff meetings; and (4) not granting him a stock option award in 2004.  To establish a *prima facie* case of discrimination in these circumstances, a plaintiff must demonstrate: (1) he is a member of a protected class; (2) his employer took an

adverse employment action against him; (3) he was qualified for the employment; and (4) other similarly situated employees who were not members of the protected class were treated more favorably.  Kosereis v. Rhode Island, 331 F.3d 207, 212 (1st Cir. 2003); see also Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir. 1999).

Most of Plaintiff's allegations against Kevin Baker are plainly insufficient to establish a *prima facie* case of discrimination because Plaintiff cannot establish that he suffered "a materially adverse employment action."  See Rosa v. Polaroid Corp., No. 963235, 1998 WL 1184203, at *5-6 (Mass. Super. Ct. 1998); Alba v. Upjohn Co., Inc. No. 95-12788-JLT, 1997 WL 136334, at * 5 (D. Mass. 1997) (citing MacCormack v. Boston Edison Co., 423 Mass. 652, 662-63 (1996).   In order to establish that he suffered an adverse employment action, Plaintiff must present "objective evidence that he had been disadvantaged in respect to salary, grade, or other objective terms and conditions of employment."  MacCormack v. Boston Edison Co., 423 Mass. 652, 663 (1996).  "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities.  Marrero v. Goya of P.R., Inc., 304 F.3d 7, 23 (1st Cir. 2002) (quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993).  "Otherwise every trivial personnel action that an irritable . . . employee did not like would form the basis of a discrimination suit."  Id. (quoting Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996).  In examining actions alleged to be adverse, courts admonish that "[w]ork places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action."  Horney v. Westfield Gage Co., 77 Fed. Appx. 24, 32 (1st Cir. 2003) (citing Blackie v. State of Maine, 75 F.3d 716, 725 (1st Cir. 1996)).

Here, Plaintiff cannot demonstrate that he suffered an adverse employment action: viz., that he was materially disadvantaged in respect to the objective terms and conditions of his employment because of the alleged acts of Kevin Baker. First, Plaintiff's conversation with Kevin Baker during which Mr. Baker commented to Plaintiff that he thought that it was unlikely that Plaintiff would be promoted to a vice president position in the near term was a hypothetical discussion concerning Plaintiff's career aspirations for the future. (¶¶ 103-106.) As Plaintiff admitted at his deposition, at the time he had this conversation with Mr. Baker, the position of Vice President, Finance of Gillette Latin America was not vacant and he was simply expressing his expectation that he would be a future potential candidate for that position. (¶ 105.) This is not a case where Plaintiff was expressing an interest in an open position and denied a promotion. Mr. Baker's opinion that Plaintiff would not be a potential candidate for the vice president position in the near term did not have any adverse effect of the objective terms and conditions of Plaintiff's employment. Plaintiff was not actually denied a promotion, did not receive a reduction in salary or benefits or suffer a diminution in duties. Thus, Mr. Baker's opinion as to the likelihood of Plaintiff obtaining a promotion in the near future is not an adverse action.

Likewise, assigning an employee to a smaller office and excluding an employee from staff meetings are not acts that rise to the level of adverse actions, but instead are the types of trivial personnel actions that courts have found insufficient to form the basis of a discrimination suit. See Weber v. Hurtgen, 297 F. Supp.2d 58, 68 (D D.C. 2003) (employee's relocation to an office with one less window was not an adverse action that would support a claim of discrimination under Title VII); Scafidi v. Baldwin Union Free School Dist., 295 F. Supp.2d 235, 239-40 (E.D.N.Y. 2003) (school's failure to put teacher on committee, to invite her to graduation

ceremonies, and exclusion of her from yearbook did not qualify as adverse employment action for purposes of stating retaliation claim).

Plaintiff's final allegation regarding Kevin Baker's recommendation that he not receive stock options in 2004 also does not establish a *prima facie* case of discrimination because Plaintiff cannot demonstrate that similarly situated non-Mexican employees were treated differently than him.  In May of 2004, just weeks after Plaintiff was removed from Project Renaissance for poor performance and was transferred to his admittedly temporary position in FSSC, Kevin Baker was required to submit his recommendations to Charles Cramb and Asad Husain as to which members of his team should receive stock options in 2004.  (¶ 93.)  Under Gillette's policies, stock options are granted to employees to provide them with an incentive to remain with the Company for the long term and to reward good performance.  (¶ 94.)  Because of the likelihood that Plaintiff would be exiting the Company in the near future and the fact that his assignment to FSSC was temporary, Mr. Baker did not recommend Plaintiff for a stock option award in 2004.  (¶ 95.)

On other occasions, Mr. Baker did not recommend employees for stock options because of the likelihood that they would be leaving the Company in the short term.  (¶ 97.)  For example, Mr. Baker did not recommend Charles Harvey for stock options when he had reason to believe that that he would be leaving the Company in the near future.  Charles Harvey is a Caucasian male whose country of national origin is the United States.  (Id.)  Likewise, Simon Lees, another finance employee, was not granted stock options when it was expected that he would be leaving Gillette shortly.  Simon Lee is a Caucasian male whose country of national origin is the United Kingdom.  (Id.)  Plaintiff has not proffered any evidence that similarly situated non-Mexican employees treated differently from him – an element of his *prima*

*facie* case, and his discrimination claim based on his failure to receive stock options in 2004 therefore fails.

For all of the reasons noted above, Plaintiff's allegations regarding Kevin Baker are plainly insufficient to establish a *prima facie* case of discrimination under both Title VII and Chapter 151B.  Accordingly, the Court should enter summary judgment in favor of Defendant with respect to these claims.

> **3.    Plaintiff's Allegations Regarding His Removal from Project Renaissance Are Insufficient to Establish a National Origin Discrimination Claim.**
>
> > i.    Plaintiff Cannot Establish a *Prima Facie* Case of Discrimination Based on His Removal from Project Renaissance.

In a termination or demotion case, in order to state a *prima facie* case of discrimination, the employee must demonstrate that: (1) he is a member of a protected class; (2) he performed his job at an acceptable level; (3) he was discharged or demoted from the position; and (4) his employer sought to fill the plaintiff's position by hiring another individual with qualifications similar to the plaintiff's."  See Blare v. Husky Injection Molding Sys. Boston, Inc. 419 Mass. 437, 441 (1995); Rodriguez-Torres v. Caribbean Farms Manuf., Inc., 399 F.3d 52, 58 (1st Cir. 2005).  Plaintiff cannot establish that he was performing his job at an acceptable level at the time he was removed as Director of Project Renaissance.

As summarized briefly above and in the Statement of Undisputed Facts, in approximately the late fall of 2003, Project Renaissance began to encounter difficulties and experience delays under the leadership of Plaintiff and Mr. Ruben.  (¶¶ 63-71.)  By early 2004, it was clear that the project was not going to meet critical deadlines, including its projected deadlines for go-live and string-testing, and that its budget would be exceeded by approximately $12.9 Million.  (Id.) Because the projected budget overrun was so significant, Mr. Cramb was required to obtain

approval for this additional expenditure on the project from the CEO, the Board of Directors, and the ITAC Committee.  (¶ 67.)  In early February 2004, after it was clear that Project Renaissance was running significantly over-budget and behind schedule, Deloitte conducted a quality and risk management review on Project Renaissance.  (¶ 75. )  After conducting its assessment, Deloitte prepared a report which provided conclusions and recommendations designed to increase the effectiveness with which the Renaissance team operated in the future.  (¶¶ 76-78.)  In this report, Deloitte concluded that the Project Renaissance team "has not, and does not currently, operate in an environment that facilitates efficient and effective execution and has also not uniformly produced high quality deliverables."  (¶ 76.)  To remedy these problems, Deloitte recommended, among other things, that Gillette "identify and empower a single project leader for the entire project" who would have "complete authority over the entire project and all work threads – e.g., IT, Business, Change, Business Case."  (¶ 77.)  In the face of these delays, budget overruns, and the objective assessment of a third-party consultant, Plaintiff asserts that none of these problems were his fault.  This stunning refusal to be accountable stands in stark contrast to Mr. Ruben's view that he and Mr. Garza were the project leaders and thus, any success or failure of the project was theirs to bear in large part.  Mr. Garza does not dispute that Project Renaissance was in disarray.  His entire case comes down to the premise that someone else should be blamed, an attitude that starkly highlights some of Gillette's very concerns with his leadership.

In addition, Plaintiff cannot establish the fourth element of his prima facie case -- that Gillette sought to fill his position by hiring another individual with qualifications similar to his after his removal.  In fact, while Mr. Cramb appointed Joe Schena to replace Claudio Ruben on the project, he did not appoint a successor to fill Plaintiff's role.  (¶ 84.)  Because Plaintiff cannot satisfy two elements of his *prima facie* case, the Court should enter summary judgment on

Plaintiff's claim of national origin discrimination based on his removal from Project

Renaissance.  See Petitti v. Mass. Dep't of Mental Health, 859 F. Supp. 33, 38-39 (D. Mass.

1993) (granting summary judgment where plaintiff failed to establish that he was performing his

job at an acceptable level at time of his discharge); Duprey v. Raytheon Co., No. 941007D, 1996

WL 1186944, at *1-2 (Mass. Super. Ct. Feb. 29, 1996) (same).

> ii.    Gillette Has Articulated Legitimate, Non-Discriminatory Reasons
> for Plaintiff's Removal from Project Renaissance.

Even assuming Plaintiff could establish a *prima facie* case of discrimination, Gillette has

plainly articulated legitimate, non-discriminatory reasons for his removal from the project.  As

discussed above and reflected in Defendant's Statement of Undisputed Facts, Gillette has

produced substantial evidence that Plaintiff was removed from Project Renaissance because the

project experienced significant delays and budget overruns under his and Mr. Ruben's leadership

and because Deloitte recommended that a single leader be appointed to have complete authority

over all aspects of the project.  Mr. Garza cannot dispute that Project Renaissance was failing

when he was replaced.

> iii.    Plaintiff Cannot Prove That the Legitimate, Non-Discriminatory
> Reasons for His Removal From the Project Are a Pretext for
> Discrimination.

Plaintiff lacks any probative evidence that the compelling, legitimate and non-

discriminatory reasons for his removal from Project Renaissance were concocted to conceal

unlawful discrimination based on his national origin.  First, Plaintiff cannot demonstrate that

similarly situated employees outside of his protected class were treated differently from him as

Mr. Cramb also removed Claudio Ruben, the other member of the finance organization leading

the project.  (¶¶ 80-82.)  Mr. Ruben's country of origin is Argentina, not Mexico.  (¶ 4.)  Second,

while Plaintiff asserts that he did not have control over some aspects of the project and may

dispute whether he should have been held accountable for such failures, he does not, and cannot, dispute that in early 2004, the project experienced significant delays, was projected to run 20% overbudget, and that Mr. Cramb did in fact hold him accountable for these delays.  (¶¶ 63-72.) Even if Plaintiff was unfairly "scapegoated" for the failures of the project, which he was not, case law well establishes that demonstrating that a decision is unfair or unwise does not establish pretext or discriminatory animus.  As long as Mr. Cramb possessed a non-discriminatory basis for believing that Plaintiff's performance warranted his removal from the Project, courts will neither second-guess his business judgment nor question the fairness of that decision.  See, e.g., Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 128 (1997) ("Chapter 151B does not grant relief to a plaintiff who has been discharged unfairly, even by the most irrational of managers, unless the facts and circumstances indicate that discriminatory animus was the reason for the decision") (internal quotation and citations omitted); Mesnick v. General Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991) (affirming summary judgment for employer on ADEA claim and commenting that: "Courts may not sit as super personnel departments, assessing the merits – or even the rationality – of employer's nondiscriminatory business decisions.").

Most importantly, the undisputed facts of this case provide compelling evidence that such reasons were not pretextual.  At his deposition, Mr. Ruben, who, like Plaintiff, was removed from the Project by Mr. Cramb for poor performance, testified that he and Plaintiff should have foreseen the problems with the project and that they, as the leaders of the project, were accountable for the delays and budget overruns on the project.  (¶ 86.)  According to Mr. Ruben, the decision to remove both Plaintiff and himself from Project Renaissance was not motivated by discriminatory animus based on race or national origin, but resulted directly from the fact that they, as the leaders of the project, failed to deliver.  (¶ 87.)

Moreover, the decision to remove Plaintiff from Project Renaissance was made by Mr. Cramb, who is the same individual who, less than two years earlier, had selected Plaintiff to lead this highly significant and visible financial project based on Plaintiff's track record of success. (¶¶ 21, 80-81, 84.)  In similar situations, courts have applied the same actor presumption under which an inference may arise that there was no discrimination when the person who hires or promotes the plaintiff is also responsible for the adverse employment action.  "[I]t is improbable that the same persons who hire someone already in a [protected class] will suddenly develop an aversion to [that class]." See Woods v. Baystate Health Sys., No. 04-30010-KPN, 2005 WL 1513118, at *4 (D. Mass. 2005) (quoting Dziamba v. Warner & Stackpole LLP, 778 N.E.2d 927, 934 (Mass. App. Ct. 2002)).

For all of these reasons, Mr. Garza's removal from Project Renaissance was entirely lawful.

### 4.     Plaintiff's Allegations Regarding His 2004 Performance Review Are Insufficient to Establish a National Origin Discrimination Claim.

i.     Plaintiff Cannot Establish a *Prima Facie* Case of Discrimination Based on His 2004 Performance Evaluation.

Plaintiff cannot establish a *prima facie* case of national origin discrimination based on the comments made by Joe Schena in his 2004 Performance evaluation because, as explained above, Plaintiff cannot establish that such comments are a "a materially adverse employment action." "An unsatisfactory performance evaluation … is not itself a 'change in terms, conditions, or privileges of employment' and, absent some evidence that the performance evaluation led to other more concrete consequences affecting the benefits and demands of work, is not actionable under [Title VII]." Menchaca v. Ottenwalder, 18 Fed. Appx. 508, 509 (9th Cir. 2001); see also Clark v. Alcan Alum. Corp., 41 Fed. Appx. 767, 776 (6th Cir. 2002) (negative evaluations "in and of themselves" do not constitute adverse action).  Here, Plaintiff cannot establish that Joe

Schena's negative comments in his evaluation resulted in any adverse consequences affecting the demands and benefits of his work.

When Mr. Schena drafted this performance evaluation in February of 2005, Plaintiff had already been removed from Project Renaissance and denied stock options approximately 8 months earlier. (¶¶ 84, 95, 98.)  In 2005, after receiving this performance evaluation, Plaintiff continued to serve as a Project Director in FSSC and he received a raise in his salary.[5] (¶ 69.) Where negative comments in a performance evaluation are not accompanied by any adverse consequences in the objective terms of a plaintiff's employment, as in this case, such negative comments do not constitute an adverse employment action.  Accordingly, Plaintiff cannot establish a *prima facie* case of discrimination with respect to his 2005 performance evaluation, and his claim should therefore be dismissed.

        ii.     Gillette Has Articulated a Legitimate, Non-Discriminatory Reason for Plaintiff's 2004 Performance Evaluation and Plaintiff Cannot Prove that This Reason Is a Pretext for Discrimination.

Even if Joe Schena's comments in Plaintiff's performance evaluation for the year 2004 constitute an adverse employment action, as explained above, Gillette has articulated legitimate, non-discriminatory reason for its actions – Plaintiff's performance as the leader of Project Renaissance was not acceptable and Plaintiff has not, and cannot, offer any evidence that this reason is a pretext for discrimination.

---

[5]  At his deposition, Plaintiff claims that he did not authorize the release of his information to P&G because of the negative performance evaluation he received from Joe Schena.  ¶ 113. Plaintiff cannot use this claim to establish that the performance evaluation resulted in adverse consequences in the objective terms of his employment.  As an initial matter, Gillette did not take any adverse action against Plaintiff based on this performance evaluation.  Plaintiff's decision not to authorize the release of his personnel information was entirely his own. Moreover, claims related to Plaintiff's termination from Gillette are not at issue in this matter. See Discussion at Argument, Section I.C.

### C.     Plaintiff's Termination Is Not At Issue In This Case.

On December 9, 2004, Plaintiff filed his Charge at the MCAD, alleging that Gillette discriminated against him based on his national origin by denying him promotional opportunities.  (¶ 116.)  On July 7, 2005, Plaintiff filed his Complaint in the Superior Court of Suffolk County of the Commonwealth of Massachusetts.  (¶ 118.)  Approximately three and a half months later, on October 31, 2005, Plaintiff's employment with Gillette was terminated in connection with a post-merger reduction-in-force.  (¶ 114.)  Because Plaintiff's termination did not occur until approximately three and a half months after he filed his Complaint, he did not make, and could not have made, any allegations regarding his termination from Gillette in his Complaint.  At the Scheduling Conference on November 2, 2005, Plaintiff's counsel notified the Honorable Nathaniel M. Gorton that the Plaintiff had been terminated from Gillette since filing his Complaint on July 7, 2005 and indicated that he was considering whether to amend the Complaint to add claims arising out of Plaintiff's termination.  (¶ 121.)  In the Electronic Scheduling Order, dated November 7, 2005 and at the Scheduling Conference, Judge Gorton instructed the parties to amend or supplement their pleadings on or before November 30, 2005. (¶ 122.)  To date, Plaintiff has not amended his Complaint, nor, to Defendant's knowledge, has he filed an administrative charge at the MCAD related to his termination.  (¶ 123.)  Accordingly, there are no claims related to Plaintiff's termination at issue in this matter.

## II.     THE COURT SHOULD ENTER SUMMARY JUDGMENT IN FAVOR OF DEFENDANT ON PLAINTIFF'S § 1981 CLAIM.

### A.     Plaintiff Has Failed to State a Claim Under Section 1981 Because He Has Not Alleged That He Was Discriminated Against on the Basis of His Race or That He was Treated Differently Than White Employees.

To prevail on his Section 1981 claim, Plaintiff "must show (1) that he is a member of a racial minority, (2) that the defendant discriminated against him on the basis of his race, and (3)

that the discrimination implicated one or more of the activities enumerated in the statute." Garett v. Tandy Corp., 295 F.3d 94, 98 (1st Cir. 2002). As the United States Supreme Court has recognized, Section 1981 encompasses only claims of racial discrimination and not claims of discrimination premised on other protected categories such as national origin. Saint Francis College v. Al-Khazraji, 481 U.S. 604, 613 (1987); see also Alexis v. McDonald's Restaurants of Mass., Inc., 67 F.3d 341, 346 (1st Cir. 1995). Plaintiff's Section 1981 claim must be dismissed because it is based solely on Plaintiff's national origin and not his race. See Complaint at ¶ 1 ("The Plaintiff . . . has filed this Civil Action Complaint against the Defendant for employment discrimination based on national origin."). While racial discrimination may include discrimination based on ancestry or ethnic characteristics for the purposes of Section 1981 protection, Saint Francis College, 481 U.S. at 613, Plaintiff simply has not alleged discrimination on this basis, nor is there evidence of any such discrimination. Thus, Plaintiff's Section 1981 claim must be dismissed.

> **B.     Plaintiff's Allegations Regarding Discriminatory Acts Suffered By Him While He Was Working and Living in Mexico Cannot Form the Basis of His Section 1981 Claim.**

Assuming Mr. Garza could bring a Section 1981 claim, in his Complaint and at his deposition, Plaintiff makes a number of allegations regarding discriminatory treatment he received while he was working in Mexico from 1987 to 1990 and from 1999 to 2002.[6] See Complaint at ¶¶ 8-15; Ex. 1, Plaintiff Dep. I at 19-20, 22, 32-37, 55-59. Plaintiff's allegations regarding these alleged discriminatory acts which occurred while he was living and working and Mexico and which involve a promotion to a position in Argentina are not actionable under Section 1981 because the statute does not apply extraterritorially. See Ortiz-Bou v. Universidad

---

[6]  Many of these claims are also time-barred by Section 1981's four-year statute of limitations. See Jones v. R.R. Donnelly & Sons, Co., 124 S.Ct. 1836 (2004).

Autonoma de Guadalajara, 382 F. Supp.2d 293, 296 (D. P.R. 2005) (holding that Section 1981 did not apply extraterritorially to discrimination which allegedly ensued in Mexico); Ofori-Tenkorang v. American Internat'l Group, Inc., -- F.3d --, 2006 WL 2349169, at *4-8 (2d Cir. Aug. 15, 2006) (noting that "nothing in the text, structure, or history of Section 1981 indicates that Congress intended the statute to reach discrimination against individuals outside the territorial jurisdiction of the United States" and holding that Section 1981 did not apply to employer's alleged discriminatory and retaliatory treatment of employee in South Africa). Accordingly, all of Plaintiff's Section 1981 claims that are based on discriminatory acts which allegedly occurred while he was working in Mexico or anywhere else outside the United States should be dismissed.

### C.    Plaintiff's Allegations Are Insufficient to Establish a Section 1981 Claim.

As discussed in Section II.A above, Plaintiff cannot bring a Section 1981 claim because it does not apply to claims of natural origin discrimination. Even if it did, however, the undisputed facts make clear that the claim fails as a matter of law. Section 1981 discrimination claims are analyzed using the same framework and principles as those used to analyze Title VII cases. See Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 95-96 (1st Cir. 1996). Thus, Plaintiff's Section 1981 claims that arise out of the same facts used to support his timely Title VII and Chapter 151B claims should be dismissed for the reasons discussed in Section I.B above. The additional allegations put forward by the Plaintiff that precede the February 21, 2004 statute of limitations date for the Title VII/Chapter 151B claims and fall within the four-year statute of limitations period for Section 1981 claims are discussed below. None of these allegations support a Section 1981 claim.

1.     **Plaintiff's Hostile Environment Racial Harassment Claim Fails.**

In his Complaint and at his deposition, Plaintiff alleges that he was subjected to a hostile environment based on his national origin while employed at Gillette.  Plaintiff's hostile environment claim is based on the following allegations:

- During 2002 and 2003, Alexander Caillet informed Plaintiff that an executive in his position should not wear the top two buttons of his shirt open in the conservative environment of Gillette's corporate headquarters.  Mr. Caillet also took Plaintiff shopping at Sax Fifth Avenue for shirts and advised him that he needed to improve his English, that he should not bend his eyes when he shook hands, and that he should not place his hand on his chin.  See Ex. 1, Plaintiff Dep. I at 119-22.

- During 2002 and 2003, Claudio Ruben allegedly criticized Plaintiff's accent, his manner of dress and his shirts.  See id. at 155-158.

- During 2002 and 2003, Gary Piscatelli undermined Plaintiff's authority by "talking bad" about him to members of the FLT and demonstrated his dislike for Latinos at May 1, 2003 meeting where he had an outburst.  Claudio Ruben allegedly told Plaintiff in 2002 that Gary Piscatelli had commented that Plaintiff was unfit to be his boss.  See id. at 141-142, 147.

- During a lunch meeting in 2003, Rick Lees commented that immigrants and immigration are the biggest problem for America.  Mr. Lees was allegedly referring to Spanish-speaking immigrants when he made this statement.  See id. at 125-127.

Plaintiff's allegations fail to establish a hostile environment claim.

To establish a *prima facie* case of hostile environment racial harassment under Section 1981, plaintiff must establish that: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) that the harassment was based upon his race; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) the objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been

established.  See O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001).  The

environment must be sufficiently hostile or abusive in light of all the circumstances, including

the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance."  Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998).  The

conduct that forms the basis of the complaint must be so severe and pervasive as to create a

"formidable barrier to the full participation of an individual in the workplace."  See College-

Town Div. of Interco, Inc. v. Massachusetts Comm'n Against Discrimination, 400 Mass. 156,

162 (1987).

> i.    Plaintiff Cannot Demonstrate that He Was the Target of Speech or
>       Conduct Based on His National Origin or Race.

Plaintiff is unable to establish that the allegedly harassing conduct and comments of

Messrs. Ruben, Caillet, Piscatelli and Lees were based on his national origin or race.  On their

face, Mr. Caillet's and Mr. Ruben's comments about Plaintiff's dress have nothing to do with his

race or national origin.  Plaintiff does not allege that Mr. Caillet or Mr. Ruben told him to stop

dressing like he was Mexican, but rather alleges that they told him to button the top two buttons

of his shirt in the conservative environment of Gillette and to stop wearing cheap shirts.  Also,

the recommendations allegedly made to Plaintiff by Mr. Ruben and Mr. Caillet that he should

improve his accent and fluency while speaking English are not discriminatory on their face.

Plaintiff was required to speak English to communicate on a daily basis with his Project

Renaissance team and customers.  Likewise, Rick Lees' alleged comment that immigration or

immigrants were a big problem for the United States is not facially discriminatory and does not

reflect a dislike of Latinos or Mexicans, but rather Mr. Lee's opinion on a political issue.

Similarly, Plaintiff has proffered no evidence that Gary Piscatelli made offensive comments to him based on his national origin or that Mr. Piscatelli undermined him because he is Mexican.  As an initial matter, at his deposition, Plaintiff expressly admitted that Mr. Piscatelli never made any disparaging comments about his national origin to him.  See Ex. 1, Plaintiff Dep. I at 142.  Plaintiff alleges, however, that during 2002 and 2003, Mr. Piscatelli created a hostile environment by undermining his authority by "talking badly" about him to members of the FLT. See id. at 141-142, 147.   At his deposition, Plaintiff admitted, however, that he did not know what Mr. Piscatelli specifically said about him when he allegedly spoke badly about him and could offer no evidence that such "bad talk" was related to his national origin.  See id. at 144. Further, nothing in Plaintiff's own description of the May 1, 2003 incident (which he alleges demonstrated Mr. Piscatelli's dislike of Latinos) suggests that Mr. Piscatelli was motivated by discriminatory animus when he behaved inappropriately at a team meeting.  (¶ 34.)   In fact, Plaintiff, himself, admitted at his deposition that he did not believe that this incident had anything to do with race or national origin until after he discovered that Mr. Piscatelli was undermining him by talking badly about him.  See Ex., Plaintiff Dep. I at 143-144.  Moreover, Mr. Ruben, who is also Latino, does not believe that Mr. Piscatelli's outburst had anything to do with his or anyone else's race or national origin.  (¶ 42.)  Plaintiff also claims that Mr. Piscatelli's alleged comment that Plaintiff was unqualified to be his boss was based on the fact that he is Mexican.  See Ex. 1, Plaintiff Dep. I at 138-139.  When asked at his deposition why he believed this comment was motivated by discriminatory animus, Plaintiff responded "because he didn't know me."  See id. at 141.

In short, Plaintiff has offered nothing but his own conclusory allegations to support his claim that the alleged conduct and comments of Messrs. Ruben, Caillet, Lees and Piscatelli were

motivated by discriminatory animus.  Such surmise and conjecture are insufficient to establish

that such conduct is based on race and national origin.

> ii.     Plaintiff Cannot Establish that the Alleged Conduct Was
> Sufficiently Severe or Pervasive to Alter the Conditions of His
> Employment and Create an Abusive Working Environment.

Plaintiff's allegations regarding the conduct of Messrs. Ruben, Caillet, Piscatelli and Lees

fall far short of satisfying the severity and pervasiveness standards required to sustain a claim of

hostile environment harassment.  See Clark County School Dist. v. Breeden, 532 U.S. 268, 270-

71 (2001).  Although the law imposes no numerosity requirement per se, it is well settled that

incidents of harassment generally must occur on a repeated and/or continuous basis to constitute

"severe and pervasive" harassment.  See, e.g., Kotcher v. Rosa & Sullivan Appliance Ctr., 957

F.2d 59, 62 (2d Cir. 1992).  Plaintiff has identified one or two comments or incidents involving

each of Messrs. Piscatelli, Lees, Caillett and Ruben over a two-year period.  The comments and

behavior of which Plaintiff accuses these individuals are not racial epithets, physically

threatening or even discriminatory on their face.  Courts do not permit the severity and

pervasiveness standard to be satisfied by such isolated incidents, particularly when considering

the innocuous nature of the incidents.  See, e.g., O'Rourke v. City of Providence, 235 F.3d 713,

732 (1st Cir. 2001); Chamerlin v. 101 Realty, Inc., 915 F.2d 777, 783 (1st Cir. 1990);  Sarin v.

Raytheon Co., 905 F. Supp. 49, 54 (D. Mass. 1995).  Further, where the comments are not so

severe and pervasive as to interfere with a reasonable person's work performance, there is no

actionable claim for racial harassment.  See Messina v. Araserve, Inc., 906 F. Supp. 34, 36 (D.

Mass. 1995); Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 533 (2001).  Plaintiff

has not alleged or proffered any evidence that the alleged comments and conduct of Messrs.

Lees, Ruben, Caillet and Piscatelli interfered with his ability to do his job or with his work

performance.

iii.     Plaintiff's Allegations Fail to Support His Attempt to Attach Vicarious Liability to Gillette.

Plaintiff's allegations also fail to support his attempt to attach vicarious liability to Gillette under applicable case law involving harassment by supervisors, co-workers, and independent contractors. First, Claudio Ruben is the only alleged harasser who was Plaintiff's supervisor. Mr. Piscatelli was Plaintiff's subordinate and Mr. Lees, his co-worker. Mr. Caillet was not a Gillette employee but rather an independent contractor hired by Gillette to coach Plaintiff. In cases involving harassment by co-workers and non-employees, an employer can only be held liable for such conduct if it knew or should have known of the harassment and failed to take prompt remedial action. See Johnson v. Plastic Packaging, Inc., 892 F. Supp. 25, 29 (D. Mass. 1995). Here, Plaintiff did not avail himself of Gillette's internal process for reporting harassment complaints until July of 2004 – more than one year after the May 1, 2003 incident involving Gary Piscatelli and at least 6-7 months after his lunch meeting with Rick Lees, and his coaching sessions with Alexander Caillet. (¶ 107.) Once Plaintiff reported these allegations to Dawn Frazier-Bohnert, Gillette launched a full investigation into Plaintiff's allegations. (¶¶108-109.) Finding no evidence that Plaintiff had been discriminated against or that he had been subjected to a hostile environment, Gillette took appropriate remedial action under the circumstances. (¶ 109.)

With respect to Mr. Ruben, it is well settled that, under Title VII[7] (and thus, under Section 1981), employers are not automatically liable for harassment committed by their supervisors. While an employer may be "subject to vicarious liability to a victimized employee

---

[7] Although the *Faragher-Ellerth* defense is not recognized under Chapter 151B, Plaintiff's hostile environment claims arising from the alleged conduct of Mr. Ruben, Mr. Piscatelli, and Mr. Lees during 2002 and 2003 under 151B are time-barred. Accordingly, Plaintiff can only pursue his hostile environment claims under Section 1981. Such claims are analyzed under the Title VII framework.

for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee," the employer "may raise an affirmative defense to liability or damages" if "no tangible employment action [was] taken" against the victimized employee. See Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 764-65 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998).  "The defense comprises two necessary elements:  (a) that the employer exercised reasonable care to prevent and correct promptly any [] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807.

In this case, Plaintiff has not alleged that Mr. Ruben took a tangible employment action against him.  Thus, assuming *arguendo* that Plaintiff was able to satisfy the other elements of his harassment claim with respect to Mr. Ruben, Gillette is still not liable for this conduct because the two elements of the *Faragher-Ellerth* affirmative defense are met.  With respect to the first element, Gillette has exercised reasonable care to prevent and correct promptly any harassing behavior by implementing training programs and a harassment policy, which educate employees about harassment and provide them with a mechanism for reporting harassment claims.  See Ex.8, Husain Aff. at ¶ 8 & Ex. 1 to Ex. 8 (copy of policy).  With respect to the second element, while Plaintiff alleges that Mr. Ruben began mocking his accent and manner of dress in 2002 and 2003, he did not report this alleged harassing behavior to Human Resources until filing his formal complaint of discrimination in July of 2004 – 3 months after Mr. Ruben had left the Company and anywhere from 7 months to 2 years after the alleged comments were made. (¶ 107.)  Thus, Plaintiff unreasonably failed to take advantage of any preventive or corrective

opportunities provided by Gillette and Gillette, therefore, cannot be held responsible for Mr.

Ruben's allegedly harassing behavior.

>    **2.    Plaintiff's Allegations Regarding His Not Being Designated as an NGL Are Not Sufficient to Establish a Discrimination Claim Under Section 1981.**

>    >    i.    Plaintiff Cannot Establish a *Prima Facie* Case of Discrimination Based on the Fact that He Was Not Designated as an NGL.

Plaintiff alleges that during 2003, he was not designated as an NGL by the FLT because

of his national origin.  Plaintiff's failure to be designated as an NGL by the FLT, however, is not

actionable under Section 1981 because Plaintiff cannot establish that this action was "a

materially adverse employment action."  See Rosa v. Polaroid Corp., No. 963235, 1998 WL

1184203, at *5-6 (Mass. Super. Ct. 1998); Alba v. Upjohn Co., Inc., No. 95-12788-JLT, 1997

WL 136334, at * 5 (D. Mass. 1997) (citing MacCormack v. Boston Edison Co., 423 Mass. 652,

662-63 (1996).  In order to establish that he suffered an adverse employment action, Plaintiff

must present "objective evidence that he had been disadvantaged in respect to salary, grade, or

other objective terms and conditions of employment."  MacCormack v. Boston Edison Co., 423

Mass. 652, 662-63 (1996).  As Plaintiff acknowledged at his deposition, individuals who were

designated as NGLs did not receive raises, bonuses or stock options as a result of this

designation and Plaintiff has not otherwise demonstrated how his failure to be designated as an

NGL otherwise affected the objective terms and conditions of his employment.  (¶ 46.)

Accordingly, Plaintiff's Section 1981 claim based on his NGL status fails.

>    >    ii.    Gillette Has Articulated Legitimate, Non-Discriminatory Reasons for Why Plaintiff Was Not Designated As An NGL and Plaintiff Cannot Prove That These Reasons Are a Pretext for Discrimination.

Even if Plaintiff could establish a *prima facie* case of discrimination based on these

allegations, Gillette has articulated legitimate, non-discriminatory reasons for why Plaintiff was

not designated as an NGL.  First, his supervisor, Claudio Ruben determined that Plaintiff's

performance on Project Renaissance did not warrant designation as an NGL because Plaintiff

continued to struggle with his leadership skills, communication style, and executive presence.

Specifically, Mr. Garza was unable to express his ideas in a clear, concise and understandable

manner at the various meeting and presentations that the Renaissance team conducted related to

the project.  He also assumed a passive role at meetings with his team and with the FLT, causing

some members of the FLT to question his leadership abilities and skills.  (¶¶ 47-49.)  In addition,

during the talent review meeting, none of the 18 members of the FLT expressed the opinion that

Plaintiff should be designated as an NGL.  To the contrary, several members of the FLT

expressed concern about Plaintiff's performance on Project Renaissance, including his leadership

abilities.  (¶ 49.)  During the 2003 talent review meeting, Mr. Cramb also expressed concerns

about Plaintiff's competency and leadership on Project Renaissance.  (¶ 48.)  Unlike Plaintiff,

employees who were designated as NGLs had exceptional performance reviews, were

recommended to be designated as such by their immediate supervisors and regional and/or

divisional managers and were well-regarded and finally approved by the FLT.  (¶ 50.)

Plaintiff has not proffered any evidence that Gillette's legitimate, non-discriminatory

reasons for not designating Plaintiff as an NGL are a pretext for discrimination based on his

national origin or race.  Further, the undisputed facts of this case provide compelling evidence

that such reasons were not pretextual.  During the 2003 talent review process, the FLT

designated Jose Uribe as an NGL.  Mr. Uribe's country of origin is Mexico.  (¶ 51.)  In addition,

in 2003, 13 out of the 93 employees designated by the FLT to be NGLs were Latino.  (¶ 52.)  It

strains credulity that the members of the FLT, the ultimate decision-makers as to whom would be

designated as an NGL, would discriminate against Plaintiff based on the fact that he is Mexican

or Latino but not discriminate against other employees based on their membership in these

protected categories.

**III.  THE COURT SHOULD ENTER SUMMARY JUDGMENT IN FAVOR OF DEFENDANT ON PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM BECAUSE IT IS BARRED BY THE WORKERS' COMPENSATION ACT.**

Both state and federal courts repeatedly have held that the exclusivity provision of the

Massachusetts Workers' Compensation Act bars claims for intentional infliction of emotional

distress alleged to have arisen in the workplace.  See Green v. Wyman-Gordon Co., 422 Mass.

551, 557-58 (Mass. 1996); Clarke v. Kentucky Fried Chicken of California, Inc. 57 F.3d 21, 28-

29 (1st Cir. 1995).  Count III of Plaintiff's Complaint presents the Court with just such a claim.

In Count III, Plaintiff alleged that "Defendant, acting through its agents and employees, engaged

in the acts previously described deliberately and intentionally in order to cause Plaintiff severe

emotional distress."  See Complaint at ¶ 94.  The "acts previously described" in Plaintiff's

Complaint are all acts that allegedly occurred in the workplace and Plaintiff's claimed emotional

distress allegedly arose from those events.  See Complaint at ¶¶ 8-74.  Accordingly, Plaintiff's

intentional infliction of emotional distress claim is barred by the Workers' Compensation Act,

entitling Gillette to summary judgment.  See Doe v. Purity Supreme, Inc., 422 Mass. 563, 565

(Mass. 1996); Niemi v. Genrad, Inc., 20 Mass. App. Ct. 948, 949 (1985).

**IV.  THE COURT SHOULD ENTER SUMMARY JUDGMENT IN FAVOR OF DEFENDANT ON PLAINTIFF'S TORTIOUS INTERFERENCE WITH THE EMPLOYMENT RELATIONSHIP CLAIM.**

To make out a claim for tortious interference with an employment relationship, a plaintiff

must show that (1) he had a contract or advantageous relationship with a third party; (2) the

defendant knowingly interfered with that contract relationship through improper motive or

means; and (3) plaintiff was harmed by defendant's actions.  Harrison v. Netcentric Corp., 433

Mass. 465, 476-77 (Mass. 2001).  Count V of the Complaint does not allege that Gillette

interfered with Plaintiff's relationship with a third-party but rather that Gillette interfered with its

<u>own</u> contract or relationship with Plaintiff.  <u>See</u> <u>Complaint</u> at ¶¶ 97-99.  It is axiomatic that an

employer cannot be held liable for interference with its own relationship with its employees.

<u>Harrison</u>, 433 Mass. at 476 n.12; <u>Appleby v. Locke</u>, 369 Mass. 540, 543 (1986).  Accordingly,

the Court should enter summary judgment on Count V of the Complaint.

## <u>CONCLUSION</u>

The summary judgment record is devoid of any facts which would support Plaintiff's

claims of national origin discrimination under Title VII, Mass. General Laws ch. 151B, and

Section 1981, and his tortious interference and intentional infliction of emotional distress claims.

For the reasons set forth above, the Court should grant Defendant's motion for summary

judgment and dismiss the Complaint in its entirety with prejudice.

Respectfully submitted,

THE GILLETTE COMPANY

By its attorneys,

/s/ Anthony D. Rizzotti
Anthony D. Rizzotti (BBO# 561967)
Christine A. Phipps (BBO# 658942)
David C. Potter (BBO#644610)
Ropes & Gray LLP
One International Place
Boston, MA  02110-2624
(617) 951-7000

Date:   September 15, 2006

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants (if any) on September 15, 2006.


Date:  September 15, 2006                          /s/  David C. Potter
                                                                      David C. Potter