UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

EDUARDO GARZA MORA )
    Plaintiff, )
 )
v. )     Civil Action 05-11651NMG
 )
THE GILLETTE COMPANY )
    Defendant. )

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I. INTRODUCTION

In support of his Motion in Opposition to Defendant's Motion for Summary

Judgment, Eduardo Garza Mora ("Plaintiff" or "Garza Mora") submits this Memorandum

of Law.  Garza Mora opposes The Gillette Company's ("Defendant" or "Gillette")

Motion for Summary Judgment on several grounds: 1)  Defendant created a new

promotional system infected with discriminatory input of supervisors that tainted

promotional opportunities; 2) Plaintiff satisfies the standard for prima facie case of

discrimination as to failure to promote, wages, and requirement accent correction; 3) A

reasonable trier of fact could disbelieve the Defendant's proffered proof of justifying

demotion as pretext for discrimination; 4) Continue violation doctrine applies to

Plaintiff's claims of discrimination.

II. LEGAL STANDARD FOR SUMMARY JUDGMENT REVIEW

The standard of review for a grant of summary judgment is whether, viewing the

facts in the light most favorable to the nonmoving party, there is no genuine issue as to

any material fact, and the moving party is entitled to judgment as a matter of law.  *See*

*Fed. R. Civ. P. 56 (c)*, *Cellotex Corp. v. Katrett*, 477 U.S. 317, 332 (1986).  It is the trial

judge's function to determine whether there is a genuine issue for trial and not to weigh the evidence and determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In the final analysis, upon examining the facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in her favor, the court must determine if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Sands v. Ridefilm Corp.,* 212 F.3d 657 (1st Cir. 2000) *quoting Anderson*, at 249. All reasonable inferences and all credibility issues are resolved in favor of the nonmoving party. *Anderson*, at 255.

III. ARGUMENT

   A. <u>Defendant Created a New Promotional System Infected With Discriminatory Input of Supervisors That Tainted Promotional Opportunities.</u>

   Garza Mora contends his supervisor's unlawful inclusion of national origin bias tainted the selection process for filling senior level management positions. Complaint Facts ("Cmt.") ¶¶ 51,52. Within the Defendant's Finance Division, according to established criteria, the responsibility for designating employees for promotion rested with the Financial Leadership Team[1] ("FLT"). Def. Ans. Cmt. ¶¶ 40,41. The criteria for designation Next General Leader[2] ("NGL") can be summarized as: demonstrated leadership competencies, medium to high learning capacity, strong performance track record, and mobility, interest and ambition to progress in career. Def. Ans. Cmt. ¶ 42. When evaluating a candidate's leadership competency, the FLT considers certain leadership skills including not limited to building a successful team, drive for results, and strategic leadership. Def. Ans. Cmt. ¶ 43. When evaluating a potential NGL's

---

[1] FLT was comprised of approximately 18 senior members of the finance organization. See Def. Ex. 5 Cramb Aff. ¶ 10.
[2] Employees designated as NGL would have a development plan created so that when an opportunity arose they would be ready for consideration. See Def. Ex. 3 Husain Dep. at 129:20 – 130:3.

employment performance, the FLT considers the candidate's previous performance evaluations and current performance, among other criteria. Def. Ans. Cmt. ¶ 44.

In 2003 the Defendant implemented a new program as part of talent review process.  Def. Ex. 5, Cramb Aff. ¶ 23.   In August 2003, members of the FLT, during a talent review meeting, discussed potential candidates for promotional opportunities within the Finance Division.  Def. Ex. 3 Husain Dep. at 160 and Def. Ex. 5, Cramb Aff. ¶ 24.  In a meeting with Garza Mora in mid 2003 Claudio Ruben ("Ruben") the Plaintiff's immediate supervisor told him that he had not been selected as an NGL.   Def. Ans. Cmt. ¶ 48; Def. Ex. 1 EGM Dep. at 97:2-6 and 112:21 – 113:12.   The complete truth of the matter was that Garza Mora was never considered because Ruben did not propose his inclusion for consideration as an NGL. Def. Ex. 5, Cramb Aff. ¶ 25.

Defendant's new selection process linked all advancement opportunities through a system that requires the endorsement of a qualified candidate's immediate supervisor. Without an NGL designation a qualified candidate would not be part of the pool of eligible candidates for promotion to a senior management position.  Def. Ex. 1 EGM at 113:20 - 23.

Defendant's records indicate Plaintiff's native language is Spanish and that he is proficient in English and French.  Def. Ans. Cmt. ¶ 2.  In November 1987, the Defendant hired the Plaintiff as a Business Planning Manager in its Mexico location.  Def. Ans. Cmt. ¶ 7.  In January 1991, the Plaintiff earned a promotion to the position of Senior Financial Analyst. Def. Ans. Cmt. ¶ 18.  In February 1993, the Plaintiff earned a promotion to the position of Financial Planning Manager.  Def. Ans. Cmt. ¶ 20.  In December 1993, the Plaintiff earned a promotion to the position of Controller. Def. Ans. Cmt. ¶ 21.  Between

the years of 1993-2002, the Plaintiff held three different positions as Controller/Director of Finance for Defendant, working in various geographical locations such as Colombia, Turkey, and Mexico. Cmt. ¶ 23; Def. Ans. Cmt. ¶ 23.  In April 2002, based on his skills, background and experience the Plaintiff was chosen for the position of Finance Director for Project Renaissance ("Renaissance").  Def. Ans. Cmt. ¶ 28.

At the time of the talent review meeting in August and throughout 2003 Garza Mora's qualifications and experiences would have made him at least qualified for consideration as an NGL.  Plf. Ex. A; Plf. Ex. C.  Prior to taking on the position of Director Renaissance the Plaintiff received meets expectations evaluation on his PDP for 2002 signed by Ruben.  Plf. Ex. C.  Throughout Plaintiff's tenure as the Director of Renaissance  that included most of 2002 and all of 2003 he was able to achieve significant milestones under difficult conditions.[3]  Plf. Ex. F – Inter-Office Memo Friday Posting from Cramb to CEO J. Kilts.  In August of 2003, at the time of the talent review meeting, Plaintiff's immediate supervisor failed to present him to the FLT as a possible NGL, without any legitimate business reason for his exclusion.  Ruben had over a number of years remarked directly to the Plaintiff that his national origin remained an impediment to advancement at Gillette.[4]  Def. Ex. 1 EGM at 33:6 – 16, 35:21 – 36:3, 36:21 – 37:8, 94:4 – 24, 97:12 – 24 and 155:23 – 158:14.  But for Ruben's stated animus

---

[3] Inter-Office Memo dated October 24, 2002 acknowledges "The Board [ ] recognize the challenges associated with the implementation of a project of this magnitude." Plf. Ex.  F, 2nd full parg.

[4] These remarks included 1) you are the best person for a promotion to Comptroller but I am under pressure to give position to a person from Argentina (opening given to Marcell Ripoll less qualified Argentinean), 2) I could speak about advancing in Gillette if my passport Argentinean, Bralizan or Columbian  - I had the wrong passport, 3) discussing possible promotion he stated this job "is for them" meaning not even for me to ask about filling position, 4) reminded me that he told me before I had the wrong passport when discussing filling VP Oral-B job. 5) consistently mock my accent by exaggerating my pronunciation, 6) wont give me a pay increase upon joining Renaissance   because he did not want to show support for me even thought every other person who joined after me received a base pay increase, 7) consistently ask not to talk in meeting.  Plf. Ex.  1 – Aff. EGM ¶¶ 19 -27.

towards the Plaintiff based on his national origin he would have been selected as an NGL in 2003 and obtained access to advancement opportunities.

As a direct result of the unlawful inclusion of national origin, despite exceptional qualifications for promotion, the Plaintiff was effectively excluded from consideration by the FLT for any promotion to a senior management position.

B.  Plaintiff Satisfies Standard for Prima Facie Case of Discrimination.

Discrimination cases arise in a variety of contexts, the prima facie elements must be tailored to the given case. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512 (2002). The circumstances of this case do not fit neatly within the standard elements of a prima facie failure to promote case.  In a  standard case the necessary elements to set forth a prima facie case failure to promote are the Plaintiff (i) is a member of a protected class who (ii) was qualified for an open position for which he applied, but (iii) was rejected (iv) in favor of someone possessing similar qualifications. *Gu v. Boston Police Dep't*, 312 F.3d 6, 11 (1st Cir. 2002) and *Abramian v. President and Fellows of Harvard College*, 432 Mass. 104 (2000).  The circumstances of employment at higher level positions in large corporations, as is the case in the present matter, require an expanded definition of 'application'.  *Mateza v. Polaroid Corporation*, 27 Empl. Prac. Dec. P 32,286, Mass.Super., July 30, 1981 citing *Smith College v. MCAD*, [18 EPD ¶ 8699] Mass. Adv. Sh. (1978) at 2359-60.

In evaluating whether a discrimination claim under Chapter 151B survives summary judgment, Massachusetts courts use the same three-stage analysis originally devised by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) to address Title VII discrimination claims.  *Wynn & Wynn, P.C. v.*

*MCAD,* 431 Mass. 655, 665 (2000); *Blare v. Husky Injection Molding Systems Boston,*

*Inc.,* 419 Mass. 437, 440 (1995). The Plaintiff alleges in his Complaint that under the

same underlying facts the Defendant discriminated against him in violation of M.G.L.

151B as well as Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e. Cmt. Gen.

Therefore, the analysis for prima facie cases applies to federal and state discrimination

statutes.

    1)  *Unlawful Discrimination in failure to promote.*

    In a case of an employer that fails to post an available position, thereby depriving

the employee of the opportunity to apply, an employee can still make out a prima facie

case of discrimination with respect to the denial of a promotion. *Hill v. Forum Health*,

167 Fed. Appx. 448; 2006 U.S. App. LEXIS 1698 (6th Cir. Jan. 20, 2006)(summary

judgment in favor of defendant affirm based on plaintiff's insufficient evidence of

pretext). The Sixth Circuit decision in *Hill* explained that it is not necessary for an

employee to apply for the promotion where the employer has not given employees notice

and a formal mechanism by which to express interest in applying for the promotion.

Therefore, the employer had a duty to consider each employee who might be reasonably

interested in the promotion. Where the employer did not give the Plaintiff an opportunity,

the district court concluded, that Plaintiff did not have to meet the "applied for" and

"considered for" elements to make out a prima facie case.

    The Defendant's selection process for senior level management positions ran

through an annual talent management review in which members of the FLT presented

possible candidates for consideration for future leadership openings. Def. Ex. 5, Cramb

Aff. ¶¶ 23,24; Def. Ex. 3 Husain Dep. at 160; Def. Ex. 5, Thus the Defendant's new

review process creates a circumstance that warrants the Plaintiff need not meet directly the applied for consideration in failure to promote prima facie case. Defendant's new scheme for filling high level senior position is devoid of a mechanism that allows an employee to express an interest and apply for a promotion. Defendant's scheme eliminated from the hiring process a qualified candidate applying opening and replaced it with a selection process driven by a system that first requires the endorsement of a qualified candidate's immediate supervisor.

The Plaintiff's immediate supervisor's unlawful bias harmed his equal and fair consideration for advancement to senior level positions at Gillette. Ruben's omission, by failing to endorse the Plaintiff as a potential NGL at the August 2003 talent review process, Def. Ex. 5, Cramb Aff. ¶ 25, insidiously infected Garza Mora chances for advancement based illegal on documented national origin bias. See above footnote No. 4.

*2) Federal 1981 Discrimination.*

The line between discrimination based on "ancestry or ethnic characteristics," and discrimination based on "place or nation of . . . origin," is not a bright one. *Saint Francis College v. Al-Khazrji,* 481 U.S. 604, 614 (1987)(Justice Brennan, concurring). Often, however, the two are identical as a factual matter. *Id.* see 29 C.F.R. 1606.1 (1986)(national origin discrimination "includ[es], but [is] not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural, or linguistic characteristics of a national origin group"); *Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86, 89

Section 1981 purpose ensures all persons can make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for

the security of persons and property as is enjoyed by white citizens.  Section 1981 does not use the word race to articulate a group of persons who where to receive protection under the statute but rather clearly defined a protected right of all non-white citizens. Based on the history of 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. *Saint Francis College,* at 613.  Where a Plaintiff can prove that he was subjected to intentional discrimination based . . . [not] solely on the place or nation of his origin, he would make out a case under 1981. *Id*.

The Plaintiff in his Complaint does not use the specific word race but instead makes several allegations of discrimination based on ethnic group Latin or Latino.  Cmt. ¶¶ 30, 34, 35, 53, 54 and 72.  Plaintiff's Complaint is not solely based on his national origin but also infers discrimination based on ethic group that of Latino.  Where a factfinder determines that the Plaintiff is a member of a protected class, and Defendant had a intention to discriminate and that discrimination interfered with the making and enforcing of a contract, then liability under §1981 is applicable against the Defendant.  It is enough to name the Plaintiff and the Defendant, state the nature of the claim for relief and a few additional details, such as the date of any occurrence, that will allow the Defendant to investigate.  *Kolupa v. Roselle Park District*, Case No. 05-2925 (7th Cir., Feb. 10, 2006).

C.  Plaintiff Satisfies His Burden of Establishing a Prima Facie Case of Disparate Treatment Regarding Wages Paid, Unjust Requirement of Accent Correction

1) *Wage Payment Discrimination*

In the first stage of the *McDonnell Douglas Corp.* analysis, the Plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. *Blare,* 419 Mass. at 441. Once the prima facie case is established, the Plaintiff enjoys a presumption of discrimination that entitles the Plaintiff to judgment unless and until the Defendant rebuts the presumption "by articulating a legitimate, non-discriminatory reason for its [adverse employment] decision." *Id* . Once the Defendant satisfies this burden of production, the presumption vanishes, and the Plaintiff bears the burden of persuasion at the crucial third stage to establish either that the employer's articulated reason was a pretext or that the actual reason for the termination decision was discrimination. *Id.* at 444.

The Plaintiff's Complaint alleges based on his Latino ancestry and national origin a denial of salary increases and other localization benefits provided to white employees and persons not of Mexican origin.   Cmt. Gen., Plf. Ex. 1 – Aff. EGM ¶¶ 2,3 and Def. Ex. 1 EGM at Dep. at 66:18-21, 67:17 – 68:5.  Plaintiff alleges that he was the only person who started on Renaissance  who was not given an increase in base salary. Cmt. ¶ 29;Def. Ex. 1 EGM Dep. at 65:9-14, 91:1-7, 157:3-10. Further, the Plaintiff alleges unjust removal from successfully leading a major company project (equivocal of a demotion) that directly impacted on him being excluded from consideration in a newly formed company after Gillette merged with Proctor and Gamble and ultimately lead to his involuntary separation for the company. Plf. Ex. J; Plf. Ex. 1 – Aff. EGM ¶¶ 46 – 49 and Def. Ex. 3 Husain Dep. at 164:19-22.

A Plaintiff can establish a prima facie case of discrimination in pay by showing he received smaller raises than received by persons not in his protected class. *Rowlett v.*

*Anheuser-Bush, Inc.*, 832 F.2d 194 (1st Cir. 1987), *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

All the members of the Renaissance team, with the exception of the Plaintiff and Ruben, were non-Latinos. Def. Ex. 1 EGM Dep. at 153:11-18. Renaissance was a major company task taken on by the Finance division and considered by senior managers to be "one of the most important financial projects for Gillette in a decade." Def. Ex. 5 Aff. Cramb ¶ 5 and Def. Ex. 3 Asad Husain Dep. at 64:16-23. In April 2002 the Plaintiff was asked to lead Renaissance as its Director because of his experience and track record of success and positive results in prior assignments. Def. Ex. 5, Cramb Aff. at ¶ 8; Def. Ex. 1 EGM Dep. 62-64.

Garza Mora satisfies the first prong of the *McDonnell Douglas Corp* analysis by a preponderance of evidence faced discrimination in pay rate, where only he a Mexican born Latino was treated differently when he began working on "one of the most important financial projects for Gillette in a decade," without the opportunity for base pay increase. When compared to other non-members of his protected class, each non-Latino received base salary increase to join "one of the most important financial project for Gillette in a decade." At the second stage of the *McDonnell Douglas Corp* analysis the Defendant can offer a non-discriminatory reason for the difference in treatment. The Plaintiff anticipates that the Defendant will put forward the argument that he did not negotiate or ask for a pay increase in connection with his appointment to Project Renaissance. Defendant's Statement of Fact No. 25.

At this third stage of *McDonnell Douglas Corp* analysis the Plaintiff can proffer evidence that not negotiating the salary is not the real reason for the difference in

treatment but instead pretext for discrimination.  The Plaintiff's proffered evidence at the third stage consists of unexplained variances and the unavailability of various other benefits the company normally provides to an employee changing countries to lead "one of the most important financial projects for Gillette in a decade.[5]  Furthermore, when anyone else joined Renaissance  they did not need to negotiate a salary increase that was offered to anyone who joined.  Plf. Ex. 1 – Aff. EGM ¶ 26.  Ruben directly stated to Plaintiff he was not giving him a salary increase because he did not want to show he supported him in any way.   Plf. Ex. 1 – Aff. EGM ¶ 26.

2) *Unjustified Requirement Accent Correction*

Accent and national origin "are obviously inextricably intertwined in many cases," a "searching look" is demanded to ensure that employer assertions about a candidate's poor communications skills are not used as a cover or pretext for national origin discrimination. *Fragante v. City & County of Honolulu,* 888 F.2d 591, 596(9th Cir. 1989 )(citing 29 C.F.R. § 1606.6(b)(l)).

As part of Plaintiff's 2003 PDP the Defendant included a development plan that he needed to improve his accent/fluency.  Plf. Ex. A.  Additionally, in a meeting in 2003 with Plaintiff  Ruben told him in order to be considered an NGL he would need accent correction so that people could understand him.  Def. Ex. 1 EGM Dep. at 97:2-6 and

---

[5] When offered the job to work on Renaissance  the plaintiff worked and lived in Mexico, in order to take the position he needed to relocate to Boston, MA its company Expat policy that an employee relocating to another country to work is allowed  a country of assignment package which includes commodity services, utilities and expenses that the employee would not have otherwise had. See Def. Ex. 3 Husain Dep. at 18:14-21.  As part of the Expat policy dictates that the employee's immediate manager with Expat Dept determine the conditions of the package which include salary which the employee should know before starting. . See Def. Ex. 3 Husain Dep. at 21:22 – 24:6.  When Plaintiff started working in U.S. the company gave him without negotiations a localization package, EGM Dep. At 66:18 – 21.  An expat package is more expensive option for Gillette. . See Def. Ex. 3 Husain Dep. at 73:9 – 15 and Ruben Dep at 147:8 - 17.  The localization package when given to an employee is paid in a lump sum. See Def. Ex. 3 Husain Dep. at 164:23 – 165:3  Plaintiff when localized was not given lump sum payment but a less valuable three years payout. Def. Ex. 1 Graza Dep. at 68:6 – 69:1.  Plaintiff immediate supervisor had no discussion with him about localization. See Def. Ex. 4, Ruben Dep. at 147:18 – 21.

112:21 – 113:12.  When the Plaintiff asked him to elaborate at a later meeting as to what he meant by accent correction the only response was that it was straightforward.  Def. Ex. 1 EGM Dep. at 114:3-24.  Despite Ruben's claiming people were saying things to him that they could not understand what Garza Mora was say in presentation he had no documentation of this as a development issue for the Plaintiff in 2003.  Def. Ex. 4 - Ruben Dep. at 98:6 – 99:10.  While in the position of Director Renaissance  several people in positions above and below Garza Mora expressed an opinion that his presentations have been clear and extremely helpful.  Plf. Ex. 1 – Aff. EGM ¶ 40 and Plf. Ex. D – Email from Lemuel Lanier February 27, 2003.  Mr. Lanier's email is documented evidence contradicting any assertion that people during 2003 where having trouble understanding his presentations.  Furthermore, the Defendant's Answer acknowledges they are in possession of documents that Mr. Garza Mora is proficient at English when his native language is Spanish. Def Ans. Cmt. ¶ 2.

Generally, an employer may only base an employment decision on accent if effective oral communication in English is required to perform job duties and the individual's foreign accent materially interferes with his or her ability to communicate orally in English.  EEOC Compliance Manual Sec. 13 V. (A) Dec. 2002.  It would therefore be an easy refuge in this context for an employer to unlawfully discriminate against someone based on national origin to state falsely that it was not the person's national origin that caused the employment or promotion problem, but the candidate's inability to measure up to the communication skills demanded by the job. *Fragante v. City & County of Honolulu*, 888 F.2d 591, 596 (9th Cir. 1989).

Defendant can not set forth any facts that justify the requirement of imposing on the Plaintiff that he correct his accent in 2003.  Assuming the court accepts the statement of this immediate supervisor, without documentation as credible, that other people talked to him verbally, as an offer of a legitimate business reason for the action, then the Plaintiff's documentation of the clarity of his presentation adequately rebuts that assertion as pretext for national origin discrimination.

In the context of a discrimination case based on disparate treatment, summary judgment is a disfavored remedy. *Matthews v. Ocean Spray Cranberries, Inc.,* 426 Mass. 122, 127 (1997), citing *Blare,* at 439. "The ultimate question of the defendants' state of mind is elusive and rarely is established by [anything] other than circumstantial evidence . . . which requires the jury to weigh the credibility of conflicting explanations of the adverse [employer conduct]." *Blare,* at 439-40, citing *Wheelock College v. MCAD,* 371 Mass. 130, 137 (1976).

D.  A Reasonable Trier of Fact Could Disbelieve the Defendant's Proffered Proof Justifying Demotion as Pretext Discrimination

In March of 2004 the Defendant removed the Plaintiff from his position as Director of Renaissance . Def. Ex. 5, Cramb Aff. at ¶ 50.  As there was no other equivalent position the Plaintiff's removal equated to a demotion.  Def. Ex. 5, Cramb Aff. at ¶ 50.  Thereafter, the Plaintiff was assigned work of a grade 16/17 with no supervisory responsibilities.  Def. Ex. 7 Baker Aff. at ¶ 15.  At the time of his removal Joe Schena who had recently been placed in the position of overseeing Renaissance  announced to the corporation that the Plaintiff was moved out of the project as a result of his desire to flatten the structure. Plf. Ex. J.  Mr. Schena's announcement thanked Garza Mora for his efforts and contribution to the projects accomplishments.  Plf. Ex. J.  Supporting the

notion that Renaissance achieved tremendous successes while the Plaintiff was its Director are numerous inter-office memo's from Chuck Cramb to Gillette's Chairman of the Board of Directors and CEO J. Kilt. Ex. F. Notwithstanding the fact that the actual startup date of Renaissance was delayed related to problems with contingent project GPCat, and unrelated to Plaintiff's performance, there was a great deal accomplished by the Renaissance team under difficult circumstances. Def. Ex. 4, Ruben Dep. at 130:14-18; Plf. Exhibit 1 – Aff. EGM ¶ 60.

At the time of the Plaintiff's removal from the project he specifically expressed an interest in finding a permanent role at Gillette. Plf. Ex. 1 – Aff. EGM ¶ 47. Among others, the Plaintiff also expressed this interest to Joe Schena, Kevin Baker and Asad Husain. Plf. Ex. 1 – Aff. EGM ¶ 47. Despite more than 16 years of loyal service to the Defendant several senior level managers without justification assumed that the Plaintiff would seek to leave the company. Def. Ex. 5, Cramb Aff. at ¶ 50; Def. Ex.. 7, Baker Aff. at ¶ 12. When Garza Mora stayed on after his demotion to a grade 16 position Joe Schena increased the stress level by creating an unjustified very negative evaluation of Garza Mora covering the time period he worked on Renaissance in the first quarter of 2004 under the supervision of Ruben.[6] Joe Schnea reviewed the Plaintiff during this first quarter of 2004 as extremely negative without having any supervisory control over Garza Mora during this time period. The Plaintiff formally complained about the negative review by someone who was too far removed to know whether he performed his objectives well. Def. Exhibit 3 Husain Dep. at 52:6-16 and 142:12-18. Garza Mora's

---

[6] The effect of a negative evaluation would limit salary increase, access of bonus in stock and limit advance. See Plf. Ex. B.

complaint were ignored because Mr. Cramb the reviewer on the Plaintiff's PDP signed of on them as he had in prior years.  Def. Exhibit 3 Husain Dep. 142:19 – 143:6.

The Plaintiff's PDP for fiscal year 2003 accurately reflected his successes on achieving his objectives and comports with Mr. Cramb's regular reports to J. Kilt the CEO on the many successes of Renaissance . Plf. Ex. A; Plf. Ex. F.   Plaintiff's PDP for 2004 written by Joe Schena is suspect because he did not report to him during the first quarter of 2004, which is the period of time he was given an extremely negative review.

A Plaintiff can establish pretext by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [defendant's] proffered legitimate reasons" such that a factfinder could " infer that the [defendant] did not act for the asserted non-discriminatory reasons." *Santiago-Ramos v. Centennial P. R. Wireless Corp.,* 217 F.3d 46, 56 (1st Cir. 2000) quoting *Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 168 (1st Cir. 1998).  A Plaintiff can prevail on a discrimination claim when his case rests exclusively on a prima facie case of discrimination and sufficient evidence for the trier of fact to disbelieve the defendant's legitimate, nondiscriminatory explanation for its action. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097 (2000).

The evidence used to show pretext can support a finding of discriminatory animus if it enables a fact finder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action.  *De La Cruz v. El Conquistador Resort & Country Club,* 218 F.3d 1, 5 - 6 (1st Cir. 2000).  A Plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is

15

false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves*, at 147-148.

Once the Plaintiff presents a prima facie case, there is a rebuttable presumption of intentional discrimination, however, the employer can rebut the presumption created by the prima facie case by articulating a legitimate, nondiscriminatory for the adverse action. *Burdine*, 450 U.S. at 254-55. Once the employer produces evidence to support a nondiscriminatory explanation for its decision, the Plaintiff is then afforded the opportunity to proffer sufficient admissible evidence, if believed, by a preponderance of the evidence that the legitimate reasons offered by the Defendant were not its true reasons, but were a pretext for discrimination. *Burdine*, at 253; *see also St. Mary's Honor Center v. Hicks*, 509 U. S. 502, 507-508 (1993). The Plaintiff, however, bears the ultimate burden of persuasion on the issue of discrimination. *Burdine*, at 254-56 (1981); *McDonnell Douglas Corp*., at 802.

Documentation presented by the Plaintiff strongly challenges Defendant's proffered evidence that he was justly removed from Renaissance  and demoted because the project was delayed and went over budget. Plf. Ex. A; Plf. Ex. C and Plf. Ex. F. Defendant based there adverse action on the fact that the project lead by the Plaintiff was delayed and therefore went over budget. Notwithstanding that the project was delayed, it does not without some supporting documentation translate into a conclusion that the Plaintiff's job performance was unsatisfactory. Plaintiff's evidence can establish that he performed his job well and that factors beyond his control (not his unsatisfactory performs) led to the delays in Renaissance . There is amble evidence in this case supporting the notion that Plaintiff's lack of performance does not justify Defendant's

adverse action and as such the trier of fact could conclude that the employer's false

justification for adverse action is pretext for unlawfully discriminated. *Reeves*; at 141; *see*

*also Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995).

Court's are mindful that there is no "mechanical formula" for finding pretext.

*Feliciano de la Cruz*, 218 F.3d 1, 6 (1st Cir. 2000). It is the type of inquiry where

"everything depends on the individual facts." *Thomas v. Eastman Kodak Co.,* 183 F.3d 38,

57 (1st Cir. 1999) (citation and quotation marks omitted). As such, we have been

"particularly cautious" about taking such questions out of the jury's hands. *Hodgens*, 144

F.3d at 167; see also *Petitti v. New England Tel. & Tel. Co.*, 909 F.2d 28, 34 (1st Cir.

1990)(determinations of motive and intent, particularly in discrimination cases, are

questions better left for the jury, as proof is generally based on inferences that must be

drawn, rather than on the proverbial "smoking gun")

E. Continuing Violation Doctrine Applies to Plaintiff's Claim of Discrimination.

On December 9, 2004 the Plaintiff filed a timely complaint with MCAD and

EEOC claiming disparate treatment discrimination based on his national origin. Cmt. ¶

78. Defendant argues any act of discrimination beyond the statute of limitation should be

excluded from any consideration in Plaintiff's timely filed complaint. Plaintiff disagrees

for the following reasons.

The presence of "continuing violations" can provide an exception to the statute

of limitations pursuant to 804 Code Mass. Regs. § 1.03(2). *Ocean Spray Cranberries v.*

*MCAD,* 441 Mass. 632, 642 (2004); see *Clifton v. Massachusetts Bay Transp. Auth.,* 445

Mass. 611, 616-17 (2005). This exception "recognizes that some claims of

discrimination involve a series of related events that have to be viewed in their totality in

order to assess adequately their discriminatory nature and impact." *Cuddyer v. Stop & Shop Supermarket Co.,* 434 Mass. at 531. For the continuing violation doctrine to apply, the Plaintiff generally must prove that: "(1) at least one discriminatory act occurred within the limitations period; (2) the alleged timely discriminatory acts have a substantial relationship to the alleged untimely discriminatory acts . . . [and] (3) earlier violations outside the limitations period did not trigger [the plaintiff's] awareness and duty to assert his rights." *Ocean Spray,* at 642-43 (fn3). The conduct that occurred within the limitations period must be sufficient to anchor the earlier incidents. *Cuddyer,* at 532. The anchoring conduct alone need not necessarily support his claim, but it must substantially relate and contribute to the alleged course of discriminatory conduct. *Cuddyer,* at 533. Events, outside the limitation period that do not substantially relate however, may still be used as background evidence to support the surviving claims. *Cuddyer,* at 530 n.10 ("plaintiff who has a seasonable claim may use events that occurred prior to the limitation period as background evidence . . . even though she cannot recover damages for the time-barred events.").

At the heart of the Plaintiff's Complaint rests the contention that for a number of years his immediate supervisor, Ruben, consistently treatment him differently based on his national origin. See above footnote 4. Throughout his long career with Gillette the Plaintiff work hard to obtain the skills and experience that would lead to higher levels of responsibility as well as pay. Cmt. ¶¶ 2-6; 18-23. To the extent that the Plaintiff had the education coupled with high performance over a number of years he was able to earn career advancement at Gillette. Over the last few years of his employment it became apparent that his advancement and the benefits associated with higher levels of

responsibility at the senior management level where unlawfully curtailed chiefly through the discriminatory animus held by his immediate supervisor.  The pattern of discrimination only became crystal clear to the Plaintiff in early 2004 when Gillette took the adverse action of demoted him from the position of Director of Renaissance . Def. Ex. 5, Cramb Aff. at ¶ 50.  Plaintiff's demotion subsequently led to him receiving less bonus pay and greatly contributed to his involuntary separation from employment when Gillette merged with Proctor and Gamble latter in 2004. Def. Exhibit 3 Husain Dep. 164:6-22; Def. Ex. 1 EGM Dep. 135:18 – 136:23.

As a direct result of his immediate supervisor's actions his career advancement was halted by the poisonous inclusion of his discriminatory animus towards Plaintiff's national origin of Mexico.  In 2003 Gillette's new talent review system, allowed the Plaintiff's supervisor to hold all the power to either advance him towards a senior management level position or torpedo 16 years of loyal service.  But for a discriminatory animus, Ruben withheld his endorsement of the Plaintiff during the August 2003 talent review, without any documented justification, despite all the available documentation that would support a conclusion that the Plaintiff had the education, skills and work experiences that would make him a leading candidate for promotion. When Ruben's poisonous animus in August of 2003 manifested itself in early 2004 with the Plaintiff's unjust removal and demotion from directing Renaissance  it anchored the series of subtle forms of discrimination over the past years that limited the Plaintiff's advancement to senior level management opportunities within Gillette's Finance Division.

IV.  CONCLUSION

Several genuine issues of material fact are presented in this matter, thus precluding a summary judgment determination.  Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, at 248 (1986).  Where, as in this matter, the moving party's state of mind, motive, or intent is at issue, then summary judgment is a disfavored means of resolving the disputes, which requires weighing the credibility of witnesses.  *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464 (1962).

For the foregoing reasons, the Defendant's Motion for Summary Judgment should be denied in its entirety as the Plaintiff sets forth a prima facie case of discrimination in violation of state and federal laws.

Respectfully submitted
Plaintiff By his Attorney


 /s/ Neil Osborne
Neil Osborne (BBO# 567674)
41 West Street 7th Floor
Boston, MA  02111-1216
(617) 482-1160 Phone
(617) 482-1166 Fax

Dated: September 29, 2006

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants (if any) on September 29, 2006.

 /s/ Neil Osborne
Neil Osborne

Plf. Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

EDUARDO GARZA MORA                )
      Plaintiff,                )
                      )
v.                                )     Civil Action 05-11651NMG
                      )
THE GILLETTE COMPANY              )
      Defendant.                )
_____ )

## Affidavit of Eduardo Garza Mora

I, Eduardo Garza Mora, being on oath deposes and say as follows:

1. I currently reside at 25003 Castle Peak Court Katy, TX 77494.

2. My national origin is Mexico.

3. I was born in Guadalajara, Jalisco, Mexico.

4. I am currently employed at The Coca-Cola Company in Houston, TX.

5. I started work for The Coca-Cola Company on December 30, 2005.

6. Prior to working for The Coca-Cola Company I worked for The Gillette Company.

7. In November 1st, 1987 I started working for The Gillette Company in the position of Business Planning Manager in its Mexico location.

8. My last day of work for Gillette was October 31 2005.

9. Prior to taking the position of Director Project Renaissance I held the position of Controller / Finance Director with a grade level of 21.

10. As the Controller / Finance Director one of my many responsibilities of the position required that I give regular presentations.

11. Between the years of 1993-2002, I held three different positions as Controller / Director of Finance working in various geographical locations such as Colombia, Turkey, and Mexico.

12. In my role as Controller / Finance Director and as an indirect report to Claudio Ruben he had numerous opportunities to observe me make oral presentations to different audiences.

1

13. As Controller / Finance Director I reported indirectly to Claudio Ruben; he was in a position that oversaw my work.

14. Between 1993 and 2002 Claudio Ruben had a direct or indirect reporting relationship to Chuck Cramb who maintained a supervisory role over me as Controller / Director of Finance.

15. During my time as Controller / Director of Finance Chuck Cramb had opportunities to see me make oral presentations.

16. I have received various formal and informal compliments on my ability to present my ideas prior to taking the position of Director Project Renaissance from subordinate, co-workers, individuals in position senior to my grade level as well as directly from Claudio Ruben and Chuck Cramb.

17. It was my understanding from speaking with Claudio Ruben that the position of Director of Project Renaissance would also include on a regular basis making oral presentations to various groups.

18. I was lead to believe by my supervisors that based on my past success in my prior positions that the position of Director of Project Renaissance would be a great career advancement opportunity for me.

19. While working for Claudio Ruben I was consistently reminded by him that my Mexican origin would be an impediment to my career growth with Gillette.

20. Claudio Ruben has told me I was the best person for a promotion to Controller but he was under pressure to give position to a person from Argentina.

21. The opening for the Controller position was given to Marcelo Ripoll a less qualified Argentinean.

22. Claudio Ruben has told me I could speak about advancing in Gillette if my passport was Argentinean, Brazilian or Colombian - I had the wrong passport.

23. Claudio Ruben when discussing a particular possible promotion stated this job "is for them" meaning not even for me to ask about filling the position.

24. Claudio Ruben has reminded me that I had the wrong passport when discussing the possibility of me filing the position of Vice Present for Oral-B job.

25. Claudio Ruben has consistently mocked my accent by exaggerating my pronunciation, making gestures and even throwing aside documentations I've diligently prepared.

2

26. Claudio Ruben explained to me he won't give me a pay increase upon joining Project Renaissance because he did not want to show support for me even thought every other person who joined after me received a base pay increase.

27. Claudio Ruben has consistently shouted me down in meetings whenever an American was about to speak.

28. When I started in the position of Director of Project Renaissance the level and scope of my duties and responsibilities increased greatly.

29. When I started in the position of Director of Project Renaissance my grade level of 21 did not increase with the level of responsibility.

30. When I questioned Claudio Ruben on why he selected me for the position of Director of Project Renaissance he responded that Chuck Cramb made the selection not him; that his choice would have been a Colombian.

31. I was present at a staff meeting of Finance Leadership Team when a subordinate of mine on Project Renaissance, Gary Piscatelli, made and outburst openly confirmed he maintained the view that Latinos such as myself from Mexico and Claudio Ruben of Argentina where not worthy of being his boss. I was personally offended because the inappropriate comments of Mr. Piscatelli directly challenged the projects strategies that required him to take direction from two person's of Latin decent.

32. Gary Piscatelli before taking on the assignment of working for Project Renaissance expressed the view that I was not worthy of supervising him. This despite that he only thing he was told about me was my name and my national origin.

33. Mr. Jose Uribe is one of many individuals that in my many supervisory roles I have the great fortune to help influence his career development at Gillette.

34. As a direct result of working with Mr. Uribe I had the opportunity to get to know him and learn about his background.

35. Mr. Uribe is widely known at Gillette as "the Paisa" a person whose origin is the Colombian region of Antioquia.   Mr. Uribe's country of origin is Colombia and not Mexico.

36. A position at the head of finance for a region or a Business Unit (usually with a title of Vice President) would be a natural promotion from my position as Controller / Finance Director.

37. I am aware of several individuals who held the position of Controller / Finance Director who received promotions to the head finance position of a region.

38.     The names of these similar situated individuals who received promotions are: Claudio Ruben (Argentinean), Alberto Loustau (Argentinean), Eduardo Castillo (Argentinean) and Bob King (American).

39.     In 2003 after successfully guiding an extremely difficult and risky project such as Project Renaissance along with my prior accomplishment as Controller / Finance Director I was at the very least a qualified candidate for an opening at the level of Vice President of Finance of a region or a Business Unit.

40.     While in the position of Director Project Renaissance several people in positions above and below me expressed an opinion that my presentations have been clear and extremely helpful.

41.     On several occasions, following presentations as Director of Project Renaissance, Claudio Ruben congratulated me. Mr. Ruben was so pleased, with the results I obtained that he even requested me to repeat the same presentation to different audiences.

42.     It was only at the point that the GPCat project confirmed it needed additional time that one of Project Renaissance's work streams, Financial Reporting, then knew that its go-live date would be correspondingly delayed.

43.     Sting testing and integration testing did not in any way cause any critical date of Project Renaissance to be delayed as these matters where manageable.

44.     In early 2004 I saw the need for the risk assessment for the Financial Reporting work stream of Project Renaissance and worked to consensus with Piscatelli, Ruben and Lanier to bring in Deloitte for this assessment.

45.     Joe Schena told me directly that it was his decision to remove me from Project Renaissance in order to flatten the organization.

46.     Mr. Cramb had no information that would justify an expectation that I after more than 16 loyal years at Gillette would seek to leave. At the time I was removed from leading Project Renaissance; he offered and I accepted his commitment to search for a permanent position for me.

47.     I specifically expressed an interest in finding a permanent role at Gillette after being removed from Project Renaissance so that Joe Schena could accomplish his vision of a more flatten organization. Among others, I expressed this interest to Chuck Cramb, Joe Schena, Kevin Baker and Asad Husain.

48. Gillette employees where not told that as a precondition for consideration in the newly integrated company with P & G required signing an authorization to release certain information from personnel files.

49. I was informed that employees had a choice which I choose to exercise based on my recent complaints over my PDP that included in my opinion unjustified negative evaluation of my performance on Project Renaissance.

50. Gary Piscatelli's inappropriate comment and reaction during a May 2003 meeting warranted discussion of his immediate termination.

51. After several discussions with my supervisor, Human Resources personnel and my supervisor's boss it was unmistakably agreed that Piscatelli was to be removed from Renaissance not only for his outrageous behavior during a staff meeting, but for the creation of a hostile working environment against me.

52. Claudio Ruben informed me that Mr. Piscatelli was not to be removed from Project Renaissance because, after intervention from Joe Schena, the Financial Operating Committee (which included Chuck Cramb, Claudio Ruben and Joe Schena) reversed the decision of the group that his action and behavior warranted removal. Claudio Ruben told me that this decision was imposed to him against his own will.

53. I was opposed to the decision of not to remove Mr. Piscatelli and advocated for some formal documentation of disciple but my efforts where rejected by senior management.

54. Prior to the May 2003 incident, Piscatelli was creating a difficult work environment for me, by undermining my authority with co-workers, subordinates and members of the Financial Leadership Team.

55. When I learned for his negative attitude towards my supervision I spoke directly with Mr. Piscatelli and he admitted boastfully that he engaged in this negative behavior and stated that everyone in the group liked it and encouraged him when he spoke ill of me and of Claudio Ruben.

56. After speaking directly with Mr. Piscatelli and not getting any assurance that he would stop this negative behavior I spoke with Claudio Ruben about how best to address this problem.

57. Claudio Ruben failed to meaningful address my concerns that Mr. Piscatelli's behavior was undermining my authority with the group. Mr. Ruben response was that Mr. Piscatelli was able to get away with his behavior because Mr. Piscatelli was an American and we (Mr. Ruben and me) were Latinos.

58.    When I did not get any meaningful assistance from Mr. Ruben I recall
       having discussions with Asad Husain a Human Resource manager
       regarding Piscatelli creating a difficult  work environment as well as
       discussions with Nancy Picard and Kalpana Shamugan, both outside
       consultants about the problems his behavior was having on me and the
       negative impact on the group.

59.    In 2003 I was informed by Asad Husain that employees selected as NGL
       received special training and development opportunities not available to
       other employees.

60.    In January of 2004, it became clear that Project Renaissance was not going
       to meet critical deadlines due to project delays related to GPCat, a
       program not under my control. Other delays were caused by IT, also not
       under my control, which were manageable and would not have put at risk
       critical deadlines.

61.    I had discussion with Chuck Cramb about gaining control over the IT
       work stream but Mr. Cramb refused to give control of this critical project.

62.    In February 2004, Project Renaissance's string testing and integration
       testing under the direct control of IT department lead by Lem Lanier, who
       was equal in reporting line to Claudio Ruben, were behind schedule.

Signed this day under the pains and penalties of perjury, September 27, 2006

*Eduardo Garza Mora*

Eduardo Garza Mora



Plf. Exhibit  A



## *"Driving Performance through Assessment and Development"*

## Performance Development Process
### For Fiscal Year - 2003

Date Form Completed    <u>January 30, 2004</u>

Name    <u>GARZA</u>                    <u>Eduardo</u>
          Last                      First                      Middle Initial

Present Position  <u>Director, Project Renaissance</u>

Business Unit/Group  <u>Corporate Controller's Department</u>

Department    <u>Renaissance</u>

Location  <u>Boston, MA</u>

**CONFIDENTIAL**



*World-Class People*
**Gillette Human Resources**

**PART I: ASSESSMENT OF OBJECTIVES**

**ANNUAL OBJECTIVES FORM - FY**   _____2003_____

*Year Just Completed*

| Name: **Eduardo GARZA** | | | Date: **Jan. 2004** | Approval | **Claudio RUBEN** | | | | |
|---|---|---|---|---|---|---|---|---|---|

| Area of Accountability | Objectives | Relative Priority | Standard of Performance | Rating | | Weighted Rating | |
|---|---|---|---|---|---|---|---|
| | | | | Self | Mgr | Self | Mgr |
| 1  Business Process Improvement | Implement the new budgeting and planning model, on agreed timetable.<br>❑  Phase I - March<br>❑  Phase II - July<br>❑  Phase III - September<br>❑  Be ready for Phase IV - Q1 '04 | 20% | *Successful implementation.* Delivered: Market & Legal P&L and B/S. Developed: SGP. Developed late: GTM & Customer P&L. Exceeded: ArcPlan analytics, Demand Plan alignment, old systems phase-out and future processes implementation in three regions. | 3 | 3 | 0.6 | 0.6 |
| 2  Business Process Improvement | Complete all necessary steps to ensure implementation of the new Financial Reporting model, processes and tools. To be ready to start in Q1, '04. (Financial Reporting, Management Reporting, consolidation process, KPI's, etc.) | 20% | *Successful implementation.* In line with approved plan: development to be completed and Integration Testing to start in Q1. A sound project design sign-off was introduced. As a windfall of the reporting tool selection process, Renaissance helped the selection of the company's standard dashboard solution. | 3 | 3 | 0.6 | 0.6 |

November 2003

| 3 Business Process Improvement | Throughout the process, make sure that the right enablers are in place and that we stick to them:<br>□ Guiding coalition<br>□ Communication program<br>□ Risk mitigation plan<br>□ Project management<br>□ Change management program<br>□ Training program<br>□ Required human resources<br>□ CITA | 20% | *Management judgment.*<br>Beyond the original plans:<br>□ Hub visits to gain first hand knowledge to better fit customer needs (Poland, Russia, UK, France, Spain and Brazil).<br>□ Survey on Phase I to measure the tool and detect needs. | 4 | 4 | 0.8 | 0.8 |
| 4 Business Process Improvement | Resolve all outstanding and new issues.<br>Memo, current open topics:<br>□ Business partnering definition<br>□ Exploit best practices (Japan)<br>□ Internal and process control issues<br>□ Frequently asked Q&A's<br>□ Retention of key people during transition | 10% | *Management judgment.*<br>Through a comprehensive action log, Renaissance is translating new topics into actions.<br>Beyond original plan:<br>□ Supported the **Finance Strategic Map** start up and communication program.<br>□ Recommended a post-Renaissance **service model** for Financial Reporting.<br>□ **Control** was pointed out as an important concern that is being addressed through pre / post Audit reviews. | 4 | 4 | 0.4 | 0.8 |

| 5  Business Process Improvement | Keep project cost within Board's approved limit, unless scope changes are agreed that require additional funding. | 10% | *Do not exceed numbers.* Current projection holds numbers at Board's approved number. | 3 | 3 | 0.3 | 0.3 |
|---|---|---|---|---|---|---|---|

| 6  People & Organization | Ensure all Core Team members have:<br>• PDP's - IDP's<br>• Quarterly priorities<br>• Personal training program (development)<br>• Exposure | 10% | *Management judgment.* | 3 | 3 | 0.3 | 0.3 |
|---|---|---|---|---|---|---|---|

| 7  People & Organization | Refine and agree on the Finance organizational model and savings stream. | 10% | *Management judgment.* Three rounds of organizational / savings reviews. | 3 | 3 | 0.3 | 0.3 |
|---|---|---|---|---|---|---|---|

|  |  |  |  |  |  | **3.3** | **3.3** |

**Part II: COMPETENCY ASSESSMENT & DEVELOPMENT**

Using the competency description guide, review the three levels of proficiency for each competency that has been identified as critical for the employee. Place an "x" in the column that best represents the employee's overall proficiency level in each competency.

| Competency Proficiency Level | | | | |
|---|---|---|---|---|
| | (Place X in appropriate box below) | | | |
| | Individual Contributor | Mgr. | Dev. Needed | Proficient | Strength |
| Adaptability | X | X | | X | |
| Innovation | X | X | | X | |
| Building a Successful Team | X | X | | | X |
| Building Strategic Working Relationships | X | X | | X | |
| Communication | X | X | X | | |
| Strategic Leadership /Decision Making | X | X | | | X |
| Drive for Results | X | X | | | X |
| Customer Focus | X | X | | | X |
| Coaching | | X | X | | |
| Facilitating Change | | X | | X | |
| Aligning  Performance for Success | | X | | X | |
| Leading Through Mission & Values | | X | | X | |
| Identifying & Developing Talent | | X | | X | |
| Technical/Professional Knowledge & Skills | X | X | | X | |
| | | | | | |
| | | | | | |

**Strengths:** Using the definitions and descriptors of proficiency levels from the **Competency Description Guide,** describe those **Competencies** at which the individual is particularly strong.

- ❑ **Building a successful team:** Based on a clear understanding of each individual's strengths, Eduardo assigns appropriate roles and responsibilities and allows the team to shine. Eduardo sets the team's tone. During team meetings, he asks the right questions, challenges the team to think and commit to different courses of action and provides helpful ideas and suggestions.
- ❑ **Strategic Leadership / Decision Making:** Eduardo has a strategic mind and is an agent of change. He quickly identifies problems, comes up with creative alternatives and sets the appropriate course to reach targeted solution.
- ❑ **Drives for results.** Shows strong purpose and very high urgency, sets high standards and seeks delivery. Getting things done takes precedence over his own comfort.
- ❑ **Customer Focus:** Since taking his current responsibility, Eduardo sought to make Renaissance a project driven by and accountable to their customers. Identifies customers and actively seeks information from them about their needs. He also looks for feedback both, formally and informally.

**Opportunities for Improvement:** Using the definitions and descriptors of proficiency levels from the **Competency Description Guide,** describe those **Competencies** at which the Employee needs to improve.

- ❑ **Communication:** Eduardo needs to communicate more and better during meetings in order to further establish his public persona. He also needs to increase his one on one update meetings. He is aware of this opportunity and is actively working to improve.

❑ **Coaching:** Still an area of opportunity, though Eduardo has shown significant progress over the past several months. As an example, Eduardo has clearly articulated his direct reports PDP's and training and development needs together with them.

**Development Plan**

In what activities, (coaching, training, work assignments, etc.) will the Employee participate in the coming year.

| Learning Need /Competency | Objective | Date Completed | Developmental Activities | Support Needed | Tracking Method |
|---|---|---|---|---|---|
| Communication (Public speaking) | Gain high impact when addressing audiences. | Throughout first half of 2004 | Attend training for public speaking. | Formal feedback from his Manager after each presentation. | Test his abilities in meetings and presentations |
| Communication (Improve accent and fluency) | Gain high impact. | Throughout 2004 | Continue training on accent correction and power of word. | Formal feedback from his Manager. | |
| Communication (one-to-one) | Improve visibility | Throughout 2004. | Increase frequency of update meetings with LT members. | None | Execution |
| Coaching | Improve his support to his direct reports. | Plan to be build in Q1. Implement throughout 2004. | Adhere to plan. | Feedback from his Manager and from RHR. | Monitor as per committed actions. |

## PART III: OVERALL PERFORMANCE EVALUATION

### Overall Performance Evaluation:

Summarize overall performance for the prior year as either *(Unacceptable, Needs Improvement, Meets Expectations, Exceeds Expectations, Outstanding)* using both the annual objective score and competency assessment to justify your rating.

| Annual Objective Score | 3.3 |
|---|---|

**Overall Performance Rating: (Place an "x" next to the appropriate rating below)**

|  | |
|---|---|
|  | Unacceptable |
|  | Needs Improvement |
| X | **Meets Expectations** |
|  | Exceeds Expectations |
|  | Outstanding |

### Comments:

Eduardo achieved most of his objectives in 2003 (Financial Planning-First phases, Financial Reporting Design, Financial Reporting Delivery Tool Selection, etc.) What makes Renaissance different from other Corporate Projects is its understanding and acceptance by the users and the full user community involvement in the project's design and development. Eduardo has played a key role in making this happen.

## Part IV: CAREER INTERESTS

**Employee's Interests:** Employees should describe, in this section, their career interests. In case the employee wants to move, what positions or kinds of positions would the employee be interested in going into from their current position. Should the employee desire to move to a new position what kinds of competencies and/or experiences would they need to develop or acquire in order to be considered for the position. Please comment on timing, if appropriate.

For more than eight years, Eduardo headed the financial responsibility in several geographically diverse Gillette operations. Eduardo has also had management experience in Boston Headquarters (Int'l HQ's in the early nineties and Renaissance now). Eduardo believes that his consistent record of contributions and learning experiences represent a strong asset with which he can enrich a Boston based GBU. Therefore – once his current assignment is completed – he would expect to receive the financial responsibility of a Boston based GBU.

**Part V: APPROVALS**

This form should be reviewed and approved by at least one level of management above the immediate supervisor of the Employee whose performance is being reviewed.

Claudio RUBEN

Prepared by _~Claudio~_____ Date _1/26/04_

Immediate Supervisor

Charles CRAMB                               CFO

Reviewed by _~Chuck Wholf~___ Title _CFO_ Date _2/5/04_

**Comments:**

**Employee's Signature & Comments:**  The Employee's signature acknowledges that the review took place, not necessarily approval of the evaluation.  The Employee should use the "Comments" section to state any reaction to the evaluation.

Signature _Eduardo Goiza_____ Date of Review _1/26/04_

**Comments:**

**Part VI: PERSONAL DATA**

# Please Complete Shaded Areas For Non-U.S. Employees Only

| | |
|---|---|
| *Employment Date* ___11 / 1 / 87___ | *Date Assigned to Present Position* __4 / 1 / 02__    *Date of Birth*_____ |
| *Marital Status* _____ | *Place of Birth* _____ |
| *Passport Nationality*_____ | *No. of Dependents Residing with Employee*_____ |

## 1. Education - College or University

| From | To | Name /Location of College or University | Major Program of Study | Highest Degree |
|------|-----|------------------------------------------|------------------------|----------------|
| 1977 | 1981 | Universidad del Valle de Atemajac, Guadalajara, Mexico | Business Administration | Equivalent Bachelor |
| 1982 | 1985 | Ecole des Hautes Etudes Commerciales, Jouy-en-Josas, France | Strategy and Business Policy | Doctoral Program Diploma |
| 1989 | 1990 | Colegio de Graduados en Alta Dirección, Mexico City, Mexico | Management | MBA Certificate |

## 2. Languages:

*NATIVE LANGUAGE* ____Spanish_____

Are you proficient in other languages   Yes __X__    No _____

If yes, please list all languages in which you are proficient.

French            Adequate for common business requirements
English           Adequate for common business requirements
Portuguese        Limited

## 3. Employment History:

List all positions held including those inside and outside of Gillette.  List most recent position last.

| From | To | Business Unit / Company | Department | Position |
|------|-----|--------------------------|------------|----------|
| 78 | 80 | School for Blind Girls in Guadalajara, Mexico | Administration | Analyst |
| 80 | 81 | Electronic Data processing Center, Mexico's Treasury Ministry | I.T. | Technician |
| 83 | 83 | Scientific Center, IBM France | I.T. | Programmer (training) |
| 9 / 85 | 10 / 87 | L'Oréal de Paris, Mexico | Finance | Controller |
| 11 / 87 | 12 / 90 | Gillette Mexico | Finance | Business Planning Mgr. |
| 1 / 91 | 1 / 93 | Gillette International, Boston | Finance | Sr. Financial Analyst |
| 2 / 93 | 11 / 93 | Gillette International, Boston | Finance | Financial Planning Mgr. |
| 12 / 93 | 3 / 98 | Gillette Colombia | Finance | Controller |
| 4 / 98 | 1 / 99 | Gillette Turkey & the Mediterranean | Finance | Finance Director |
| 2 / 99 | 3 / 02 | Gillette Mexico & Central America | Finance | Finance Director |
| 4 / 02 | date | Corporate - Project Renaissance | Finance | Director, Project Renaissance |

**4. Are you mobile?**

| Yes | | No | X |
|-----|---|-----|---|

**If yes, please indicate:**

| Nationally (Within current geography) | | Internationally (To other geography) | |
|---|---|---|---|

## Part VII: OBJECTIVE SETTING

**New Objectives:** Define the objectives for the coming fiscal year using the Annual Objectives Form. Assign relative weightings for each area of accountability and individual objective. The list of objectives should include Diversity goals (for U.S. based Employees).

### ANNUAL OBJECTIVES FORM - FY _____2003_____

| Name: Eduardo GARZA | | Date: Jan. '04 | Approval | Claudio RUBEN | | | | |
|---|---|---|---|---|---|---|---|---|

| Area of Accountability | Objectives | Relative Priority | Standard of Performance | Rating | | Weighted Rating | |
|---|---|---|---|---|---|---|---|
| | | | | Self | Mgr | Self | Mgr |
| 1.0 Business Process Improvement | | 50% | | | | | |
| | 1.1 Go live with the Planning tool<br>□ Customer P&L - Q1, including targeted training.<br>□ SGP - Q1, including UAT, training and roll out.<br>□ GTM - Q2 (BU#2), including Integration Testing, UAT, training and rollout.<br>□ Migrate each phase to the operations.<br>□ Recommend Governance Model. | 20% | Successful implementation. Management judgement. | | | | |
| | 1.2 Integrate the Planning and Reporting tools.<br>□ Auto interface to / from HP / BW.<br>□ Appropriate design (including security).<br>□ Fully tested. | 5% | Successful implementation. Management judgement | | | | |
| | 1.2 Implement the Financial Reporting tool. Including:<br>□ Full testing (Finish String Testing started in '03, Integration Testing and User Acceptance Testing.)<br>□ ArcPlan Management Reporting.<br>□ Training documentation and content delivery to reach all CGL / ECCS users in line with go-live.<br>□ Governance on all master data, closing process, reporting and security.<br>□ Hypercare after each phase. | 25% | Successful implementation. Management judgement | | | | |

Coming Year

| | Adhere to the following timetable (unless a new date is approved by the Leadership Team following the new GPCat schedule):<br>□ The Americas - Q2 '04.<br>□ AMEE, Europe and Asia Pacific - Q3 '04.<br>Transfer to FRD - Q4 '04. | | | | | | |
|---|---|---|---|---|---|---|---|
| 2.0 Business Process Improvement | Throughout the process, make sure that the right Change Leadership enablers are in place, including:<br>□ Guiding coalition meetings.<br>□ Web site updates.<br>□ Renaissance updates.<br>□ Visits to selective hubs / conferences. | 10% | Management judgement | | | | |
| 3.0 Business Process Improvement | Throughout the process, make sure that there are specific actions to ensure feedback gathering from our customers, and that they are adequately reflected on the Risk Mitigation Plan or on specific action logs. | 10% | Management judgement | | | | |
| 4.0 Business Process Improvement | Keep project cost within approved limit, unless scope changes are agreed that requires different funding. | 10% | Do not exceed the numbers. | | | | |
| 5.0 Business Process Improvement | Provide support - as requested - in the savings realization workstream. | 10% | Management judgement | | | | |
| 6.0 People & Organization | | 10% | | | | | |
| | 6.1 Ensure next steps are defined and executed for the Core Team members. | 5% | Management judgement | | | | |
| | 6.2 Ensure that Core Team members have PDP's / IDP's / Quarterly Priorities. | 5% | Management judgement | | | | |

# Gillette's
# Performance Management Cycle and
# P D P



PDP Aligning Performance For Success PDP Aligning Performance For Success

*" Driving a High Performance Culture Through Assessment and Development"*



**Performance Planning**
**Coaching for Performance**
**Reviewing Performance**
**Creating an IDP**

---



**Q' 4 – Q' 1**

**Performance Planning**

- Organizational Strategic Plan Communicated
- Business Unit/Functional Strategy Developed & Accountabilities Communicated
  - 4-8 accountabilities
- Determine Team/Individual Accountabilities and objectives
  - < 12 objectives
  - minimum relative priority = 5%
  - SMART objectives
  - Determine Standard of Performance

| Accountability | Objectives | Relative Priority | Standard Of Performance |
|---|---|---|---|
| 1.0 Financial Performance | Maximize the financial health of the overall business by keeping key financial ratios in line with best-in-class | 30% | |
| | 1.1 Reduce the net factory variances in all plants | 10% | Variances must be kept in line with product cost targets |

- Set Expectations regarding competencies
- Finalize IDP
- Establish Q1 Priorities (if appropriate)

---

***Alignment is the Essence of Success!***



- Monitor Performance
  - Observation
  - Customer feedback
- Monitor progress of IDP
- Conduct mid – year review
  - Objective review
  - IDP review
  - Career Development discussion
- Assess Quarterly Priority Progress

**Q'1 – Q'4 Coaching for Performance**

Provide Feedback (STAR)

**S**ituation

**T**ask

**A**ction

**R**esult

| Position | | Manager: | | Quarter: | Approval: |
|---|---|---|---|---|---|
| | | Due Date | Personal Assessment | Weighed Rating | Comments |
| 1.0 Financial Performance | 30% | | | | |
| 1.1 Collaborate with Trade Marketing to ensure that all custom promotional activity is in line with meeting an average of 2% | 10% | 3/1/02 | 80 | 8 | |
| 1.2 Present TSO Initiative to all accounts. | 20% | 3/31/02 | 100 | 20 | |



- Calculate annual objective score
  - Use whole numbers (see scale below)
- Assess proficiency in appropriate competencies
  - Strength
  - Proficient
  - Development Needed
- Determine overall performance rating
- Identify strength and developmental competencies

**Q'4 – Q'1 Reviewing Performance**

| Rating | Objective Standard of Performance |
|---|---|
| 5 | Objective was fully met and exceeded to a significant extent. |
| 4 | Objective was fully met and exceeded to a marginal extent. |
| 3 | Objective was fully met. |
| 2 | Objective was marginally met. |
| 1 | Objective had very low level of achievement. |



- Review the following:
  - Previous year's performance
  - Competency assessment
  - Accountabilities and objectives for coming year
- Build a development Plan (OPAL)
- Implement Development Plan

**Q'4 – Q'1 Creating an IDP**

| Competency / Learning Need | Objective | Completion Date | Learning Activity | Support Needed |
|---|---|---|---|---|
| | | | | |

*Alignment is the Essence of Success!*



**The Gillette Company**



## *"Driving Performance through Assessment and Development"*

## Performance Development Process
## For Fiscal Year  -  2002

Date Form Completed    <u>January  31, 2003</u>

Name _____ <u>Garza</u> _____ <u>Eduardo</u> _____
            Last            First              Middle Initial

Present Position  <u>Director, Project Renaissance</u>

Business Unit/Group  <u>Corporate Controller</u>

Department  <u>Finance</u>

Location  <u>Boston, MA</u>

**CONFIDENTIAL**



*World-Class People*

**PART I: ASSESSMENT OF OBJECTIVES**

**ANNUAL OBJECTIVES FORM - FY** _____ 2002 _____
*Year Just Completed*

| Area of Accountability | Objectives | *Relative Priority* | Standard of Performance | Rating | | Weighted Rating | |
|---|---|---|---|---|---|---|---|
| | | | | Self | Mgr | Self | Mgr |
| 1 Business Process Improvement | Complete the following steps of Project Renaissance:<br>• Business case<br>• Project scope<br>• Implementation plan<br>• ITAC and Board approval | 30% | Completion of documents.<br>*All four steps were completed. In addition a road map was prepared. Eduardo's decision to take action before Board approval enabled that, by the time of Board presentation, some actual deliveries had already been achieved, namely:*<br>• *First Planning prototype*<br>• *Information Template*<br>• *First run on organization and savings* | | 3.0 | | 0.9 |
| 2 Business Process Improvement. | Define a course of action for the project's implementation, including required internal resources, outside consultants, etc. | 15% | Management judgment.<br>*Course of action was outlined and resources are in place.* | | 3.0 | | 0.45 |
| 3 Business Process Improvement. | Recommend a formal change management / communications program and start execution. | 15% | Management judgment.<br>*Within a challenging environment the proposal was approved and is well advanced. It exceeded Renaissance scope by including topics such as Finance Vision and Finance Culture.* | | 3.0 | | 0.45 |

May 2002

| 4. Business Process Improvement. | Carry out workshops with the objective of securing targeted headcount and savings | 10% | Carry out the workshops. | 3.0 | | 0.30 |
|---|---|---|---|---|---|---|
| 5 Business Process Improvement. | Ensure that quick hits are implemented. | 5% | Implementation. | 3.0 | | 0.15 |
| 4 People & organization | Set up the following core functions:<br>• Financial Planning Manger<br>• Financial Reporting Manager<br>• Change Management Mgr.<br>• Project Officer | 20% | Filling up the four positions.<br>*The four core positions were appointed, and within sixty days after the Board approval, all 23 positions in the extended team had been appointed.* | 4.0 | | 0.80 |
| 4 People & organization | Establish a training program (e.g. Project Management, Change Management...) | 5% | Establish the training program. | 3.0 | | 0.15 |

Total                                                                                                                                   3.20

**In addition, Eduardo took the necessary steps to ensure a back-up position was ready for Gillette de Mexico. This enabled:**
- **To rapidly move to the Renaissance team.**
- **A smooth transition of Mexico's Finance Director position.**

**Part II: COMPETENCY ASSESSMENT & DEVELOPMENT**

Using the competency description guide, review the three levels of proficiency for each competency that has been identified as critical for the employee. Place an "x" in the column that best represents the employee's overall proficiency level in each competency.

| Competency Proficiency Level | | | | | |
|---|---|---|---|---|---|
| | | (Place X in appropriate box below) | | | |
| | Individual Contributor | Mgr. | Dev. Needed | Proficient | Strength |
| Adaptability | X | X | | X | |
| Innovation | X | X | | X | |
| Building a Successful Team | X | X | | | X |
| Building Strategic Working Relationships | X | X | | X | |
| Communication | X | X | X | | |
| Strategic Leadership /Decision Making | X | X | | | X |
| Drive for Results | X | X | | | X |
| Customer Focus | X | X | | X | |
| Coaching | | X | X | | |
| Facilitating Change | | X | | X | |
| Aligning  Performance for Success | | X | | X | |
| Leading Through Mission & Values | | X | | X | |
| Identifying & Developing Talent | | X | | X | |
| Technical/Professional Knowledge & Skills | X | X | | X | |

**Strengths:** Using the definitions and descriptors of proficiency levels from the **Competency Description Guide,** describe those **Competencies** at which the individual is particularly strong.

His current role, confirms Eduardo's strengths showed during his previous positions:
- **Strategic leadership & decision-making**, identifying problems and setting course of actions to reach targeted solutions. Committing to a course of action to accomplish objective.
- **Drive for results**, Eduardo has consistently addressed challenging targets.
- **Building a successful team,** as seen with the collaborative and mutual support of the different high-performing teams that have reported to him.

**Opportunities for Improvement:** Using the definitions and descriptors of proficiency levels from the **Competency Description Guide,** describe those **Competencies** at which the Employee needs to improve.

Areas to be tackled:
- **Communication.** Needs to communicate more in meetings and better one-on-one.
- **Coaching**: needs to be more proactive, providing guidance and support to his managers.
- **Facilitating change**: needs to be more "visible" and proactive managing the complexities of a project like Renaissance.

**Development Plan**

In what activities, (coaching, training, work assignments, etc.) will the Employee participate in the coming year.

| Learning Need /Competency | Objective | Date Completed | Developmental Activities | Support Needed | Tracking Method |
|---|---|---|---|---|---|
| Communication | Gain high impact when addressing audiences. | Throughout 2003. | Formal feedback from his Manager after each presentation. | | Test his abilities in each stakeholders' presentation. |
| Coaching | Improve his support to his direct reports. | Throughout 2003. | Implement IDP's to all his direct reports and adhere to them. | TBD | Monitor as per IDP's committed actions. |
| Facilitating change | Increase visibility and be more proactive | Throughout 2003. | Coaching. | | Feedback by C.R. |

## PART III: OVERALL PERFORMANCE EVALUATION

### Overall Performance Evaluation:

Summarize overall performance for the prior year as either *(Unacceptable, Needs Improvement, Meets Expectations, Exceeds Expectations, Outstanding)* using both the annual objective score and competency assessment to justify your rating.

**Annual Objective Score**    | 3.20 |

**Overall Performance Rating: (Place an "x" next to the appropriate rating below)**

|     |                      |
| --- | -------------------- |
|     | Unacceptable         |
|     | Needs Improvement    |
| X   | Meets Expectations   |
|     | Exceeds Expectations |
|     | Outstanding          |

### Comments:

Eduardo's made it possible to move forward Renaissance from nonexistence into a reality. Renaissance speed is forcing other Company areas. Examples include definition of the Commercial business model (hubs as opposed to markets), as well as a development of a Finance vision. His challenge in 2003 is to make the project a reality.

## Part IV: CAREER INTERESTS

### Employee's Interests:

Employees should describe, in this section, their career interests. In case the employee wants to move, what positions or kinds of positions would the employee be interested in going into from their current position. Should the employee desire to move to a new position what kinds of competencies and/or experiences would they need to develop or acquire in order to be considered for the position. Please comment on timing, if appropriate.

Eduardo believes that his record of contributions to the Company represent a strong asset and that therefore, his next move could be to a GBU. Therefore - once his current assignment is completed - he would expect to receive this kind of responsibility.

## Part V: APPROVALS

This form should be reviewed and approved by at least one level of management above the immediate supervisor of the Employee whose performance is being reviewed.

Prepared by ___Claudio RUBEN *Claudio*_____ Date    31/1/03
                          Immediate Supervisor

Reviewed by ___Charles CRAMB_____ Title ___Corporate Controller___ Date    Feb. '03

### Comments:

### Employee's Signature & Comments:
The Employee's signature acknowledges that the review took place, not necessarily approval of the evaluation. The Employee should use the "Comments" section to state any reaction to the evaluation.

Signature *Eduardo Garza* Date of Review_____
### Comments:

**Part VI: PERSONAL DATA**

# Please Complete Shaded Areas For Non-U.S. Employees Only

| | | |
|---|---|---|
| *Employment Date ___11/1/87_____* | *Date Assigned to Present Position __7/02___* | *Date of Birth_____* |
| *Marital Status _____* | *Place of Birth _____* | |
| *Passport Nationality_____* | *No. of Dependents Residing with Employee_____* | |

## 1. Education - College or University

| From | To | Name /Location of College or University | Major Program of Study | Highest Degree |
|------|-----|----------------------------------------|------------------------|----------------|
| 1977 | 1981 | Universidad del Valle de Atemajac, Guadalajara, Mexico | Business Administration | Equivalent. Bachelor |
| 1982 | 1985 | Ecole des Hautes Etudes Commerciales, Juy-en-Josas, France | Strategy and Business Policy | Doctoral Program Diploma |
| 1989 | 1990 | Colegio de Graduados en Alta Dirección, Mexico City, Mexico | Management | Master Program Diploma |

## 2. Languages:

**NATIVE LANGUAGE _____    Spanish _____**

Are you proficient in other languages   Yes __X____    No _____

If yes, please list all languages in which you are proficient.

| | |
|---|---|
| French | Adequate for common business requirements |
| English | Adequate for common business requirements |
| Portuguese | Limited |

## 3. Employment History:

List all positions held including those inside and outside of Gillette. List most recent position last.

| From | To | Business Unit / Company | Department | Position |
|------|-----|------------------------|------------|----------|
| 78 | 80 | School for Blind Girls in Guadalajara, Mexico | Administration | Administrative assistant |
| 80 | 81 | Electronic Data Processing Center, Mexico's Treasury Ministry | Information Technology | Technician |
| 83 | 83 | Scientific Center, I.B.M. France | Information Technology | Programmer (training) |
| 9/85 | 10/87 | L'Oréal de Paris, Mexico | Finance | Controller (reporting to Director of Finance) |
| 11/87 | 12/90 | Gillette Mexico | Finance | Business Planning Manager |
| 1/91 | 1/93 | Gillette International, Boston | Finance | Sr. Financial Analyst |
| 2/93 | 11/93 | Gillette International, Boston | Finance | Financial Planning Manager |
| 12/93 | 3/98 | Gillette Colombia | Finance | Controller |
| 4/98 | 1/99 | Gillette Turkey & the Mediterranean | Finance | Finance Director |
| 2/99 | 6/02 | Gillette Mexico and Central America | Finance | Finance Director |
| 7/02 | date | Gillette's Corporate Controller | Renaissance | Director |

## 4. Are you mobile?

| Yes | | No | X |
|-----|---|-----|---|

## Part VII: OBJECTIVE SETTING

**New Objectives:** Define the objectives for the coming fiscal year using the Annual Objectives Form. Assign relative weightings for each area of accountability and individual objective. The list of objectives should include Diversity goals (for U.S. based Employees).

### ANNUAL OBJECTIVES FORM - FY               2003

*Coming Year*

| Name: | Date: | Approval | | | | | |
|---|---|---|---|---|---|---|---|
| **Area of Accountability** | **Objectives** | **Relative Priority** | **Standard of Performance** | **Rating** | | **Weighted Rating** | |
| | | | | **Self** | **Mgr** | **Self** | **Mgr** |
| 1 Business Process Improvement | Implement the new budgeting and planning model, on agreed timetable.<br>• Phase I - March<br>• Phase II - July<br>• Phase III - September<br>• Be ready for Phase IV - Q1 '04 | 20% | Successful implementation. | | | | |
| 2 Business Process Improvement | Complete all necessary steps to ensure implementation of the new Financial Reporting model, processes and tools. To be ready to start in Q1, '04. (Financial Reporting, Management Reporting, consolidation process, KPI's, etc.) | 20% | Successful implementation. | | | | |
| 3 Business Process Improvement | Throughout the process, make sure that the right enablers are in place and that we stick to them:<br>• Guiding coalition<br>• Communication program<br>• Risk mitigation plan<br>• Cultural change<br>• Project management<br>• Change management program<br>• Training program<br>• Required human resources<br>• CITA | 20% | Management judgment. | | | | |
| 4 Business Process Improvement | Resolve all outstanding and new issues.<br>Memo, current open topics:<br>• Business partnering definition<br>• Exploit best practices (Japan) | | Management judgment. | | | | |

| | • Internal and process control issues<br>• Frequently asked Q&A's<br>• Retention of key people during transition | | | | | | |
|---|---|---|---|---|---|---|---|
| 5  Business Process Improvement | Keep project cot within Board's approved limit, unless scope changes are agreed that require additional funding. | 10% | Do not exceed numbers. | | | | |
| 6  People & Organization | Ensure all core Team members have:<br>• PDP's - IDP's<br>• Quarterly priorities<br>• Personal training program (development)<br>• Exposure | 10% | Management judgment. | | | | |
| 7  People & Organization | Refine and agree on the Finance organizational model and savings stream. | 10% | Management judgment. | | | | |

Plf. Exhibit D



**Lemuel Lanier**

27 Feb 2003 05:56 PM

To: Eduardo Garza/NA/Gillette@Gillette
cc: Mike Egan/WO/Gillette@Gillette, Claudio Ruben/BO/Gillette@Gillette,
Charles Cramb/BO/Gillette@Gillette
Subject: Re: Today's presentation

Eduardo,

Thank you for presenting at the CITA OpCom on Wednesday. Your focused presentation greatly elevated the understanding of the significance of Project Renaissance to The Gillette Company. I believe your presentation will greatly help both or our organizations.

Lem Lanier
CITA - Corporate Systems
617-421-8005
Eduardo Garza

**Eduardo Garza**

02/26/2003 11:55 AM

To: Mike Egan/WO/Gillette@Gillette, Lemuel Lanier/BO/Gillette@Gillette
cc:
Subject: Today's presentation

Mike, Lem,

Just for your reference, a copy of today's presentation.

Best regards,   Eduardo

# Change Leadership

## *Gillette Finance Transformation*

**Alexander Caillet**
(917) 868-0263
acaillet@gunnpartners.net

**Omar Aguilar**
(609) 953-9129
oaguilar@gunnpartners.net

GUNN PARTNERS
*An Exult Company*

CONFIDENTIAL
GIL0000518

# Meeting Objectives

- Gain a deeper understanding and appreciation for Gillette's Finance Transformation effort

- Qualifying Gunn Partners as a premier consultancy to work as a business partner within this effort

- Review and discuss Gunn Partners' point-of-view and approach to Change Leadership and Finance Transformation

- Expand our personal rapport to a broader professional relationship between the two organizations

- Agree on concrete next steps to meet Gillette's needs

CONFIDENTIAL
GIL0000519

**GUNN PARTNERS** *An Exult Company* © 2002

2

# Gillette Finance Transformation

*Project Renaissance*
*Change Leadership Proposal*

**Alexander Caillet**
(917) 868-0263
acaillet@gunnpartners.net

**Omar Aguilar**
(609) 953-9129
oaguilar@gunnpartners.net

CONFIDENTIAL
GIL0000526



**GUNN PARTNERS**
*An Exult Company*

1

# Overview

1. Our Understanding of Your Objectives

2. Suggested Approach

3. Critical Success Factors & Estimate of Investment

4. Next Steps

CONFIDENTIAL
GIL0000527

 © 2002

2

3

# Our Understanding of Your Objectives

© 2002

GUNN PARTNERS
a Capital Company

CONFIDENTIAL
GIL0000528

# Project Renaissance is one part of a larger Finance Transformation program

- The Finance Transformation program at Gillette seeks to increase the relevance and effectiveness of the Finance function

- Project Renaissance seeks to redefine and implement new worldwide processes and systems for Financial Planning, Financial Reporting and Information Management

- Specifically, Project Renaissance seeks to deliver:
  - A single financial planning tool with supporting processes
  - Standard tools and supporting processes to facilitate internal and management reporting including allowing management to access the database
  - New data requirements for information management

- The program was launched in early 2002 and the Program Team is in place – D&T has been hired to design and run the implementation roadmap

- The change leadership approach has not yet been developed and to-date, change leadership has been limited to a combination of communications events

CONFIDENTIAL
GIL0000529

**GUNN PARTNERS** *An Exult Company* © 2002

4

# Six change leadership objectives have been identified for Project Renaissance

1. Build a powerful Guiding Coalition that will successfully lead Project Renaissance

2. Design and roll out a comprehensive communications program that generates ownership, support and enthusiasm for Project Renaissance from all concerned and affected stakeholders

3. Design and roll out a culture change initiative that will result in a real shift in 'mindset' within the Finance function

4. Utilize a suite of change assessment tools to support the creation and deployment of a change risk mitigation plan

5. Design and roll out a relevant education and training curriculum to align stakeholder capability with the Finance vision

6. Manage the human side of change throughout the lifecycle of Project Renaissance

CONFIDENTIAL
GIL0000530

GUNN PARTNERS
*An Exult Company*  © 2002

5

# These six change leadership objectives fit within the Gunn Change Leadership Cycle



CONFIDENTIAL
GIL0000531

GUNN PARTNERS  An Exult Company  © 2002

6

## Inter-Office Memo



**The Gillette Company**

World-Class Brands, Products, People

Prudential Tower Building
Boston, MA 02199

Date      July 26, 2002

From      C. W. Cramb

Subject   **Friday Posting**

To        J. Kilts

**C. Cramb - Friday Posting**
Page 2.

- On Project Renaissance, we have agreed to also consider Bain and McKinsey to assist in change management/communications facilitation.

- Also on Project Renaissance, the Leadership Team has strongly endorsed the concept of accelerating the planning module so that it can be in use by the beginning of January (versus original target of July 2003). We should be in position to decide on this by the end of August.

- After several years of trying, we have finally closed on the sale of our Janesville WI property (an old Stationery Products - Parker - facility) for $1.5 million.

- Second quarter results are now public. Congratulations to all on an excellent quarter!

CWC/jh

Plf. Exhibit  F

*Inter-Office Memo*



**The Gillette Company**

*World-Class Brands, Products, People*

Prudential Tower Building
Boston, MA 02199

| | |
|---|---|
| Date | *October 24, 2002* |
| From | *C. Cramb* |
| Subject | ***Project Renaissance*** |
| To | *Distribution* |

Earlier today, the Board of Directors approved Project Renaissance's business case, scope and investment. The approval enables the development and implementation of new financial processes and systems to significantly enhance our capabilities at competitive costs within:

- Financial Planning,
- Financial Reporting, and
- Management Reporting.

The Board did recognize the challenges associated with the implementation of a project of this magnitude. It was also recognized that while those risks exist, it is imperative for the Company to capitalize on Renaissance's benefits.

Project Renaissance will allow the Company to attain a substantial portion of our goal of Finance Functional Excellence. The approval confirms support at the highest possible level.

Earlier this week, as we announced our third-quarter earnings, Jim Kilts stated "We must intensify our Zero Overhead Growth cost-savings efforts while focusing on improving capabilities across the Company through our Functional Excellence program. A dual emphasis on superior performance at the lowest possible cost offers the best assurance of continued acceleration in our business recovery." Project Renaissance is a key component of this.

The strategic priority of Project Renaissance is being confirmed, and we must flawlessly execute. This will happen with everyone enthusiastically engaging toward a common goal of best-in-class capabilities within the targeted overhead levels.

Complementing the above news, we have now chosen the majority of the financial members of the Renaissance team, which is shown in the attached organizational chart. CITA is also rapidly putting together the personnel that will work with the financial team to bring Renaissance to success. Once CITA completes the staffing, a project structure will be circulated.

*October 24, 2002*
*Page 2*
**Project Renaissance**

I acknowledge the participation and involvement of the financial community to get Renaissance to this stage, and ask that each of you proactively participate in both congratulating the Renaissance team members and providing your commitment to be a part of its success.

Sincerely,

Chuck



**Inter-Office Memo**

**The Gillette Company**

World-Class Brands, Products, People

Prudential Tower Building
Boston, MA 02199

| | |
|---|---|
| Date | February 21, 2003 |
| From | C. W. Cramb |
| Subject | **Friday Posting** |
| To | J. Kilts |

## Project Renaissance

- The Financial Planning Application due for March is up and "running" in that it has passed a preliminary performance test.

- On Management Reporting we are holding a series of user workshops to identify front-end user requirements, and focus groups to help evaluate different software alternatives. This is a significant commitment by participants from around the world, but it is an essential step in the software selection.

- Two weeks ago the GPCAT team announced an implementation delay from June to October. We have been working with them since then to determine how to mitigate the risks the delay put on the Renaissance Project. New requirement flows, timetables, and commitments have been established that will allow Renaissance to deliver on its timetable. However, all involved appreciate that we have elevated the risk level significantly, and there is now no cushion for any further delays. However, CITA, the GPCAT team, and the Renaissance Team all believe we will be able to deliver the software development work on time per the revised timetable.

- Renaissance informational meetings continue. Over the last week presentations have been made to the extended Duracell OpComm, the European Controllers, and management members in Braun, Kronberg.

- In February we have a teaser campaign started on Insight where I briefly tell the readers that "big changes" are coming, particularly in Planning, Reporting and Talent Management, and that we have a Finance Vision statement supported by Goals, Objectives, and Initiatives. In March I will address Renaissance in detail and in April the Finance Vision Statement. The communications will be in the form of an interview.

## Inter-Office Memo



**The Gillette Company**

World-Class Brands, Products, People

Prudential Tower Building
Boston, MA 02199

| | |
|---|---|
| Date | March 21, 2003 |
| From | C. W. Cramb |
| Subject | **Friday Posting** |
| To | J. Kilts |

### Renaissance

We will be conducting a CITA/Finance Steering Committee meeting Friday, March 21. This meeting will be chaired by K. Lane and myself as key project owners. A critical deliverable for this meeting is a reset of the project plan systems development work for the Planning Module by IT@G, and the subsequent impact of that effort on the rest of the project, including Financial Planning – Phase II. Other critical areas will include identification of key milestones, and an update on other initiatives on which this project is dependent (such as GPCAT).

Renaissance Program was reviewed with the North America Shared Service Center organization as part of our overall communications program.

Work continues on the company SGP modeling analysis. Early financial takeaways are:
- limited pricing opportunities in most businesses
- GTM and FE cost reduction focus will be critical to maintaining EPS growth rates that over time would make Gillette a top tier performer.

We are exploring the possibility of expanding our Processor/Commissionaire (Tradeco) business model to Latin America. There are early indications that there may be a meaningful opportunity with Mexico.

We will be dividending just under $20mm from Brazil next week. This is the remainder of unremitted profits through 2002.

While the HR shared service centers have added substantial operational benefits, they have also created some difficulties in achieving tax deductibility of all of their operating costs. The Tax department is developing guidelines and operating procedures to help mitigate the issue.

## Inter-Office Memo



**The Gillette Company**

World-Class Brands, Products, People

Prudential Tower Building
Boston, MA 02199

| | |
|---|---|
| Date | April 18, 2003 |
| From | C. W. Cramb |
| Subject | **Friday Posting** |
| To | J. Kilts |

## Renaissance

Good progress on the Renaissance Project including the following milestones:

- Financial Planning Roll-out (Phase one) timetable agreed with ComOps globally. It does encompass roll-in to 2004 Budget cycle. Presented to and confirmed by the Finance/IT@G Oversight Committee this morning.

- Reached agreement within Core Team as to appropriate front end tool for Financial Reporting and Management Reporting. It is ArcPlan software and is deemed appropriate to both business needs (user friendly) and technical infrastructure. This was also recommended to the Finance/IT@G Oversight Committee today and was approved.

- Have started requirements definition for Phase II of Financial Planning (basically Capital Budget) led by GTM, Corporate Financial Planning and IT@G.

- Work continues with GPCat team to ensure revised scope embraces all Renaissance requirements. All organizations aligned – requirements now fully comprehended.

- Financial Reporting data gap analysis has identified over 600 gaps of data information required to meet local needs. This is more extensive than originally thought, and overall data mapping is not yet complete. However, the more comprehensive this process is at the front end, the easier will be the systems development work as these exceptions will be anticipated as opposed to being "retrofitted" into the application.

- Held our biweekly Finance/IT Oversight Committee meeting this morning. Have seen dramatic improvement in our processes and cross-functional collaboration. Team confidence and enthusiasm in meeting project deliverables is growing.



## Inter-Office Memo

**The Gillette Company**

World-Class Brands, Products, People

Prudential Tower Building
Boston, MA 02199

| | |
|---|---|
| Date | May 16, 2003 |
| From | C. W. Cramb |
| Subject | **Friday Posting** |
| To | J. Kilts |

### Renaissance

Integration testing of the Financial Planning tool has commenced with CONA. Initial results are excellent.

On Financial Reporting, high level design is nearing completion. As part of this process, the identification of business processes and data requirements (particularly product data) requiring unique design solutions is currently much greater than anticipated. I believe our next important step will be to aggressively challenge each of these unique requirements to ensure they are absolutely necessary as we would prefer to change local processes and data requirements to harmonize across Gillette, rather than to replicate different current processes.

K. Lane and I led a town Hall session with the Renaissance Team members. Despite holding it on a late Friday afternoon, we had extremely high participation. Kathy and I shared our perspectives on the project, its importance to Gillette, and the most essential ingredient of teamwork, to ensure success. We then held a 45-minute Q&A session. Feedback has been very positive, and we are, by popular demand, planning the next one.

At the Finance Leadership Team meeting we demonstrated ArcPlan, the front end tool for Renaissance. Key functionalities such as ad hoc reports, drill down capabilities, and dashboard views were shared with the group. We received very strong positive support for the tool and its capabilities.

A bit of data. We have agreed that our global information system will capture data for 595 trade customers (includes key global accounts as well as key local customers). Interestingly, these 595 customers currently represent 71% of our world-wide sales.

## Inter-Office Memo



**The Gillette Company**

World-Class Brands, Products, People

Prudential Tower Building
Boston, MA 02199

| | |
|---|---|
| Date | July 11, 2003 |
| From | C. W. Cramb |
| Subject | **Friday Posting** |
| To | J. Kilts |

### Renaissance

Planning module user testing completed successfully.  Application went live, on schedule, on June 30.  Training program continues to roll-out with approximately 350 users having been trained to date (both Financial and non-Financial users).

Within the Reporting module, the design and analysis phase completed on June 24 and the critical Design Review document was fully signed off by all participants.  Construction started June 30.

The Renaissance team took a 3-hour break last night to celebrate progress with a barbecue poolside at the Colonnade.  It was a lot of fun and a great team-building event.

You met yesterday with our core Renaissance team for a brief project update and a town hall type Q&A session.  Have already had very strong, positive feedback from the participating team members.

### S 404 (Sarbanes-Oxley)

Project scope and definition work continues.  Completed a control "set" for HR/Payroll, which will be used globally for self-assessment.  This is one of the 13 key defined business processes that come under S 404.

## Inter-Office Memo



**The Gillette Company**

World-Class Brands, Products, People

Prudential Tower Building
Boston, MA 02199

Date        August 15, 2003

From        C. W. Cramb

Subject      **Friday Posting**

To          J. Kilts

### Renaissance

Financial Planning phase expansion continues as scheduled – featuring GTM roll-out, Customer P&L definitions and SGP requirements.

Within Financial Reporting, the increased focus on DER's (Development Requests) has resulted in a substantial improvement in progressing requests, to the point that we expect completion of all outstanding requests by the end of the month.

On the Financial Reporting implementation plan, we have been working on a three-wave implementation plan. Based on progress to date, our users' strong appetite for the reporting module, and a thorough review of cost versus risk, it appears that we will implement in two waves rather than three, saving considerable time and money. Decision to be made in early September.

## Inter-Office Memo



**The Gillette Company**

World-Class Brands, Products, People

Prudential Tower Building
Boston, MA 02199

| | |
|---|---|
| Date | August 22, 2003 |
| From | C. W. Cramb |
| Subject | **Friday Posting** |
| To | J. Kilts |

### Renaissance

Internal Audit completed the pre-implementation review of the Financial and Management Reporting design. The report indicates that "the project contains robust and largely complete documentation for the initial design of the system". The audit also pointed out that "while there remains a considerable amount of work to be completed, the project plans anticipate the required effort". Needless to say, we are pleased with these initial results.

### SOX 404

We are on track with the development, refinement and review of the Control Sets. Out of thirteen sets, ten have been either finalized or are in the development stage. The plan is to have all Control Sets completed and loaded into the self-assessment tool by the end of September. Engagement Letter and License Agreement with D&T are in final review with the Legal Department. All changes have been agreed to by both parties and are being incorporated into the agreements. Should be completed by early next week.

Regional Champions have now been appointed for all major functions / regions.

## Inter-Office Memo

 **The Gillette Company**

World-Class Brands, Products, People

Prudential Tower Building
Boston, MA 02199

| | |
|---|---|
| Date | August 29, 2003 |
| From | C. W. Cramb |
| Subject | **Friday Posting** |
| To | J. Kilts |

### Renaissance

Customer P&L requirements are nearing completion, working with Commercial groups to finalize interdependencies.

The DER's (development requests) for Financial Reporting are significantly advanced, with a large majority of them being already accepted for construction. We expect that the remaining DER's will be completed this week.

A revised project plan aiming at implementing Financial Reporting in two waves rather the currently planned three will be presented for approval at the next IT@G/Finance O/S Committee scheduled for next week. The Project expenses are also being realigned following the new roll-out strategy.

Given the successful finalization of the design phase for Financial Reporting, we plan to revisit the role of Deloitte Consulting moving forward. The expectation is that we will significantly scale down DC's staff assigned to the project.

We've established a "Transition Team" that will oversee the execution of the move to the post-Renaissance organizational structures. The objective is to ensure a smooth implementation, in line with the new roles and responsibilities, that severance costs are appropriately managed and that all committed savings are captured.



**Inter-Office Memo**

**The Gillette Company**

World-Class Brands, Products, People

Prudential Tower Building
Boston, MA 02199

| | |
|---|---|
| Date | October 10, 2003 |
| From | C. W. Cramb |
| Subject | **Friday Posting** |
| To | J. Kilts |

### Renaissance

- New Planning Tool is up and running in all of CONA and AMEE, in the Benelux and Nordic Markets in Europe, and in Australasia, Hong Kong, and Japan in Asia Pacific. With the exception of four markets, all other markets are running the new Planning Tool in parallel with their old processes. We have also been pleased by the number of markets which have decided to have non-financial users work directly with the Planning Tool as opposed to working through their financial team. These transitions had been scheduled to start next year.

- Users of the Planning Tool have reported some system performance issues (response time) which seem to be related to the increased volume caused by the submission of the 2004 Budget. Corrective action is being investigated by the team.

- On the Reporting side, the new Centralized General Ledger is ready for unit testing.

### S 404

- Control Set development is virtually complete. All but 2 (out of 12) control sets have been loaded into the self-assessment tool (RCTS).

- Self assessment for operations located in North America will start next week.

## Inter-Office Memo



The
Gillette
Company

World-Class Brands, Products, People

Prudential Tower Building
Boston, MA 02199

| | |
|---|---|
| Date | October 24, 2003 |
| From | C. W. Cramb |
| Subject | Friday Posting |
| To | J. Kilts |

### Renaissance

- Input from users of the Planning Tool identified expanded analysis capabilities as a key desirable that was beyond the original scope. In response to the requests we expanded the project scope, and Arcplan resources will begin design and construction work next week. We believe we will be able to add these additional functionalities within the current project financial budget.

- Construction of the Financial Reporting Tool continues on schedule. Current focus is on resolving DER's.

### Financial Planning

- We have strong alignment between the GBU's and Commercial Units for the profile of our 2003 latest estimate, and the numbers are in line with the objectives we discussed after receiving the BU#3. The resulting product line and geographic sales targets are being communicated back out to reinforce that alignment. The only area of potential concern centers around the Duracell trade inventory levels in CONA, where we would like to see further reductions, if possible.

- Preliminary budget numbers are reasonably well aligned to our published guidelines. We will review these with you on October 29th to help set the stage for the formal Budget Presentations.

**Inter-Office Memo**



The
Gillette
Company

World-Class Brands, Products, People

Prudential Tower Building
Boston, MA 02199

Date        October 31, 2003

From        C. W. Cramb

Subject     **Friday Posting**

To          J. Kilts

## Renaissance

- Completed the Phase 1 user survey of the Planning Tool. With an 80% survey participation rate, the tool received 87% rating it as satisfactory. The three weakest areas were against Performance (Web Page inputs), Analytic Reports (outside of original scope) and Help Desk support (expected transitional difficulties as we move to an outsourced solution). Action plans are underway to address all three areas, including some scope expansion to give more robust analytics.

- Held project updates with you as well as with the Oversight Committee (your direct reports). Main message is that things appear to be on schedule.

## S-404

- We commenced training sessions for the process using Gillette only employees as trainers. In the initial phases the training had been facilitated by D&T resources.

- Self assessment for organizations located in North America have started. These are scheduled to be completed during December.

**Inter-Office Memo**



**The Gillette Company**

World-Class Brands, Products, People

Prudential Tower Building
Boston, MA 02199

| | |
|---|---|
| Date | November 7, 2003 |
| From | C. W. Cramb |
| Subject | **Friday Posting** |
| To | J. Kilts |

### Renaissance

- Progress continues to be made on rolling out the company wide planning tool. Training for the Boston based GBU's took place this week and they will utilize the tool to submit GBU expenses for the November Budget update. Additionally, this training supports the Q1 2004, scheduled rollout of the SGP planning model which will link/build off of the annual budget model.

- Regarding Financial Reporting we have experienced some delays in both programming development by our outside contractor and acceptance by IT@ G. Implications vs. original rollout dates are not clear as of yet; we will keep you posted.

### SOX 404

- We started exploring with the GOLD Team the alternative of establishing web based interactive training. When implemented, this would result in substantial advantages versus the current classroom training, particularly as it relates to cost.

### Tax

- Continue discussions with KPMG regarding Tradeco expansion to Mexico. We continue to feel good about this initiative.

**Inter-Office Memo**



The
Gillette
Company

Prudential Tower Building
Boston, MA 02199

**World-Class Brands, Products, People**

| | |
|---|---|
| Date | November 14, 2003 |
| From | C. W. Cramb |
| Subject | **Friday Posting** |
| To | J. Kilts |

### Renaissance

- Held an IT/Finance Oversight Committee meeting. We reviewed project status with a focus on issues and developing mitigating plans. We experienced slippage in completing portions of SAP development and are taking actions to recoup the lost time. While much work remains, the joint team expects to accomplish the 2003 project milestones. However, given our margin for error is small, we are scheduling an additional Oversight meeting for next week to re-evaluate the situation.

### SOX 404

- Self-assessment testing for North American Operations is in process. Approximately 300 assessments will be conducted by year-end. Some of the assessments are proving to be fairly tedious. We are monitoring the process closely to gain learnings which could be applied to other organizations to improve efficiency.

**Inter-Office Memo**



**The Gillette Company**

World-Class Brands, Products, People

Prudential Tower Building
Boston, MA 02199

| | |
|---|---|
| Date | November 21, 2003 |
| From | C. W. Cramb |
| Subject | Friday Posting |
| To | J. Kilts |

## Renaissance

- Final Budget submissions were due on November 17. All Commercial units except Europe used the new planning tool with no parallel system back-up. Europe's plan is to phase out parallel back-up during Q1, 2004. All US based GBU's also used the new planning tool. Equally exciting is that AMEE, LAG, and Asia Pacific have moved to the new planning processes including utilizing non-financial people to control inputs to the system, and Europe will be implementing these processes during the BU#2 planning period.

- We held an IT/Finance Oversight Committee meeting today, with the focus on delays to the reporting tool development work. We have dramatically increased the third party resources for software development - primarily Patni - and are cautiously optimistic that we will be able to recover lost time and be back on track, ready for integration testing, by year end.



**The Gillette Company**

Prudential Tower Building
Boston, MA 02199

World-Class Brands, Products, People

| | |
|---|---|
| Date | December 5, 2003 |
| From | C. W. Cramb |
| Subject | **Friday Posting** |
| To | J. Kilts |

## Renaissance

- Within the Planning Tool, the additional (beyond scope) analytical reports requested by users have all been constructed and are in test mode. We believe we will be able to "go live" with these functionalities later this month.

- Within Planning, the construction of both the SGP and the Customer P & L continue on track.

- Within the Financial Reporting Tool, construction is well underway. We continue to encounter delays in String Testing as the tests are taking longer to complete than originally planned. A portion of this is due to our stringent rule that no String Test will be considered complete until it is 100% operational (including even very minor issues). We have had a target completion date of December 19 to finish String Testing to enable us to move to Integration Testing as planned next month. This will be a key focus area for tomorrow's IT@G/Finance Oversight Committee Meeting.

- GPCAT is a key application development that the Renaissance is highly dependant on. Given the recent project delays, the team is defining potential alternatives to an operational GPCAT as of January 1, 2004. This is necessary because GPCAT is the application meant to be the backbone for elements such as inventory revaluation calculations, the input of 2004 product cost standards, transfer prices/intercompany mark-ups, etc. It is also fundamental to delivery a business process that drives out mismatches. Although the GPCAT team continues to be hopeful to have an active database available at the beginning of the year, they are working with the Renaissance team to help define a temporary mitigating work around solution.

Plf. Exhibit G



Claudio Ruben/BO/Gillette
12/04/2003 03:13 PM

To  Charles Cramb/BO/Gillette@Gillette

cc  Michelle Viotty/BO/Gillette@Gillette, Ian
Lee-Leviten/BO/Gillette@Gillette, Eduardo
Garza/NA/Gillette@Gillette, Jim
Hutton/BO/Gillette@Gillette, Gail-Treasurer
Sullivan/BO/Gillette@Gillette, Kathy
Hastings/NE/Gillette@Gillette, Jan
Hardy/BO/Gillette@Gillette, Stephen
Hoffman/BO/Gillette@Gillette, Kimberly
Mastrianni/BO/Gillette@Gillette, Kevin
Baker/IS/Gillette@Gillette, Wolfgang
Schiemichen/IS/Gillette@Gillette, Asad
Husain/BO/Gillette@Gillette, Lemuel
Lanier/BO/Gillette@Gillette, Laurel
Krzeminski/US/Gillette@Gillette, Joe
Schena/BO/Gillette@Gillette

bcc

Subject  Corporate Controller's Weekly Posting - 12/4/03


**Renaissance**

Within Financial Planning, testing of the analytical reports is progressing. All reports are built and we are on the break / fix period. We are on target to go live this month with these capabilities which were out of scope but highly demanded by the users. Construction of Customer P&L and SGP continues on track.

Eduardo visited our Spain and France ComOps last week. Both units are getting ready to disconnect their old systems and fully rely on the new Hyperion Planning application.

In Financial Reporting, construction is starting to show progress. Up to date, 291 development pieces have been received (91% of the 320 units) and 80% of them (232) have been approved by Gillette. While pressure must continue to close the "production" phase, high priority has now be given to String Testing which has already started. However, closure of tests is taking longer than planned with none of the approximately 40 tests planned closed to date. The project team is sticking to a strict requirement to close all issues, regardless of severity, prior to making a string test complete. Closing tests satisfactorily is a critical measure to prove our readiness to go to Integration Testing next month. We are closely monitoring the process. At tomorrow's IT@G Finance Oversight Committee meeting we'll be in a better position to assess the probability of hitting the December 19th deadline and the implications if not.

GPCAT continues to face problems. The GPCAT team feels that there is a high likelihood that we will have a data base of the 2004 standards ready on January 1, 2004. There is an action plan to achieve this milestone. Europe, however, is the largest risk. Based on recent experience and for the sake of prudence, we'll be meeting (Joe, Kevin,Mark) next week to find ways to evaluate accounting alternatives for January 2004 revaluation and cost setting, should GPCAT not be able to deliver. Regarding Renaissance's FR, if GPCAT cannot deliver, we would have to take shortcuts to retrieve the std. costs. since 2004 costs are required for the third round of integration testing. However, this will not ensure that there's integrity of the information and,therefore, we would not be able to accomplish the vision of low to zero mismatches and reconciliations. More to come tomorrow at the IT@G/Finance O/S Committee.

**FRD/WIC/Treasury Controller's Town Hall Meeting**

CONFIDENTIAL
GIL-E 0000409

As part of the Gallup Action Plan, we held a second Town Hall meeting on Tuesday with around a 95% participation level. We presented JMK's latest video on Functional Excellence and Asad gave a presentation on Talent Management. The feedback was very positive and people appreciated hearing about those topics. Given the success of these meetings, we've decided to have them on a quarterly basis starting in February '04 when we will discuss the Company's approach on diversity.

**November Closing**

We've closed November in a smooth and timely fashion. All markets were on time with minor exceptions which did not affect the closing process. Balance sheet and Cash Flow statement are under review. Both, sales and profit trends continue to be very positive. Expenses are well contained. Mismatches continue to be meaningless (slightly positive YTD). SMAP adjustments below estimate. We completed the Goodwill impairment test and are refining some assumptions as well as documentation. The analysis proved that we do not have an impairment issue in any of the segments. We will review with KPMG shortly. We are following up on a variety of open issues to ensure smooth year-end closing.

**SOX 404**

Assessments from the North American operations continue to flow in. The Project Team has reviewed approximately 50% of closed assessments. No major issues identified so far.

We analyzed a request from CONA to provide more specific guidance on testing and have decided that, while we will provide general guidance, the specifics on the appropriate testing sample to validate the self-assessments will be a decision of the Finance VP's (process owners), due to the diverse nature of our systems and processes globally. Benchmarking with other companies indicates that they are following a similar approach.

Laurel had a meeting in the UK with the Regional / Functional Champions from the FSE and Europe Comm Op's with the objective of finalizing the scope matrix at the sub-process level. Laurel was very impressed with how both Champions are proactively approaching this process.

Presented to 25 Finance people in Kronberg. The group included representatives from the Braun GBU, Germany Comm Op's, Braun MTO, Duracell MTO and Isleworth MTO.

CONFIDENTIAL
GIL-E 0000410

Plf. Exhibit H

**Eduardo Garza**

22 Nov 2003 01:47 PM

To: Lemuel Lanier/BO/Gillette@Gillette
cc:
Subject: GPCAT AND REVALUATION

FYI

----- Forwarded by Brian Roberts/BO/Gillette on 11/21/2003 03:42 PM -----

**Mark Kost**

11/21/2003 02:44 PM

To: Joe Schena/BO/Gillette@Gillette, Claudio Ruben/BO/Gillette@Gillette, Charles Cramb/BO/Gillette@Gillette
cc: Ed Shirley/BO/Gillette@Gillette, Brian Roberts/BO/Gillette@Gillette, Hans Peter Schaefer/BO/Gillette@Gillette
Subject: GPCAT AND REVALUATION

I wanted to let you know that we had a very productive meeting today on the above and both Ed and I feel confident that these requirements for the revaluation portion of GPCAT will be met. On Monday, a note detailing the facts and key delivery dates and confidence levels will be coming from Ed and I to you directly, at which time we would be happy to meet personally with you to discuss any further concerns or questions that you would have. We will also be issuing a similar but separate note on the Jan. 1 Rennaissance deliverables.

We look forward to sharing these facts with you.

Mark



**Brian Roberts**
11/25/2003 10:41 AM

To: Gary Piscatelli/BO/Gillette@Gillette, Mike Egan/WO/Gillette@Gillette, Roland Larose/BO/Gillette@Gillette, Eduardo Garza/NA/Gillette@Gillette, Brian Nameth/BO/Gillette@Gillette, Joe Robinson/BO/Gillette, Steve Krasker/BO/Gillette@Gillette, mitmorris@dc.com
cc:
Subject: GPCAT DELIVERABLES-DECEMBER

Please see below and attached.

----- Forwarded by Brian Roberts/BO/Gillette on 11/25/2003 10:20 AM -----

**Mark Kost**
11/25/2003 09:27 AM

To: Charles Cramb/BO/Gillette@Gillette, Joe Schena/BO/Gillette@Gillette, Claudio Ruben/BO/Gillette@Gillette
cc: Brian Roberts/BO/Gillette@Gillette, Marie DiGiorgio/WO/Gillette@Gillette, Gerry Tuffy/US/Gillette@Gillette, Hans Peter Schaefer/BO/Gillette@Gillette, Kevin Barry/BO/Gillette@Gillette, Alan R Bouchard/BO/Gillette@Gillette, Ed DeGraan/BO/Gillette@Gillette, Kathy S Lane/BO/Gillette@Gillette
Subject: GPCAT DELIVERABLES-DECEMBER

The following is an update on the Global Product Catalog initiative as it relates to Project Renaissance and year-end.

The Global Product Catalogue will facilitate the following two major year-end activities:

- staging of 2004 product cost data into the GPCat database - Dec 2003
- Populate target ERP systems (SAP, CIA etc.) with the 2004 product cost standards to allow the normal revaluation process to occur - Dec 2003

**We are on target to achieve these commitments. There are still some yellow lights in certain activities, as you will see below. However, we are confident that these will be cleared on time. Progress towards achieving these commitments will be monitored daily by the GPCat team. Key accomplishments, issues and the project status will be communicated to you each Friday (Dec 1 for Nov 28).**

The high level process to achieve these two major activities is as follows:

- GPCat SKU management process is used to identify materials requiring costs
- Mfg costs are gathered and loaded into the GPCat database
- RSPM's are gathered by WIC and loaded into the GPCat database as a source for WIC and the receiving entities
- Duty, excess cost allocation (for bills of material) and COP are calculated in GPCat
- Validation reports are used to identify missing material costs which would then be updated.
- GPCat extracts/loads costs into the target ERP systems

In essence, GPCat will simplify and streamline activities that were previously disparate and inefficient

The high level process is further broken down into 13 sequential steps and two categories as follows. The traffic lights indicates the status of each of the 13 steps (green - on target, no mitigation required; yellow - potential to miss target, mitigation required to get back on track; red - activity will not be completed on time even with mitigation):

Preparation
    1 - load 2003 mfg costs               Green
    2 - load 2003 commercial costs     Green

3 - load duty rates and commodity codes
4 - load exchange rates                          Green
5 - extract files                                **(electronically prepares spreadsheets for
users to enter cost data)**

Revaluation execution
6 - load 2004 Mfg costs
7 - Load 2004 legal entity costs                 Green (excess cost, insurance, etc.)
8 - load non-WIC RSPM's                          Green
9 - Load WIC RSPM's                              Green
10 - Extension                                   Green **(internal GPCat process)**
11 - Duty, Excess allocation, COP                Green **(internal GPCat calculation process)**
12 - Approval (by user)                          Green
13 - Extracts/Loads                              **(automated or manual transfer of data to
downstream systems)**

In summary, the mitigating actions to get the yellow status items back on track are as follows:

3 - Load duty rates
- For 2004 process, duty will be calculated based on commodity codes, country of origin and destination
- Data input is late but will be completed by Dec 1
- Added 3 people to support the collection effort for this data.
- Contingency - use 2003 duty rate percentages as a basis for the 2004 calculation
- Contingency to be evaluated on Dec 1

5 - Extract Files
- Reports distributed late to users
- Reports will be available for user entry tomorrow (Nov 25)

6 - Load 2004 Mfg costs
- M. Kost issued comprehensive request email to mfg entities on Nov 21
- Input from mfg entities due back today (Nov 24)
- Status will be reported to M. Kost tomorrow (Nov 25)

13 - Extracts/Loads
- Integration testing in process covering all target systems
- Contingency plan is in place for SAP - extract data from GPCat and upload into SAP using existing upload programs
- Non SAP systems - extract the data from the GPCat database and upload into their environments
- Contingency plan for Non SAP systems TBD

We are extremely sensitive to the importance of Renaissance, the company's year-end business requirements and the GPCAT interdependencies. We are committed to delivering against these requirements.

Please call or see myself, Ed or Martin if you have any questions or concerns.

Thank you,

Mark

Plf. Exhibit 1

**Eduardo Garza**

15 Dec 2003 10:07 AM

To: Michelle Viotty/BO/Gillette@GILLETTE
cc:
Subject: Re: latest Renaissance reporting implementation timetable 🗅

Michelle,

Go-live target dates have not changed... yet.

**We intend to go-live with the Americas on May-end (May 24), and with the rest of the world on August-end (August 23).**

However, these dates are at stake following the problems with GPCat. Our original plan is to test 2004 information in March (with January / February information). If updating 2004 costs goes beyond year-end, January data may not be useful. If updating 2004 costs occurs in February, it is likely that Renaissance's March test should be in April (with March / February data). This will, in turn, would delay the entire project by a month.

We will work out mitigation plans in January when we will know for sure whether GPCat went live (or not), and when we will be in a position to perform our first round of Integration testing.

I'll keep you updated.

Best regards,   Eduardo

Michelle Viotty



**Michelle Viotty**

12/10/2003 09:52 AM

To: Eduardo Garza/NA/Gillette@GILLETTE
cc:
Subject: latest Renaissance reporting implementation timetable

Eduardo,

could you please forward your latest go live timetable for renaissance reporting for each of the geog's-. I need to evaluate this against our required audit plans.

Tks,
Michelle

## Company News: Personnel Bulletins

**Corporate Finance Organizational Refinements**
15-Apr-2004

As a result of recent changes in Corporate Finance which combines the Corporate Controllers and Financial Operations areas, I am announcing the following organizational refinements:

**Renaissance Team:** Project Renaissance has now entered a phase, where most of the design and development work is behind us, and the focus now is on testing and implementation. As a result, the following changes have been made to flatten the structure:

Eduardo Garza has moved out of the project team and joins the FSSC team in Boston. I want to thank Eduardo for his efforts and contribution and wish him success in his new role, where he will be supporting the FSSC organization on several key initiatives.

Gary Piscatelli and Joe Robinson will report directly to me. Roland Larose and Brian Roberts will support Gary on the Renaissance Reporting Initiative – Roland will be responsible for managing the testing and implementation, while Brian will be responsible for managing the Regional Leads, Project Communication, as well as maintaining his liaison role between Renaissance and GTM Finance.

**Corporate Financial Planning:** With a view towards streamlining the function, **Jerome Allen**, Assistant Director Corporate Planning, will now report to **Karyn Ohlson**. Jerome will continue to support Board of Director meetings, Quarterly Chairman's offsite meetings, as well as other financial planning responsibilities.

**Janet Fennelly** will continue to report to me and be responsible for company-wide share of market reporting, competitive analysis, and special projects. She will also be responsible for financial planning for Global Marketing Resources (GMR).

**Assistant Controller's Group:** Consistent with our plans to better align functions within Finance, we are moving **WIC** (Worldwide Invoicing Center) to the FSSC organization in Boston, reporting to Mike McDade.

Continuing in their current roles and reporting to me are **Julieta Castaneda** (Finance Director - International), **Laurel Krzeminski** (Project Director – Sarbanes Oxley), **Kim Mastrianni** (Treasury Controller), and **Wolfgang Schlemichen** (Assistant Controller).

**Joseph Schena**
**Vice President, Controller**

Pltf. Exhibit J

GIL-0000855

*CE Learning Roundtable*

**Games CEOs Play—And Run**

**High Noon For Japan**

**FAS 123: Watch Your Wallet**

A JOURNAL OF STRATEGY AND ANALYSIS BY AND FOR INTERNATIONAL CEOS                    NUMBER 111 • MARCH 1996



# How Al Zeien Hones Gillette's Cutting Edge

Plf. Exhibit  K

**COVER STORY**



# AN ICONOCLAST IN A
# CUTTHROAT WORLD

*Sometimes growth isn't limited by capital, technology, or access to markets. It's more fundamental.*

*To Gillette's Al Zeien, it's about reinforcing a global management culture.*

**"The only way we can move faster is if we build our management team at the rate we want to grow, 20 percent,"** says Alfred M. Zeien, chairman and chief executive of Gillette.

Writing a review of a biography on Warren Buffett in a recent *Harvard Business Review,* Microsoft's Bill Gates remarked that "over time, most business assets will be affected by technology's broad reach—although Gillette and Coca-Cola should be safe." Maybe, but it was not so long ago that the fortunes of the blade maker founded by King C. Gillette in 1901 looked anything but safe.

During the 1980s, the Boston-based personal-care products company enjoyed a commanding lead in disposable razors, a market that had taken off largely as a result of the efforts of France's Bic. The disposables segment, generally less profitable for manufacturers, eventually grew to half of all shaving market sales. As Gillette's profit margins became squeezed, it





**Gillette Under Zeien's Watch\***

*Growth*

*Results reflect data since Al Zeien became chairman and chief executive of Gillette on February 21, 1991 through December 31, 1995.*

**S&P Cosmetics category includes Alberto-Culver, Avon Products, Gillette, and International Flavors & Fragrances.*

Source: Mitchell and Co.

attracted the unwelcome attention of various predators, among them, Revlon's Ron Perelman and Coniston Partners, a New York-based KKR clone.

Surviving four unsuccessful takeover attempts, Alfred M. Zeien (pronounced Zane), Gillette's chairman and chief executive since February 1991, was determined to make his company as invulnerable as possible. He refocused the company's strategy on global growth, employing the latest technology and developing a cosmopolitan management force to see it through. Today, 70 percent of its total sales and operating profits are generated outside the U.S., making Gillette among the more international companies of the Fortune 500. In addition to its blades and toiletries, which are worldwide market leaders, the company has become the market leader in fancy pens since its acquisitions of Parker Pen (in 1992) and Waterman of France (1987). It had already acquired Braun (1967) and Oral-B (1984), enabling Gillette to move into leading positions in electric shavers, personal appliances, and toothbrushes.

A marine engineer who ran General Dynamics' shipyard in Quincy, MA,

before coming to Gillette, the 66-year-old Zeien is as loquacious as he is impatient with those who don't share his convictions. And he has many. Don't compare his company with other consumer-products corporations, he says: Gillette operates more like a pharmaceutical maker, with deep investment in long-term innovations for new products that ultimately will command a market premium. Gillette, he says, isn't obsessed with market share; it's technology-driven. Zeien talks about "shaving systems" with the sort of technical gusto one expects from a Boeing or Hughes engineer.

Its geographic expansion in the last five years has transformed Gillette from a U.S.-

centered transnational to a multicentered, world-class player. Like Coca-Cola's products, all Gillette products are global (but distribution may be local). As Zeien explains in the following interview, Gillette uses the blade business to blaze a trail in an overseas market. Initially, margins may be small, but as soon as other products, such as hair-care appliances and toothbrushes, follow the same distribution channel, costs go down and profits zoom. It's a neat strategy for the $6.7 billion company, which in 1987 was considered dead meat by Wall Street's vulture capitalists.

Zeien gets excited about technology. He takes pride in the fact that the company spends more on the design and development of new production *equipment* than it does on new products. The aim is to cut manufacturing costs by at least 4 percent a year. The Sensor razor's cost has dropped by more than a third since its introduction. This boosts operating margins (see chart below) and keeps low-cost generics and knock-offs at bay.

Zeien takes a global view of technology, too. Gillette maintains its major R&D facilities in the U.S., Germany, and the U.K., and technicians in China and India



**Steady Growth:**
**Gillette's Performance Indicators, 1990-1997\***
*Years ending Dec. 31*

Net Sales ($ millions)

Net Income ($ millions)

Operating Profit Margin (percent)

COMPOUND ANNUAL GROWTH RATE

*Estimates for 1996 and 1997.*

have access to the same technology as those based in the U.S. The home market is not always the first to get new products. SensorExcel was made in the U.S., but first launched in Europe.

So what gives Gillette its sharp edge? Like any CEO, Zeien likes to talk about product innovations, but human-resource issues are his chief concern. Internationally trained line managers are to Gillette what the telegraph was to the early railroads. With 34,000 employees spread over 200 countries and territories, the company is as cosmopolitan as Royal Dutch/Shell or ABB. If there's anything that keeps Zeien up at night, it's the detail of grooming the right people. In their recent book "Maximum Leadership," Bain & Co. consultants Charles Farkas and Phillippe de Backer state that Zeien "personally conducts 800 performance reviews annually." Strictly speaking, that isn't true—if he did, he'd have time to do little else. But he does make it his business to monitor that many reviews with his senior managers during the better part of June each year.

Zeien's foremost concern is twofold: First, he aims to more than double the number of expatriate managers from the roughly 350 in place today to 700 by the turn of the century. Second, he wants to increase the number of American-born expatriate managers, now about 15 percent of the total. It will be no small feat: He points out it takes more than 10 years to develop a Gillette manager. And that's only the baseline.

Recently he talked with *CE*'s editor-in-chief, J.P. Donlon, at Gillette's Prudential Towers headquarters overlooking Boston's Back Bay.

—*J.P. Donlon*

## ROFIT MOTIVE

**That's left to change in this mature business?**

The blade business is about 38 percent of our sales; about 68 percent of our profit. One would think that as we grow our other businesses faster than the blade business, we'd be reducing our profitability. But that has not been the case. Instead, we've been making the blade business more profitable, and the other businesses more profitable at an even faster rate.

Product development is a big part of what will grow our business. When we launched our latest product, for example, the Excel, its successor was in development.

'We have to get the U.S. passport population up among our managers. Now I get a note every time we hire an American.'

When we launched Sensor, Excel was in development. We have more than 10 candidates for the next generation in the research labs.

**This wasn't always the case, though. The Sensor wasn't in development when the Trac II was launched.**

Yes, the rollout time has been reduced. The Sensor, for example, took four years from the time we launched it until it was sold into the last world market. The Excel took three years.

In the *developed* world, the thrust of the blade business is this sequence of events: introduce new products, capture customers, upgrade customers, earn more per captured customer. Once we capture the customer, we have high loyalty.

In the *developing* world, on the other hand, our job is to build market share, and ultimately upgrade customers to better products. Unlike other consumer-products companies, we didn't have to generate the category because it's already there.

## PLANTING THE SEEDS

**Do you have different strategies for different global markets?**

We treat the world globally. We offer the same products, message, marketing plan, everything, everywhere in the world. It's true we may sell more of Product A in New York and more of Product K in Bangladesh. Some things have changed in the last five years. First is focus: Our mission is perfectly clear. We only want to be in core businesses in which we are the worldwide leader or have a plan in place to be the worldwide leader. Second is speed: Reduce the time it takes to develop a product, roll it out globally, make decisions, and grow the business. You must have an organization that can move fast.

**How does one move faster?**

It has to do with the rate at which we can build management. We, have to build our management team—senior and middle managers—at 20 percent a year to grow the business 20 percent. The opportunities far exceed the number of people we can throw at them.

**Are you hiring at that rate?**

It's a question of resource allocation. It takes about 14 years to develop a manager. If we hire someone who is in the mid- to late 20s, he or she becomes a manager by the mid-30s. The other day, I asked a couple of geographic managers what their plan was for a recent European acquisition. They said, "We just bought the darned thing three weeks ago, what do you want?" Well, I want to see the plan—and if there isn't anybody to work on it, I want to find someone.

One problem we face is that fewer and fewer of our managers are Americans. Gillette is an attractive company to a foreign national, more so than it is to an American. You're born in Pakistan, and you study at an American university; you speak English well. You say, "Gee, if I work for Gillette, I can work in four or five countries, it's a nice career." So Gillette is a magnet that attracts more and more non-Americans. And we have to find a way to solve this problem, to get the U.S. passport population up among our managers, because this is still home base. We have objectives for each of the sections, and I get a note now every time we hire an American.

## CONTINUAL INNOVATION

**You've said that people shouldn't look at Gillette as a consumer-products company, but more as a pharmaceutical. Why?**

A successful pharmaceutical plots its business on a spreadsheet with a series of bars, each of which represent past, current, and future products in the market. A successful pharmaceutical has those bars lined up, so it is deriving high profits from one end and has the potential for high profits down the line.

An unsuccessful pharmaceutical doesn't have anything in the pipeline. Or the generics are killing the one whose patent just expired. A good part of managing our business, like pharmaceuticals, is to have those bars carefully smoothed: You're not just reacting to your competitors. You're orchestrating and commanding business.

**To what degree is Gillette affected by private-label products?**

Much of our business is in categories in which there is insignificant difference between the generic's cost and the patented brand's. If a customer buys 26 Sensor blades a year for 75 cents apiece, he's spending about $20 a year. He can buy generic blades for $10, saving $10 a year. Every morning, he's going to say, "Yeah, not a good shave, but I'm saving $10 a year." [*Laughs.*]

**What new products do you have in the pipeline?**

I never talk about a product until it's about to be launched. But we know what the next generation is for shaving, and we have at least five contenders for the generation after that.

**How many permutations on shaving can you create?**

We're selling an *experience*—and there's no end to improving an experience, because you can't define it. How would you define a visit to a restaurant? Do you rate it by the food quality? The service, the ambiance, whether you felt good that day? Hundreds of things affect your satisfaction with that visit, so there are any number of ways to better that experience. It's the same with shaving.

**THE COHESION OF SUCCESS**

**What ties Gillette's disparate businesses together?**

The common denominator in all of our products is that they are global, not regional. Second, management of all of our products must be interchangeable, because the factors that lead to success are common. Our successful managers, for example, have been involved with two or three product lines. All of our products must be manufactured in large quantities so we can be the low-cost producer. And they have to be in businesses that are susceptible to technology.

'A good part of managing our business is like managing a pharmaceutical: You must have products in the pipeline, so you're not just reacting to your competitors. You're orchestrating and commanding business.'

And any business we're in has to add to the benefits of our core blade business. Here's how it works: In most countries, we lead with the blade business, which doesn't make much money. We lead with that business, because we don't have to create a market for blades—it's easy to move into a pre-existing business, offer a better product, and capture market share. We then bring in two or three other businesses, and suddenly, the blade business becomes quite profitable. First, the blade business was paying for this warehouse. In come toothbrushes and hair-care appliances. So, while the blade business used to pay 100 percent of the warehouse's overhead, now it's paying 15 percent. Boom, the blade business is profitable.

**Your market capitalization is four times what it was five years ago, and you're sitting on a nice pile of cash. What areas are you looking at for acquisitions?**

We have been making acquisitions within our core businesses. Any businesses we acquire will add more to our rate of earnings growth than it would be without the acquisition. It's the rate of earnings growth, not absolute numbers. That's what our investors expect of us. Growth. If they had wanted security, they would have bought a utility.

**NEW...AND NOT-SO-NEW**

**In which international markets are you concentrating your efforts?**

The largest growth rates are in the "nearly new" markets. A "new" market is one in which we move in and do $3 million in business. The next year, we might do $6 million. It may be 100 percent growth, but it's still only $3 million.

The "nearly new" markets are those we've been in for three to five years. There, it may be a $25 million or $30 million business, and it's growing. Poland is a good example. Our business there is growing at about 60 percent and accounts for about $75 million.

**What international market has the most untapped potential for you?**

India. It is still somewhat restricted, but it has the potential to add big numbers. It's a bigger blade market than the U.S., and if we can figure out how to do this right, it can mean enormous business.

**ALL IN THE ENGINEERING**

**What is Gillette's competitive advantage?**

The heart of our business is our ability to develop new products. We have more people involved in the development of the processes—the designing and building of equipment to make Gillette products—than we have in the design or development of the products themselves.

We have four laboratories for research only, and eight laboratories that develop new products. And we have three engineering centers that develop processes and build equipment. This gives us control of the process and the ability to make proprietary products. Consequently, we have never-ending productivity improvement and continual innovation.

**What is your primary challenge as CEO?**

I hate to sound hackneyed, but my challenge is to make sure I leave this business to my successor with greater prospects for the future. But I expect to be around for a couple of years. ❑

Copyright 1996 CHIEF EXECUTIVE. Reprinted with permission.