UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EDUARDO GARZA MORA )<br>    Plaintiff,                             )<br>                                              )<br>v.                                          )<br>                                              )<br>THE GILLETTE COMPANY  )<br>    Defendant.                          )<br>                                              ) | Civil Action 05-11651NMG |

**PLAINTIFF'S RULE 56.1 STATEMENT**
**OF DISPUTED AND MATERIAL FACTS**

Pursuant to Local Rule 56.1 of the U. S. District Court of Massachusetts, Plaintiff, Mr. Eduardo Garza Mora, hereby submit the following Statement of Material Facts which will be produced at trial:

## Disputed Defendant's Facts

Defendant's Paragraph #31

*In early 2003, Mr. Cramb and Mr. Ruben became concerned that Mr. Garza was not demonstrating an effective leadership style and was alienating members of his team, members of the FLT and members of the IT organization with whom he had to work. See Ex. 5, Cramb Aff. at ¶ 13; Ex. 6, Ruben Aff. at ¶ 16.*

Plaintiff disputes the contention in early 2003 Mr. Ruben, (Plaintiff's immediate supervisor) and Mr. Cramb (Ruben's immediate supervisor) had a genuine concern that he failed to demonstrate effective leadership style and was alienating member of his team and members of the FLT (who were the customers of Renaissance Project) and IT organization.  Mr. Cramb as the reviewer of the Performance Development Process ("PDP") written by Mr. Ruben would have look at the objectives and agree or disagree with the results, and given an opinion on what those results were as well as looked at the overall rating and either agree or disagree.  Def. Exhibit 3 Husain Dep. at pg 50:5-21.

The PDP evaluation for Plaintiff dated January 30, 2004 that covers this period of time in question states an exact opposite point of view from that now stated by both Mr. Ruben's and Mr. Cramb's.  See attached Exhibit A - Garza Mora PDP Performance Review For Fiscal Year 2003 dated completed January 30, 2004.

<u>Defendant's Paragraph #32</u>

*In approximately early 2003, after observing Plaintiff make presentations to a number of audiences, Mr. Cramb and Mr. Ruben determined that Plaintiff needed to improve his executive presence, presentation skills, and public persona. See Ex. 5, Cramb Aff. at ¶ 14; Ex. 6, Ruben Aff. at ¶ 17; Ex. 4, Ruben Dep. at 85-86; 97-101.*

Plaintiff disputes the contention during this time period in early 2003 Mr. Ruben, and Mr. Cramb first made observations that he exhibited presentation deficiencies. Defendant's business practices incorporate in PDP designed specifically to assist managers in addressing and working on improving performance issues. See attached Exhibit B - Gillette Performance Management Cycle and PDP.  If a genuine issue existed regarding Plaintiff's presentation skills it would have certainly shown up in a PDP covering this period of time, or the preceding year.  See Exhibit A and Exhibit C - Garza Mora PDP Performance Review For Fiscal Year 2002 dated completed January 31, 2003. Additionally, early 2003 is not the first time Mr. Ruben and Mr. Cramb observed Plaintiff present to a number of audiences.  See Def. Exhibit 4 - Ruben Dep. at pg 101:1-5 and Plf. Exhibit 1 ¶ 12 – Affidavit Eduardo Garza Mora ("Aff . EGM")  Mr. Ruben did not observe any problem with Mr. Garza Mora presentation nor does he recall anyone mentioning to him they had a problem with Mr. Garza Mora's presentation. See Def Exhibit 4 - Ruben Dep. at pg 101:6-10.  Mr. Ruben was Mr. Garza Mora's indirect supervisor since 1987 and Mr. Cramb had opportunities to observe and be satisfied with Plaintiff's ability to present to audiences.  See Plf. Exhibit 1 – Aff. EGM ¶ 15.

Additionally, while in the position of Director Project Renaissance several people in positions above and below Mr. Garza Mora expressed an opinion that his presentations have been clear and extremely helpful. See Plf. Exhibit 1 – Aff. EGM ¶ 40 and Plf. Exhibit D – Email from Lemuel Lanier February 27, 2003.

Defendant's Paragraph #33

*In early 2003, at Mr. Cramb and Mr. Ruben's suggestion, Gillette hired an executive coach, Alexander Caillet, to work with Plaintiff in developing his executive presence, public persona, oral and written communication skills, and management style. See Ex. 8, Husain Aff. at ¶ 22; Ex. 4, Ruben Dep. at 85-86; Ex. 1, Plaintiff Dep. I at 119-120; Ex. 6, Ruben Aff. at ¶ 18; Ex. 5, Cramb Aff. at ¶ 15.*

Plaintiff disputes the contention that Gillette based solely on the suggestion of Mr. Ruben and Mr. Cramb hired Alexander Caillet to work with Plaintiff. Gunn Partners and Alexander Caillet were hired for a much larger scope of consulting on managing change leadership to transform Gillette Finance with the Renaissance Project functioning as a piece of the transformation process. See Plf. Exhibit E – Gunn Partners Change Leadership Proposal, See Def. Exhibit 1 Garza Mora Dep. at 119:7 – 19, Def. Ans. Cmplt #53.

Defendant's Paragraph #34

*During a Project Renaissance team meeting on or about May 1, 2003, Gary Piscatelli, Plaintiff's subordinate, became angry when he was asked a question by Claudio Ruben regarding the project. Mr. Piscatelli made an inappropriate comment (which had nothing whatsoever to do with Mr. Ruben's or anyone else's national origin), slammed his fist on the table, and left the room. See Ex. 1, Plaintiff Dep. I at 141-143; Ex. 4, Ruben Dep. at 133-134; Ex. 6, Ruben Aff. at ¶¶ 19-21.*

Plaintiff disputes the contention that Mr. Piscatelli's acknowledged inappropriate actions that included inappropriate comments during a meeting attended by the FLT members while being questioned by Mr. Ruben his supervisor had nothing whatsoever to

do with anyone's national origin. Mr. Piscatelli's outburst openly confirmed he maintained the view that Latinos such as Plaintiff of Mexican origin and Ruben of Argentinean origin where not worthy of being his boss and asking him question in a staff meeting. See Plf. Exhibit 1 – Aff. EGM ¶ 31. In this staff meeting in which Plaintiff attended he was offended because the inappropriate comments of Piscatelli directly challenged the projects strategies that required him to take direction from two person's of Latin decent. See Plf. Exhibit 1 – Aff. EGM ¶ 31 and Def. Ans. Cmplt #31.

Defendant's Paragraph #47

*During the 2003 talent review process, Claudio Ruben did not propose that Plaintiff be designated as an NGL. Mr. Ruben had determined that Plaintiff's performance on Project Renaissance did not warrant designation as an NGL because from early 2003 until the talent review meeting, Plaintiff had continued to struggle with his leadership skills, communication style, and executive presence. Specifically, Mr. Garza was unable to express his ideas in a clear, concise and understandable manner at the various meeting and presentations that the Renaissance team conducted related to the project. He also assumed a passive role at meetings with his team and with the FLT, causing some members of the FLT to question his leadership abilities and skills. See Ex. 4, Ruben Dep. at 155-156; Ex. 6, Ruben Aff. at ¶ 32.*

Plaintiff disputes the contention in any part of 2003 Mr. Ruben legitimately possessed an opinion that Plaintiff's performance on Project Renaissance was deficient warranting exclusion from being considered for Next Generation Leadership ("NGL") status that effectively excluded Mr. Garza Mora from consideration for any promotion. See Plf. Exhibit A.

Defendant's Paragraph #48

*During the 2003 talent review meeting, Mr. Cramb expressed concerns about Plaintiff's competency and leadership on Project Renaissance. See Ex. 5, Cramb Aff. at ¶ 26; Ex. 3, Husain Dep. at 125-127.*

4

Plaintiff disputes the contention that Mr. Cramb genuinely expressed concerns of Plaintiff's competency which directly conflicts with Plaintiff's PDP covering this same period of time. Mr. Garza Mora's PDP for 2003 was reviewed and signed by Mr. Cramb that he supported the determination made by Mr. Garza Mora's immediate supervisor Mr. Ruben. See Exhibit A. Additionally, Mr. Cramb on a regular basis wrote to the Chairman of the Board of Director for Gillette, J. Kilts regarding what great progress was being made with Project Renaissance a noted very difficult and risky project as in 2002 and throughout 2003. See Plt. Exhibit F - Inter-Office Memo, subject - Friday Posting.

Defendant's Paragraph #51

*The FLT designated Jose Uribe as an NGL in 2003. Mr. Uribe's country of origin is Mexico. See Ex. 8, Husain Aff. at ¶ 34.*

Plaintiff disputes the statement that Mr. Uribe country of origin is Mexico. As an 18 year employee of Gillette, from November 1987 to October 2005, Mr. Garza Mora mentored and coach many individuals towards hire leadership position within Gillette. A core competency for promotion is stated success in coaching other employees. Mr. Uribe is one of many individuals that Mr. Garza Mora has influenced at Gillette. As a result of this mentoring process with Mr. Uribe he familiar with his country of origin. Mr. Uribe is widely known at Gillette as "the Paisa" a person whose origin is the Colombian region of Antioquia. Mr. Garza Mora is familiar with Mr. Uribe and this country of origin is Columbia and not Mexico. See Plf. Exhibit 1 – Aff. EGM ¶¶ 33 – 35.

Defendant's Paragraph #52

*In addition, in 2003, out of the 93 employees designated by the FLT to be NGLs, 13 were Latino.*

5

Plaintiff disputes these presented static's as unsupported by any evidence presented before the court for purposes of summary judgment.

Defendant's Paragraph #55

*Because Plaintiff was in the midst of leading one of the most important and visible financial projects at Gillette at the time, he was not considered a viable candidate for a vice president position in the near term. See Ex. 8, Husain Aff. at ¶ 38; Ex. 5, Cramb Aff. at ¶ 29. In addition, in Mr. Cramb's opinion, Plaintiff's performance on Project Renaissance did not warrant consideration for a vice president role. Ex. 5, Cramb Aff. at ¶ 29.*

Plaintiff disputes the logic and accuracy of a statement that would exclude him from consideration for a promotion for a future hypothetical opening (see def. Parg #54 statement of facts) where the hypothetical opening should it occur would be a natural progression from the position the Plaintiff held even before taking on the assignment of leading an important visible financial project. See Plf. Exhibit 1 – Aff. EGM ¶¶ 36, 37. Furthermore, Plaintiff disputes the contention that Mr. Cramb genuinely had concerns over the Plaintiff's competency which directly conflicts with Plaintiff's PDP reviewed and signed by Mr. Cramb covering this same period of time. See Plf. Exhibit A.

Defendant's Paragraph #56

*At the annual talent review meeting, the FLT concluded that there were no internal candidates who could move to a vice president position in the near term. Some candidates were not considered qualified for the position because of their lack of experience or competency; others were not considered viable candidates because of timing, i.e., their existing projects required their continuing participation for a substantial amount of time. See Ex. 8, Husain Aff. at ¶ 39; Ex. 5, Cramb Aff. at ¶ 30.*

Plaintiff disputes as fact that FLT's conclusion that there was no internal candidate available at the annual talent review meeting in 2003 because at least the Plaintiff was in a position to move into a promotion based on past work and current successes. Plaintiff challenges the conclusion that a promotion to Vice President in FLT

6

would be mutually exclusive or that no other person could be promoted to position of leading Project if that was required.  See Plf. Exhibit 1 – Aff. EGM ¶¶ 39, 40.

Defendant's Paragraph #57

*In the late fall of 2003, the then-Vice President, Finance for the Oral Care Global Business Unit left the Company and the position became vacant. Because the FLT had concluded just months before that there was no viable internal candidate for a vice president position in the near future, Mr. Husain began to work with headhunters to recruit an external candidate. See Ex. 8, Husain Aff. at ¶ 40.*

Plaintiff disputes FLT's conclusion that there were no internal candidate available at the annual talent review meeting in 2003 requiring Mr. Husain to begin an external candidate search.  See Plf. Exhibit 1 – Aff. EGM ¶¶ 39, 40.

Defendant's Paragraph #63

*In approximately the late Fall of 2003, Project Renaissance began to encounter difficulties and experience delays. See Ex. 6, Ruben Aff. at ¶ 35.*

Plaintiff disputes the contention in late Fall 2003, Project Renaissance began to encounter difficulties and experience delays.  Recorded delays were due problems in the IT department, an area over which Plaintiff had not authority.  See Plf. Exhibit F - Memo dated November 7, 2003. Additionally, the delays proved to be manageable and would not have affected a go-live date if GPCat project had not been delayed.  As late as December 2003 Mr. Ruben forwards an email to Mr. Cramb regarding Corporate Controller's Weekly Posting that specifically addresses Project Renaissance which stated "we are on target to go live this month . . ."  See Plf. Exhibit G – Email message Ruben to Cramb 12/04/2003.  This contention is also at odds with Plaintiff's PDP that fails to state project is not on target or that Plaintiff's performance has negatively affected the project's progress to date.   See Plf. Exhibit A.

7

Defendant's Paragraph #68

*A few weeks later, in early February of 2004, the Renaissance team determined that the project's "go-live" date would be significantly delayed. See Ex. 2, Plaintiff Dep. II at 227-228; 231; Ex. 11, Plaintiff Dep. II, Exh. 10; Ex. 12, Plaintiff Dep. II, Exh. 11; Ex. 6, Ruben Aff. at ¶ 40; Ex. 5, Cramb Aff. at ¶¶ 42-43.*

Plaintiff disputes when the determination was made as to Project Renaissance would be delayed in that the Project's delay was inevitable if GPCat Project got delayed. See Plf. Exhibit 1 – Aff. EGM ¶ 60. It was only at the moment that the GPCat project confirmed it needed additional time that Project Renaissance then knew that its go-live date would be correspondingly delayed. See Plf. Exhibit H – series of Emails in Nov. 2003 from Mark Kost V. P. Finance and FLT member confirming confidence in GPCat's target dates. It was widely acknowledged that if GPCat project delayed it would delay Project Renaissance. See Plf. Exhibit F – Memos dated February 21, 2003, March 21, 2003 and December 5, 2003 and Plf. Exhibit I – email from Garza Mora to Michelle Viotty a member of FLT dated December 15, 2003 outlines possible mitigation plan. However, the Plaintiff had not authority over the GPCat project. See Plf. Exhibit 1 – Aff. EGM ¶¶ 60, 61.

Defendant's Paragraph #69

*The delay in Project Renaissance's "go-live" date was caused in part by delays in the development of another project, referred to as "GPCat." See Ex. 1, Plaintiff Dep. I at 79-81; Ex. 6, Ruben Aff. at ¶ 41.*

Plaintiff disputes the contention that GPCat, a project over which the Plaintiff had no control, only delayed Project Renaissance. IT construction, another project beyond the Plaintiff's control, also adversely affected Project Renaissance achieving milestones. See Def. Exhibit 1 Garza Mora Dep. at 80:22 – 82:24.

Defendant's Paragraph #71

*In February 2004, Project Renaissance's string testing and integration testing for financial and management reporting were also behind schedule. See Ex. 2, Plaintiff Dep. II at 225-226; Ex. 13, Plaintiff Dep. II, Exh. 9; Ex. 4, Ruben Dep. at 112-114; Ex. 6, Ruben Aff. at ¶ 42*

Plaintiff disputes the contention that sting testing and integration testing in any way cause Project Renaissance delay as these matters where manageable. See Plf. Exhibit 1 – Aff. EGM ¶ 60 and Def. Exhibit 4 - Ruben Dep. at pg 112:4 - 113:4.

Defendant's Paragraph #73

*In early February 2004, after it was clear that Project Renaissance was running significantly over-budget and behind schedule, Plaintiff, Gary Piscatelli, and Joe Robinson recommended to Claudio Ruben and Lem Lanier that a quality and risk management review be conducted on Project Renaissance with the objective of helping the team deliver on its goals in the future. See Ex. 2, Plaintiff Dep. II at 241-242; Ex. 14, Plaintiff Dep. I, Exh. 12; Ex. 4, Ruben Dep. at 118-119; Ex. 6, Ruben Aff. at ¶ 44; Ex. 5, Cramb Aff. at ¶ 43.*

Plaintiff disputes the contention over who and when a quality and risk management review should be conducted of Project Renaissance. It was the Plaintiff in early 2004 saw the need for the risk assessment and worked to consensus with Piscatelli, Ruben and Lanier and not Robinson as his area of coverage needed no review. See Plf. Exhibit 1 – Aff. EGM ¶ 44 and Def. Exhibit 4 - Ruben Dep. at pg 119:6-10.

Defendant's Paragraph #80

*As a result of the delays and budget overruns, and after reviewing the findings and recommendations in the Deloitte Report, Charles Cramb determined that in order for Project Renaissance to succeed, its leadership had to be changed. Accordingly, in March 2004, Mr. Cramb decided to remove the two leaders of the project, Claudio Ruben and Plaintiff from their positions. See Ex. 5, Cramb Aff. at ¶ 47; Ex. 8, Husain Aff. at ¶ 55.*

Plaintiff disputes the contention Deloitte Report was or could be the basis for removing Plaintiff from his position as the structure created by Mr. Cramb, Mr. Ruben and Mr. Lanier were the route cause of problems effecting Project Renaissance not

implementation as required of Plaintiff. See Def. Exhibit 4 - Ruben Dep. at pg 112:4 - 116:7.

Defendant's Paragraph #82

*After being notified of this decision, Mr. Ruben decided to retire from Gillette, effective May 1, 2004. See Ex. 4, Ruben Dep. at 131; Ex. 6, Ruben Aff. at ¶ 47. From the end of March 2004 to May 1, 2004, Mr. Ruben continued to perform his other duties as Controller, but no longer worked on Project Renaissance. See Ex. 4, Ruben Dep. at 131; Ex. 6, Ruben Aff. at ¶ 47.*

Plaintiff disputes contention in statement that would imply that Mr. Ruben's decision of retirement came after a period of time with an opportunity to reflect and think about the decision of retirement. Mr. Ruben's decision to retire after more than 30 years with Gillette came on the spur of the moment, with no advanced notice of meeting with Cramb to discuss Project Renaissance, it was instantaneous (within 5 minutes). Such a catastrophic career ending decision infers a strong disagreement with the decision to remove him from the Project. See Def. Exhibit 4 - Ruben Dep. at pg 129:5-18 and at pg 130:19 – 131:10.

Defendant's Paragraph #85

*Joe Schena, Rick Lees, and Kevin Baker were not involved in the decision to remove Plaintiff or Mr. Ruben from Project Renaissance. See Ex. 7, Baker Aff. at ¶ 11; Ex. 5, Cramb Aff. at ¶ 51. Mr. Ruben was not involved in the decision to remove Plaintiff from Project Renaissance. See Ex. 6, Ruben Aff. at ¶ 49; Ex. 5, Cramb Aff. at ¶ 51.*

Plaintiff disputes the contention that Joe Schena was not involved in decision to remove him from Project Renaissance. Joe Schena spoke with Plaintiff on stating that if was his decision to remove him in order to flatten the organization. See Plf. Exhibit 1 – Aff. EGM ¶ 45. In a Company News: Personnel Bulletin of April 15, 2004 Joe Schena, Vice President, Controller reported "as a result of recent changes in Corporate Finance . . . I am announcing the following organizational refinements: Renaissance has now entered

10

a phase, where most of the design and development work is behind us, and the focus in now on testing and implementation . . . Eduardo Garza has moved out of the project . . . I want to thank Eduardo for his efforts and contribution and wish him success." See Plf. Exhibit J – Company News:Personnel Bulletin.

Defendant's Paragraph #88

*Mr. Cramb told Mr. Husain that he expected that Plaintiff would be seeking opportunities outside of Gillette after obtaining his green card.*

Plaintiff disputes the contention that Mr. Cramb would have an expectation that he would seek to leave Gillette after obtaining a green card. See Plf. Exhibit 1 – Aff. EGM ¶ 46. Plaintiff had no such intention nor did he tell Mr. Cramb or anyone inside or outside of Gillette that was his intentions. Plaintiff specifically expressed an interest in finding a permanent role at Gillette after being removed from Project Renaissance so that Joe Schena could accomplish his vision of a more flatten organization. Among others, I expressed this interest to Chuck Cramb, Joe Schena, Kevin Baker and Asad Husain. See Plf. Exhibit 1 – Aff. EGM ¶ 47. But for Mr. Cramb unjustified demotion and limiting of Plaintiff's advance in the organization he had no other information that would justify an expectation that Plaintiff a loyal company employee from more than 16 years would seek to leave. See Plf. Exhibit 1 – Aff. EGM ¶ ¶ 45 - 47.

Defendant's Paragraph #95

*Because of the likelihood that Plaintiff would be exiting the Company in the near future and the fact that his assignment to FSSC was temporary, Mr. Baker did not recommend Plaintiff for a stock option award in 2004. See Ex. 7, Baker Aff. at ¶ 18; Ex. 8, Husain Aff. at ¶64.*

Plaintiff disputes the contention there was a likelihood he would be exiting the company and therefore any justification on the part of Mr. Baker according to Gillette

11

policy to not recommend stock option award in 2004.  See Plf. Exhibit 1 – Aff. EGM ¶ 47.  Plaintiff had no intention of leaving Gillette after more than 16 years of service, and nor did he tell anyone inside or outside of Gillette that was his intentions. See Plf. Exhibit 1 – Aff. EGM ¶ 47.  But for being unjustly demotion and limiting of Plaintiff's advance in the organization there existed no information that would justify an expectation that Plaintiff a loyal company employee from 16 years would seek to leave.  See Plf. Exhibit 1 – Aff. EGM ¶ ¶ 45 - 47.

Defendant's Paragraph #96

*Asad Husain, Charles Cramb, Joe Schena, and Ian Lee-Leviten agreed with Mr. Baker's recommendation that Plaintiff should not receive stock options in 2004 because of his likely exit from Gillette in the near future and his poor performance on Project Renaissance. See Ex. 7, Baker Aff. at ¶ 19; Ex. 8, Husain Aff. at ¶ 65; Ex. 5, Cramb Aff. at ¶ 57*

Plaintiff disputes the contention there was a likelihood he would be exiting the company and therefore any justification on the part of Mr. Baker, Ms. Husain, Mr. Cramb, Mr. Schena and Mr. Lee-Leviten according to Gillette policy to not recommend stock option award in 2004. See Plf. Exhibit 1 – Aff. EGM ¶ 47.  Plaintiff had no intention of leaving Gillette after 16 years of service, and nor did he tell anyone inside or outside of Gillette that was his intentions.  See Plf. Exhibit 1 – Aff. EGM ¶ 47.
But for being unjustly demotion and limiting of Plaintiff's advance in the organization there existed no information that would justify an expectation that Plaintiff a loyal company employee from 16 years would seek to leave.  See Plf. Exhibit 1 – Aff. EGM ¶ ¶ 45 - 47.  Furthermore, Plaintiff disputes he performed poorly on Project Renaissance. See Plf. Exhibit A and Plf. Exhibit J.

Defendant's Paragraph #104

12

*During this conversation, Mr. Baker informed Plaintiff that he believed that it was extremely unlikely that he would receive a promotion to a vice president position in the near term based on his lack of success in leading Project Renaissance. See Complaint at ¶ 70; Answer at ¶ 70; Ex. 7, Baker Aff. at ¶ 22.*

Plaintiff disputes he lacked success in leading Project Renaissance or that Mr. Baker possessed any information that during the time he lead Project Renaissance it was unsuccessful but for the projects over which Plaintiff was given no control that directly effected the go-live date of the project. See Plf. Exhibit 1 – Aff. EGM ¶ ¶ 60 – 62, Plf. Exhibit A and Plf. Exhibit F.

Defendant's Paragraph #105 – 106

*Plaintiff admits that at the time he had this conversation with his supervisor, the position of Vice President, Finance of Gillette Latin America was not vacant and that he was discussing his expectation that he would be a future potential candidate for that position. See Ex. 1, Plaintiff Dep. I at 99-100.  In the past five years, no employee at Gillette has been promoted to a vice president position shortly after having been removed from a Director-level position for poor performance. See Ex. 8, Husain Aff. at ¶ 70*

Plaintiff disputes the contention that lacked success in leading Project Renaissance or that he performed poorly in the position of Director that would warrant his exclusion from promotional opportunities to a position of vice president. See Plf. Exhibit 1 – Aff. EGM ¶ ¶ 60 – 62, Plf. Exhibit A and Plf. Exhibit F.

Defendant's Paragraph #111

*In order to be considered for a position in the newly integrated company, Gillette employees were required to authorize Gillette to release certain information from their personnel files to Procter & Gamble. See Husain Dep. at 163-164; Husain Aff. at ¶ 75; Baker Aff. at ¶ 27.*

Plaintiff disputes the contention that he or any other Gillette employee where told that as a precondition for consideration in the newly integrated company required signing

13

an authorization to release certain information from personnel files. Plaintiff was informed that employees had a choice which he choose to exercise based on his view that the most recent PDP included unjustly negative evaluation of his performance on Project Renaissance. See Plf. Exhibit 1 – Aff. EGM ¶ 48.

## Plaintiff's Undisputed Facts

1. Thomas Madsen an American candidate filed the position of Vice President of Finance for Gillette Latin America in October 2002. Def. Ans. Cmt. ¶ 27.

2. Defendant's hiring of Thomas Madsen in October 2002 comported with the philosophy of the former Chairman and CEO of Gillette, Al Zeien, that a problem with the company was that too many managers where not American Citizens, the problem could be fixed by getting the U. S. passport population up among our managers. See Plf. Exhibit K – Magazine article in Chief Executive March 1999 discussions with then CEO Al Zeien.

3. Gary Piscatelli's behavior at a May 1, 2003 during a staff meeting that was serious enough to warrant discussion of his immediate termination because it was inappropriate and disturbing. Plaintiff believed the resolution of the discussion was that Piscatelli's inappropriate reaction warranted his termination and that it was Plaintiff understanding after the discussion that he was to be terminated See Plf. Exhibit 1 – Aff. EGM ¶ 31, 50-51; Def. Exhibit 4 - Ruben Dep. at 137:8-14.

4. Gary Piscatelli's inappropriate behavior in the May 2003 meeting surprised and stocked the meeting participant including Claudio Ruben. See Def. Exhibit 4 - Ruben Dep. at pg 135:3-7.

5. Gary Piscatelli's behavior during the May 2003 meeting was disturbing to Mr. Ruben and Mr. Garza Mora and it was wrong. See Def. Exhibit 4 - Ruben Dep. at 137:15-20.

6. Senior managers within Finance group discuss how to respond to Mr. Piscatelli's inappropriate disturbing behavior and determined that he should be fired. See Def. Exhibit 4 - Ruben Dep. at 138:1 -139:9.

7. The decision to termination Mr. Piscatelli was reversed with the intervention of Joe Schena, Vice President/Comptroller and Plaintiff's efforts to have some formal reprimand included in his personnel file were ignored. See Def. Exhibit 4 - Ruben Dep. at pg 139:10-22; Plf. Exhibit 1 – Aff. EGM ¶¶ 52, 53.

8. Mr. Garza Mora Ruben had discussions with Asad Husain a Human Resource manager regarding Piscatelli creating a difficult work environment as well as discussions with Nancy Picard and Kalpana Shamugan, both outside consultants about the problems his behavior was having on me and the negative impact on the group. See Plf. Exhibit 1 – Aff. EGM ¶ 58.

9. Prior to May 2003 incident, Piscettili created a hostile work environment for Plaintiff, by underminding this authority with co-workers and

15

      subordinates.  Plf. Exhibit 1 – Aff. EGM ¶ 54; Def. Exhibit 1 Garza Mora Dep. at 138:6 – 142:3.

10. In 2003 employees selected as Next General Leaders ("NGL") would have a specific training and development plan created for them so that they would be considered of career advancement opportunities when they arose.  Def. Exhibit 3 Husain Dep. at 129:9 – 130:3.

11. In a meeting with Claudio Ruben in mid 2003 the Plaintiff was told he was not an NGL because among other things he needed to correct in accent.  Def. Exhibit 1 Garza Mora Dep. at 97:2-6 and 112:21 – 113:12.

12. Claudio Ruben has no documentation that supports a claim that people in the audience of Plaintiff's presentation had trouble understanding what he was presenting.  Def. Exhibit 4 - Ruben Dep. at 98:6 – 99:10.

13. Accent fluency/correction was included in Plaintiff's PDP for fiscal year 2003 as part of a development plan. Plf. Exhibit A; Def. Exhibit 4 - Ruben Dep. at 97:1 - 98:12.

14. Accent fluency/correction was included in Plaintiff's PDP for fiscal year 2002.  Def. Exhibit 4 - Ruben Dep. at 98:3-15.

15. At his deposition, Mr. Ruben testified that he should have foreseen the delays in GPCat and IT problems.  Def. Ex. 4, Ruben Dep. at 130:14-18.

16. Mr. Ruben also believed Lem Lanier in charge of IT department should have been replace but he was not. See Def. Ex. 4, Ruben Dep. at 129:14-18.

17. Michael Estrada, Human Resources Director of Global Financial Shared Services assisted in drafting extremely negative PDP report of Plaintiff for 2004. Def. Exhibit 3 Husain Dep. at 145:7-15.

18. Mike Estrada conducted an investigation into an internal complaint of discrimination filed by the Plaintiff. Def. Ex. 4, Ruben Dep. at 158:12-19.

19. The Plaintiff formally complained about the appropriateness of his PDP evaluation for fiscal year 2004 that was overly negative and written by Joe Schena, a person who did not formally supervise him over the period of time he worked on Project Renaissance. Def. Exhibit 3 Husain Dep. at 52:6-16 and 142:12-18.

20. It would be unusual for someone who did not have any direct responsibility for supervising an employee to write that employee's performance review. Def. Exhibit 3 Husain Dep. at 142:9-11.

21. Joe Schena did not have any direct responsibility for the supervision of the Plaintiff in 2004. Def. Exhibit 3 Husain Dep. at 142:6-8.

22. Gillette could have contacted Claudio Ruben for his input in written Plaintiff's fiscal 2004 PDP for the period of time under his supervision when he worked on Project Renaissance. See Def. Ex. 4, Ruben Dep. at 131:18-21.

                                          Respectfully submitted
                                          Plaintiff By His Attorney;

                                          /s/ Neil Osborne
                                          Neil Osborne (BBO# 567674)
                                          41 West Street, 7th floor
                                          Boston, MA  02111-1216

(617) 482-1160 Phone
(617) 482-1166 Fax

Dated: September 29, 2006

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants (if any) on September 29, 2006.

  /s/ Neil Osborne
Neil Osborne