UNITED STATED DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| EDUARDO GARZA MORA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 05-11651-RCL |
| v. | ) | |
| | ) | |
| THE GILLETTE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

The Gillette Company ("Gillette") submits this Memorandum of Law in Support of Its

Motion for Summary Judgment.  In his Complaint, the Plaintiff, Eduardo Garza Mora, whose

country of origin is Mexico, alleges national origin discrimination in violation of Title VII,

§ 1981, and Mass. Gen. L. c. 151B.  The Complaint also asserts claims of tortious interference

with his employment relationship and intentional infliction of emotional distress.  Plaintiff's

claims lack factual support or legal merit and should be summarily dismissed.

**STATEMENT OF THE FACTS**

The undisputed facts are set forth in the Defendant's Statement of the Material Facts.[1]

The facts may be summarized as follows:

The Plaintiff was employed by Gillette from 1987 until October 31, 2005.  (¶ 2).  During

this time, Plaintiff was promoted to various senior positions within Gillette's finance

organization at the Company's headquarters in Boston, and at several other locations outside of

the United States, including Mexico, Colombia and Turkey.  (¶ 7).  In April 2002, Charles

---

[1]  All citations to Defendants' Statement of the Material Facts are designated as "(¶ __)".  All
citations to the Appendix of Summary Judgment Materials are designated as "Ex. __".

Cramb, Gillette's Chief Financial Officer, and Claudio Ruben, Gillette's Corporate Controller, selected the Plaintiff to serve as the Director of Project Renaissance, a significant and highly visible financial project which was designed to overhaul the financial reporting and planning functions throughout Gillette's global finance organization.  (¶¶ 3-4, 14, 16, 20-21).  As Director, the Plaintiff reported to Mr. Ruben and together they were responsible for leading and assuring the success of this major new project, which Mr. Cramb considered to be one of the most important financial projects for Gillette in the last decade.  (¶¶ 16, 20).  The ultimate customer or consumer of Project Renaissance's deliverables was the Financial Leadership Team ("FLT"), which consisted of 18 senior members of Gillette's finance organization from across Gillette's global operations.  (¶ 28).

In early 2003, Messrs. Cramb and Ruben became concerned that Mr. Garza was not demonstrating an effective leadership style as the Director and was alienating members of his Renaissance team, members of the FLT and members of the Information Technology ("IT") organization.  (¶ 31).  After observing Plaintiff make presentations, Messrs. Cramb and Ruben determined that the Plaintiff needed to improve his executive presence, presentation skills, and public persona.  (¶ 32).  As a result, Gillette at its expense hired an executive coach, Alexander Caillet, to work with Plaintiff to develop his executive presence, public persona, oral and written communication skills, and management style.  (¶ 33).

In August, 2003, the FLT held its annual talent review process.  (¶ 43).  During this process and as part of Gillette's "Next Generation Leader" program, the FLT identified individuals who, based on their performance and demonstrated potential, were expected to take on senior leadership roles within Gillette's finance organization in the future and designated these individuals as Next Generation Leaders ("NGLs").  NGLs did not receive raises, bonuses

or stock options as a result of this designation. (¶ 46). Because of emerging concerns about the effectiveness of his leadership as Director of Project Renaissance and concerns about his presentation skills, the FLT did not designate the Plaintiff as an NGL. (¶¶ 47-49). However, out of the 93 employees designated by the FLT to be NGLs in 2003, 13, like the Plaintiff, were Latino. (¶ 52).

In January of 2004, it was clearly established that Project Renaissance was not going to meet its critical deadlines and the Plaintiff and Mr. Ruben informed Mr. Cramb that Project Renaissance's budget (originally, $50.1 million) would likely be exceeded by approximately $10 to $12 Million. (¶¶ 27, 64-65). In early February, 2004, it was determined that the project's "go-live" date would be significantly delayed. (¶ 68). At the same time, certain testing for financial and management reporting were also behind schedule. (¶ 71). Plaintiff and other members of the Renaissance Team informed members of the FLT of these delays.[2] (¶ 72). The Plaintiff and others recommended that a quality and risk management review be conducted on Project Renaissance to help the team deliver on its goals. (¶ 73). Mr. Cramb approved this review and Deloitte Consulting ("Deloitte") was commissioned to conduct it. (¶ 74). Deloitte concluded in its "Project Renaissance Risk Review", see Ex. 15 at p. 4, that the Project Renaissance team has "not uniformly produced high quality deliverables." (¶ 76). Among other shortcomings, Deloitte found that Plaintiff and other team members' roles seemed "highly redundant" and "top heavy." (Id.). Deloitte recommended that Gillette "identify and empower a single project leader for the entire project" who would have "complete authority over the entire project." (¶ 77). The Deloitte Report also warned: "Without change it is highly likely that Gillette will continue to

---

[2] Plaintiff attempts to wash his hands of any problems with the project, unlike his supervisor, Claudio Ruben. Mr. Ruben, who was removed from Project Renaissance at the same time that Mr. Garza was removed acknowledges that as the leaders of the project, the buck stopped with him and Mr. Garza. (¶ 87).

miss committed dates, find surprises during untimely periods and even fall short of original project goals."  See Ex. 14 at p. 4.

As a result of the delays and budget overruns, and consideration of the recommendations in the Deloitte Report, Mr. Cramb decided it was necessary to change the leadership of Project Renaissance and, therefore, he removed both of the leaders of the project, Claudio Ruben and Plaintiff, from their positions.  (¶ 80).  First, Mr. Cramb removed Mr. Ruben from the Project and replaced him with Joe Schena.  (¶ 81).  Mr. Schena assumed the duty of being the single leader to manage Project Renaissance.  (¶ 83).  Mr. Cramb and Asad Husain, Gillette's Corporate Director of Human Resources, then informed Plaintiff that he also was being removed from Project Renaissance.  (¶ 84).  Mr. Cramb did not replace Plaintiff.  (Id.).  Mr. Ruben considers that as the two senior leaders he and Plaintiff should have foreseen the various delays and problems with the project and that, as the two senior leaders of the project, they were accountable for the delays and budget overruns of the project.  (¶ 86).  Mr. Ruben believes that he and Mr. Garza were removed from the project because as the two senior project leaders, they simply failed to deliver.  (¶ 87).  In other words, the buck properly stopped with the two persons responsible for properly leading and managing the project so that it would meet its goals.

Upon his removal from Project Renaissance, Mr. Cramb requested that Mr. Husain find a temporary assignment for the Plaintiff within the Finance organization and that the Plaintiff's salary and grade not be reduced.  (¶ 88).  The Plaintiff was a Grade 21 earning $171,000 per year.  (¶ 92).  In late March/early April of 2004, Kevin Baker, Vice President of Financial Shared Services, informed Mr. Husain that he could create a temporary role for Plaintiff in Gillette's Financial Shared Services Center ("FSSC").  (¶ 90).  On April 15, 2004, Plaintiff was transferred to the temporary position of Project Director within FSSC, reporting to Mr. Baker.  (¶

91).  On July 13, 2004, Plaintiff told Mr. Baker that he expected to be promoted to a vice president position in the near future.  (¶ 103).  Mr. Baker told the Plaintiff that in his opinion this was unlikely because of his lack of success in leading Project Renaissance.  (¶ 104).  In April 2005, the Plaintiff's salary was increased to $176,600.  See Ex. 8, Husain Affidavit at  ¶ 69.

On January 28, 2005, Gillette announced that it was going to merge with the Procter & Gamble Company ("P&G").  (¶ 110).  To be considered for a position in the new company, Gillette employees were required to authorize the release of information from their personnel files to P&G.  (¶ 111).  The Plaintiff did not do this.  (¶ 112).  As a result, the Plaintiff was not considered for a position and his employment was terminated effective October 31, 2005 in connection with a post-merger reduction in force.  (¶ 114).  Gillette provided the Plaintiff with severance payments equal to approximately $244,661 and other severance benefits.  (¶ 115).

## STANDARD OF REVIEW

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56; Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).  The First Circuit has recognized that "[g]enuine issues of material fact are not the stuff of an opposing party's dreams.  On issues where the nonmovant bears the ultimate burden of proof [s]he must present definite, competent evidence to rebut the motion."  Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (emphasis added); see also Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001).

## ARGUMENT

I.  **THE COURT SHOULD ENTER SUMMARY JUDGMENT IN FAVOR OF DEFENDANT ON PLAINTIFF'S TITLE VII AND CHAPTER 151B CLAIMS.**

    A.  **All Discrimination Claims Which Are Based On Events That Occurred Prior to February 21, 2004 Are Time-Barred Under Title VII and Chapter 151B.**

The statute of limitations governing discrimination actions under Chapter 151B imposes two requirements:  plaintiff must first bring a Complaint to the MCAD within three hundred days of the allegedly discriminatory act, and must then file suit within three years of that alleged act. See Mass. Gen. Laws c. 151B § 5 (as amended by St. 2002, c. 223 § 1); Mass. Gen. L. c. 151B, § 9; see also 804 C.M.R. 1.10(2).  Similarly, to preserve a claim under Title VII, a plaintiff must file his Charge with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged act of discrimination.  42 U.S.C. § 2000e-5(e)(1).  Plaintiff filed his Charge with the MCAD and simultaneously with the EEOC on December 9, 2004.  (¶ 116).  Thus, under Chapter 151B and Title VII, Plaintiff's filing is timely only as to those alleged acts which occurred between February 21, 2004 and December 9, 2004, the date Plaintiff filed his Complaint.  Those are the only alleged events which may be properly considered for purposes of Plaintiff's Title VII and Chapter 151B claims.  See, e.g., Riebold v. E. Cas. Ins. Co., 9 Mass. L. Rptr. 599, 1999 WL 140419, at *6 (Mass. Super. Ct. 1999); Keeler v. Putnam Fiduciary Trust Co., 238 F.3d 5, 10-12 (1st Cir. 2001).  Thus, Plaintiff's national origin discrimination claims under Title VII and Chapter 151B based on events occurring prior to February 21, 2004, as set forth in paragraphs 8-15, 25-27, 29-38, and 48-55 of his Complaint are barred as untimely.[3]

---

[3]  To the extent that the Plaintiff attempts to argue that said events were part of a continuing violation and therefore timely, this doctrine is only applicable where the timely events are substantially related to earlier acts.  See Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 533 (2001); Ruffino v. State Street Bank & Trust Co., 908 F. Supp. 1019, 1040 (D. Mass. 1995).  Messrs. Piscatelli, Ruben, Caillett and Lees, the individuals who allegedly discriminated against the Plaintiff in 2002 and 2003, were not involved in the alleged acts of discrimination

**B.    Plaintiff has Failed to Present Sufficient Evidence to Support a Claim for National Origin Discrimination under Title VII and Chapter 151B.**

In his Complaint Plaintiff claims that the following alleged acts of discrimination have occurred since February 21, 2004:

- Plaintiff did not receive the position of Vice President of Finance for the Oral Care GBU (the "Oral Care position") in March 2004.  See Complaint, ¶¶ 62-66.

- Plaintiff was removed as Director of Project Renaissance in March 2004 and transferred to a temporary position within FSSC in April 2004.  See Complaint, ¶¶ 72-73.

- On or about July 13, 2004, Kevin Baker informed Plaintiff that he believed that it was extremely unlikely that he would be promoted to a vice president position in the near future because of his lack of success in leading Project Renaissance.  See Complaint, ¶¶ 67-70).

These claims fail because Plaintiff cannot establish a *prima facie* case or that the legitimate reasons articulated by Gillette were pretexts for national origin discrimination.

Plaintiff has not proffered any direct evidence of discrimination, and accordingly, his claims are governed by the familiar three-step burden-shifting framework.  See Abramian v. Presidents & Fellows of Harvard Coll., 432 Mass. 107, 116 (2000); Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 127-28 (1997).

**1.    Plaintiff Has failed to Establish a *Prima Facie* Case of Discrimination with Respect to his Claims Regarding Promotion to Vice President, Finance, Oral Care.**

The Plaintiff has failed to present sufficient evidence to establish a *prima facie* case of national origin discrimination with respect to his failure to be promoted to the position of Vice President, Finance, for the Oral Care Global Business Unit.  To establish a *prima facie* case in a

---

asserted by the Plaintiff from February 2004 to the present.  Allegedly discriminatory acts committed by different actors are not substantially related.  See Goguen v. Quality Plan Adm'rs, 11 Mass. L. Rptr. 288, 2000 WL 282485, at *3-4 (Mass. Super. 2000) (plaintiff could not anchor untimely sexual harassment allegations on timely allegation of retaliation where the retaliatory acts were committed by a different individual).

failure to promote case, the plaintiff must show that (1) he is a member of a protected class; (2) he applied and was qualified for a vacant position, (3) he was not selected, and (4) the defendant filled or sought to fill the position with someone with the plaintiff's qualifications.  Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867, 875 (1984);  Wheelock College v. Massachusetts Commission's Against Discrimination, 371 Mass. 130, 135 n.5 (1976).  Plaintiff has not presented evidence to establish the second and fourth elements necessary for a *prima facie* case of invidious discrimination.

First, Plaintiff did not apply for, or express an interest in, an <u>open</u> position and he proffers no evidence that he was even qualified for the position.  By the time Plaintiff expressed an interest in the Oral Care position on or about March 5, 2004, the decision had already been made to offer the position to Glenn Brack approximately two weeks earlier.  (¶¶ 59-61).  In addition, the Plaintiff has proffered no evidence that he met the qualifications for the Oral Care position.  Thus, Plaintiff has failed to present sufficient evidence to establish that he applied for any available position for which he was qualified.

Plaintiff has also failed to establish the fourth element of a *prima facie* case, *i.e.*, that the person selected for the position had qualifications similar to his.  At his deposition, Plaintiff admitted that he did not know Glenn Brack and that he did not know anything about his background or qualifications for the job.  See Ex. 1, Plaintiff Dep. I at 102.

Plaintiff has failed to present any evidence to establish two of the elements of a *prima facie* case, and, therefore, this claim should be dismissed.

> **2.    Plaintiff Has Failed to Present Sufficient Evidence to Establish a *Prima Facie* Case of Discrimination in Connection with Kevin Baker.**

Plaintiff alleges that Kevin Baker discriminated against him by commenting that it was unlikely that Plaintiff would be promoted to a Vice President position.  Complaint ¶ 70.

This claim fails because the actions of Mr. Baker do not constitute "a materially adverse employment action," a necessary factual prerequisite for an actionable claim of invidious discrimination. See Alba v. Upjohn Co., Inc., No. 95-12788-JLT, 1997 WL 136334, at * 5 (D. Mass. 1997) (citing MacCormack v. Boston Edison Co., 423 Mass. 652, 662-63 (1996)). To establish an adverse employment action, a plaintiff must present "objective evidence that he had been disadvantaged in respect to salary, grade, or other objective terms and conditions of employment." MacCormack v. Boston Edison Co., 423 Mass. 652, 663 (1996). "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Marrero v. Goya of P.R., Inc., 304 F.3d 7, 23 (1st Cir. 2002) (quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)). "Otherwise every trivial personnel action that an irritable . . . employee did not like would form the basis of a discrimination suit." Id. (quoting Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996)). In examining actions alleged to be adverse, courts admonish that "[w]ork places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." Horney v. Westfield Gage Co., 77 Fed. Appx. 24, 32 (1st Cir. 2003) (citing Blackie v. State of Maine, 75 F.3d 716, 725 (1st Cir. 1996)).

Here, Mr. Baker's comment that it was unlikely that Plaintiff would be promoted to a Vice President position in the near term was made during a hypothetical discussion concerning Plaintiff's career aspirations. (¶¶ 103-106). As Plaintiff admitted at his deposition, at the time of this conversation, Plaintiff was simply expressing his expectation that he would be a future candidate for a Vice President position. (¶ 105). Mr. Baker's opinion about the Plaintiff's prospects in the near term did not have any adverse effect on the objective terms and conditions

of his employment and was simply not an adverse employment action.  In addition, there is

absolutely no evidence to suggest that Mr. Baker rendered his opinion because of Plaintiff's

national origin.  Thus, this claim should be dismissed.[4]

> **3.     Plaintiff Has Failed to Present Sufficient Proof to Establish a National Origin Discrimination Claim With Respect to His Removal As the Director of Project Renaissance.**
>
> > a.     Plaintiff Cannot Establish a *Prima Facie* Case of Discrimination Based on His Removal from Project Renaissance.

In a termination or demotion case, to establish a *prima facie* case, the employee must

present sufficient evidence to establish that he: (1) is a member of a protected class, (2)

performed his job at an acceptable level, (3) was discharged or demoted from the position, and

that (4) his employer sought to fill the position by hiring another individual with similar

qualifications.  See Blare v. Husky Injection Molding Sys. Boston, Inc. 419 Mass. 437, 441

(1995); Rodriguez-Torres v. Caribbean Farms Manuf., Inc., 399 F.3d 52, 58 (1st Cir. 2005).

Plaintiff has failed to present evidence that (1) he was performing his job at an acceptable level

when he was removed as Director of Project Renaissance or that (2) he was replaced by a person

with similar qualifications.

---

[4]  Other references by the Plaintiff in his deposition to actions by Mr. Baker or others, allegedly the result of his national origin, also were not shown to be adverse employment actions or lacked any evidentiary support to establish the elements of a *prima facie* case.  For example, the Plaintiff's assignment to a smaller office is not an adverse employment action.  See Weber v. Hartgen, 297 F. Supp. 2d 58, 68 (D.D.C. 2003).  While the Plaintiff was not recommended for stock options in 2004, he does not establish that he was entitled to any given his circumstances or that he was treated differently from non-Mexican employees.  Adverse comments in the Plaintiff's 2004 Performance Evaluation also do not, in themselves, constitute an adverse employment action.  Menchoca v. Ottenwalder, 18 Fed. Appx. 508, 509 (9th Cir. 2001); Clark v. Alcon Alum. Corp., 41 Fed. Appx. 767, 776 (6th Cir. 2002).  Various comments to the Plaintiff by various people related to the Plaintiff's dress, need to improve his accent or about immigration were simply not shown to establish any hostile environment based on national origin that in any way could be construed as so severe and pervasive as to interfere with Plaintiff's work performance.  See Sarin v. Raytheon Co., 905 F. Supp. 49, 54 (D. Mass. 1995).

By early 2004, under the leadership of the Plaintiff and Mr. Ruben it was clear that Project Renaissance was not going to meet its critical deadlines, including its projected deadlines for go-live and string-testing, and that its budget would be exceeded by about $12.9 Million. (¶¶ 66-68).  Because the budget overrun was so significant, Mr. Cramb, Gillette's Chief Financial Officer, was required to obtain approval for this additional expenditure from the CEO, the Board of Directors, and the ITAC Committee.  (¶ 67).  In early February 2004, because of the failures Deloitte Consulting conducted a quality and risk management review of Project Renaissance.  (¶¶ 73-75).  The Deloitte Report provided conclusions and recommendations designed to assure that the Project Renaissance would meet its goals.  (¶¶ 76-78).  Deloitte found that the Project Renaissance team "has not, and does not currently, operate in an environment that facilitates efficient and effective execution and has also not uniformly produced high quality deliverables."  (¶ 76).  Deloitte found the roles of the Plaintiff and other top team members to be "highly redundant and 'top heavy.' "  (Id.).  To remedy these problems, Deloitte recommended that Gillette "identify and empower a single project leader for the entire project" who would have "complete authority over the entire project . . . ." (¶ 77).  The Deloitte Report warned that: "Without change, it is highly likely that Gillette will continue to miss committed dates, find surprises during untimely periods and even fall short of original project goals."  See Ex. 15 at  p. 4.  It is undisputed that Plaintiff as Director of the Project, along with Mr. Ruben, was responsible for the effectiveness of the Project, including staying within budget and delivering uniformly high quality deliverables to the FLT on time.  Given the undisputed delays, cost overruns and objective assessment that the Project was in disarray, and not meeting its goals, Plaintiff has failed to demonstrate that he was performing at an acceptable level.

In addition, Plaintiff cannot establish the fourth element of a *prima facie* case, *i.e.*, that Gillette sought to fill his position by hiring someone with similar qualifications. In fact, Mr. Cramb did not appoint a successor to fill Plaintiff's job at all. (¶ 84). Because Plaintiff cannot satisfy two elements of his *prima facie* case, the Court should enter summary judgment on his claim of discrimination relating to his removal as Director of Project Renaissance. See Petitti v. Mass. Dep't of Mental Health, 859 F. Supp. 33, 38-39 (D. Mass. 1993).

> b.   Gillette's Articulated, Non-Discriminatory Reasons for Removing the Plaintiff as the Director of Project Renaissance are Clearly Not Pretexts for Invidious Discrimination.

Assuming Plaintiff could establish a *prima facie* case, Gillette has articulated legitimate, non-discriminatory reasons for his removal as the Director of the Project. Specifically, Gillette has produced substantial evidence that Mr. Cramb, the CFO, was motivated to remove the Plaintiff from the position of Director of Project Renaissance because the project experienced significant delays and budget overruns and was not producing uniformly high quality deliverables under the leadership of the Plaintiff as its Director, and under Mr. Ruben, the Corporate Controller, and because Deloitte recommended that a single leader be appointed with complete authority over the project.

Plaintiff has provided no probative evidence that these compelling, non-discriminatory reasons for his removal from Project Renaissance were concocted to conceal unlawful discrimination based on his national origin. First, Plaintiff cannot show that similarly situated employees outside of his protected class were treated differently, as Mr. Cramb also removed Claudio Ruben, the other senior member of the finance organization leading the Project. (¶¶ 80-82). Mr. Ruben's country of origin is Argentina, not Mexico. (¶ 4). Second, while Plaintiff may claim that he should not be blamed or held accountable for such failures, he does not, and cannot, dispute the failures, *i.e.*, that in early 2004, under his leadership and responsibility, the Project

was not delivering uniformly high quality deliverables to the FLT, the Project was experiencing significant delays and was projected to run 20% over budget. Nor can the Plaintiff dispute that Mr. Cramb, in fact, believed that the Plaintiff, as the Director of the Project should be held accountable and that, to assure that the Project would be successful, it needed new leadership. (¶¶ 63-72). Even if Plaintiff was unfairly "scapegoated" for the failures of the Project, which he was not, case law well establishes that demonstrating that a decision is unfair or unwise does not establish pretext or discriminatory animus. As long as Mr. Cramb possessed a non-discriminatory basis for believing that the circumstances relating to the undisputed failures of the Project warranted the Plaintiff's removal from the Project, courts will neither second-guess his business judgment nor question the fairness of that decision. See, e.g., Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 128 (1997) ("Chapter 151B does not grant relief to a plaintiff who has been discharged unfairly, even by the most irrational of managers, unless the facts and circumstances indicate that discriminatory animus was the reason for the decision") (internal quotation and citations omitted); Mesnick v. General Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991) (affirming summary judgment for employer and explaining that: "Courts may not sit as super personnel departments, assessing the merits – or even the rationality – of employer's nondiscriminatory business decisions.").

Most importantly, the undisputed facts provide compelling evidence that such reasons were not pretextual. At his deposition, Mr. Ruben, the Corporate Controller, who, like Plaintiff, was removed from the Project by Mr. Cramb, testified that he and Plaintiff should have foreseen the problems with the project and that they, as the leaders of the project, were accountable for the delays and budget overruns on the project. (¶ 86). According to Mr. Ruben, the decision to

remove both Plaintiff and himself from Project Renaissance resulted directly from the fact that they, as the project leaders, failed to deliver.  (¶ 87).

Moreover, the decision to remove Plaintiff from Project Renaissance was made by Mr. Cramb, who is the same individual who, less than two years earlier, had selected the Plaintiff to lead this highly significant and visible financial project based on the Plaintiff's track record of success.  (¶¶ 21, 80-81, 84).  In similar situations, courts have applied the same actor presumption under which an inference arises that there was no invidious discrimination when the person who hires or promotes the plaintiff is also responsible for the subsequent adverse employment action.  "[I]t is improbable that the same persons who hire someone already in a [protected class] will suddenly develop an aversion to [that class]."  See Woods v. Baystate Health Sys., No. 04-30010-KPN, 2005 WL 1513118, at *4 (D. Mass. 2005) (quoting Dziamba v. Warner & Stackpole LLP, 778 N.E.2d 927, 934 (Mass. App. Ct. 2002)).  For all of these reasons, the evidence establishes that Plaintiff's removal as Director was the result of a good faith business decision by Mr. Cramb to change the senior leadership of Project Renaissance at a time when the Project was failing, and that Mr. Cramb's reason was not a sham to mask a discriminatory animus.

### C.    Plaintiff's Termination Is Not At Issue In This Case.

On December 9, 2004, Plaintiff filed his MCAD Complaint, alleging that Gillette discriminated against him based on his national origin by denying him promotional opportunities.  (¶ 116).  On July 7, 2005, Plaintiff filed his Complaint in Superior Court which was on August 9, 2005 removed to this Court.  (¶¶ 118-119).  Approximately three and a half months later, on October 31, 2005, Plaintiff's employment with Gillette was terminated in connection with a reduction-in-force that resulted from Gillette's merger with Procter & Gamble Company.  (¶¶ 110-114).  Because Plaintiff's termination did not occur until approximately three

and a half months after he filed his Complaint, he did not make, and could not have made, any allegations regarding his termination from Gillette in his Complaint.  At the Scheduling Conference on November 2, 2005, Plaintiff's counsel notified the Honorable Nathaniel M. Gorton that the Plaintiff had been terminated from Gillette since filing his Complaint on July 7, 2005 and indicated that he was considering whether to amend the Complaint to add claims arising out of Plaintiff's termination.  (¶ 121).  In the Electronic Scheduling Order, dated November 7, 2005 and at the Scheduling Conference, Judge Gorton instructed the parties to amend or supplement their pleadings on or before November 30, 2005.  (¶ 122).  Plaintiff has not amended his Complaint, nor, to Defendant's knowledge, has he filed an administrative charge at the MCAD related to his termination.  (¶ 123).  Accordingly, there are no claims related to Plaintiff's termination at issue in this action.

## II.  THE COURT SHOULD ENTER SUMMARY JUDGMENT IN FAVOR OF DEFENDANT ON PLAINTIFF'S § 1981 CLAIM.

### A.  Plaintiff Has Not Alleged That He Was Discriminated Against on the Basis of His Race or That He was Treated Differently Than White Employees.

To prevail on his § 1981 claim, Plaintiff "must show (1) that he is a member of a racial minority, (2) that the defendant discriminated against him on the basis of his race, and (3) that the discrimination implicated one or more of the activities enumerated in the statute."  Garett v. Tandy Corp., 295 F.3d 94, 98 (1st Cir. 2002).  Section 1981 encompasses only claims of racial discrimination and not claims of discrimination premised on other protected categories such as national origin.  Saint Francis College v. Al-Khazraji, 481 U.S. 604, 613 (1987); see also Alexis v. McDonald's Restaurants of Mass., Inc., 67 F.3d 341, 346 (1st Cir. 1995).  Plaintiff's § 1981 claim must be dismissed because it is based solely on Plaintiff's national origin and not his race.  See Complaint at ¶ 1.  While racial discrimination may include discrimination based on ancestry or ethnic characteristics for the purposes of Section 1981 protection, Saint Francis College, 481

U.S. at 613, Plaintiff simply has not alleged discrimination on this basis, nor is there evidence of any such discrimination.  Thus, Plaintiff's Section 1981 claim must be dismissed.

**B.      Alleged Discriminatory Acts Suffered By Plaintiff While He Was Working and Living in Mexico Cannot Form the Basis of His § 1981 Claim.**

Assuming Mr. Garza could bring a Section 1981 claim, in his Complaint and at his deposition, Plaintiff makes a number of allegations regarding allegedly discriminatory treatment he received while he was working in Mexico from 1987 to 1990 and from 1999 to 2002.[5]  See Complaint at ¶¶ 8-15; Ex. 1, Plaintiff Dep. I at 19-20, 22, 32-37, 55-59.  These allegations which occurred while he was living and working in Mexico and which involve a promotion to a position in Argentina are not actionable under § 1981 because the statute does not apply extraterritorially.  See Ortiz-Bou v. Universidad Autonoma de Guadalajara, 382 F. Supp.2d 293, 296 (D. P.R. 2005); Ofori-Tenkorang v. American Internat'l Group, Inc., -- F.3d --, 2006 WL 2349169, at *4-8 (2d Cir. Aug. 15, 2006).  Accordingly, all of Plaintiff's Section 1981 claims that are based on discriminatory acts which allegedly occurred while he was working outside the United States should be dismissed.

**C.      Plaintiff's Allegations Are Insufficient to Establish a Section 1981 Claim.**

Section 1981 discrimination claims are analyzed using the same framework and principles as Title VII cases.  See Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 95-96 (1st Cir. 1996).  Thus, Plaintiff's § 1981 claims that arise out of the same facts used to support his timely Title VII and Chapter 151B claims should be dismissed for the reasons discussed above.  The additional allegation put forward by the Plaintiff that his failure to be designated as a NGL in 2003 which precedes the February 21, 2004 statute of limitations date for the Title

---

[5]  Many of these claims are also time-barred by Section 1981's four-year statute of limitations. See Jones v. R.R. Donnelly & Sons, Co., 124 S.Ct. 1836 (2004).

VII/Chapter 151B claims but falls within the four-year statute of limitations period for § 1981 claims is discussed below.

> **1.** **Plaintiff Has Presented Insufficient Evidence to Establish a *Prima Facie* Case of Discrimination Under § 1981 With Respect to His Failure to Be Designated an NGL.**

Plaintiff alleges that during 2003, he was not designated as a Next Generation Leader ("NGL") by the eighteen members FLT because of his national origin. Plaintiff's failure to be designated as an NGL, however, is not actionable under § 1981 because Plaintiff cannot establish that this action was "a materially adverse employment action." See Rosa v. Polaroid Corp., No. 963235, 1998 WL 1184203, at *5-6 (Mass. Super. Ct. 1998); Alba v. Upjohn Co., Inc., No. 95-12788-JLT, 1997 WL 136334, at * 5 (D. Mass. 1997) (citing MacCormack v. Boston Edison Co., 423 Mass. 652, 662-63 (1996)). To establish an adverse action, Plaintiff must present "objective evidence that he had been disadvantaged in respect to salary, grade, or other objective terms and conditions of employment." MacCormack v. Boston Edison Co., 423 Mass. 652, 662-63 (1996). As Plaintiff acknowledged at his deposition, individuals who were designated as NGLs did not receive raises, bonuses or stock options and Plaintiff has not otherwise demonstrated how his failure to be designated as an NGL affected the objective terms and conditions of his employment. (¶ 46). Accordingly, Plaintiff has failed even to establish a *prima facie* case of discrimination.

> **2.** **Gillette Has Articulated Legitimate, Non-Discriminatory Reasons for Why Plaintiff Was Not Designated As An NGL and Plaintiff Cannot Establish That These Reasons Are Pretextual.**

Even if Plaintiff could establish a *prima facie* case of discrimination, Gillette has articulated legitimate, non-discriminatory reasons for why Plaintiff was not designated as an NGL. Plaintiff's performance on Project Renaissance did not warrant NGL designation because Plaintiff struggled with his leadership skills, communication style, and executive presence. (¶¶

47-49). Specifically, Mr. Garza was unable to express his ideas in a clear, concise and understandable manner at the meetings and presentations that the Renaissance team conducted. He also assumed a passive role at meetings with his team and with the FLT, causing some members of the FLT to question his leadership abilities and skills. (¶¶ 47-49). In addition, during the talent review meeting, none of the 18 members of the FLT expressed the opinion that Plaintiff should be designated as an NGL. (¶ 49). To the contrary, several members of the FLT expressed concern about Plaintiff's performance on Project Renaissance, including his leadership abilities. (Id.). During the 2003 talent review meeting, Mr. Cramb also expressed concerns about Plaintiff's competency and leadership on Project Renaissance. (¶ 48).

There is no evidence that Gillette's legitimate, non-discriminatory reasons for not designating Plaintiff as an NGL are pretextual. Indeed, the undisputed facts show that such reasons were not pretextual. As a result of the 2003 talent review process, 13 out of the 93 employees designated by the FLT to be NGLs were Latino. (¶ 52). It strains credulity that the members of the FLT, the ultimate decision-makers as to whom would be designated as an NGL, would discriminate against Plaintiff based on the fact that he is Mexican or Latino but not discriminate against other employees based on their membership in these protected categories.

## III.    PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM IS BARRED BY THE WORKERS' COMPENSATION ACT.

Courts repeatedly have held that the exclusivity provision of the Massachusetts Workers' Compensation Act bars claims for intentional infliction of emotional distress alleged to have arisen in the workplace. See Green v. Wyman-Gordon Co., 422 Mass. 551, 557-58 (Mass. 1996); Clarke v. Kentucky Fried Chicken of California, Inc. 57 F.3d 21, 28-29 (1st Cir. 1995). Count III of the Complaint asserts just such a claim. See Complaint at ¶¶ 8-74. Accordingly,

Plaintiff's intentional infliction of emotional distress claim is barred by the Workers' Compensation Act.  See also Doe v. Purity Supreme, Inc., 422 Mass. 563, 565 (Mass. 1996).

## IV.    PLAINTIFF'S TORTIOUS INTERFERENCE CLAIM MUST BE DISMISSED.

To state a claim for tortious interference with an employment relationship, a plaintiff must show that (1) he had a contract or advantageous relationship with a third party; (2) the defendant knowingly interfered with that contract relationship through improper motive or means; and (3) plaintiff was harmed by defendant's actions.  Harrison v. Netcentric Corp., 433 Mass. 465, 476-77 (Mass. 2001).  Count V of the Complaint does not allege that Gillette interfered with Plaintiff's relationship with a third-party but rather that Gillette interfered with its own contract or relationship with Plaintiff.  See Complaint at ¶¶ 97-99.  It is axiomatic that an employer cannot be held liable for interference with its own relationship with its employees. Harrison, supra 433 Mass. at 476 n.12; Appleby v. Locke, 369 Mass. 540, 543 (1986). Accordingly, the Court should enter summary judgment on Count V of the Complaint.

## CONCLUSION

For the reasons set forth above, the Court should grant Defendant's Motion for Summary Judgment and dismiss the Complaint in its entirety with prejudice.

Respectfully submitted,
THE GILLETTE COMPANY
By its attorneys,

/s/ Anthony D. Rizzotti
Anthony D. Rizzotti (BBO# 561967)
Christine A. Phipps (BBO# 658942)
David C. Potter (BBO#644610)
Ropes & Gray LLP
One International Place
Boston, MA  02110-2624
(617) 951-7000

Date:   October 30, 2006

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants (if any) on October 30, 2006.

Date:   October 30, 2006                    /s/  David C. Potter
                                            David C. Potter